UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Civil Action No. 25-10189 (PAE)<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

Jeffrey Stein
Brett Max Kaufman
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
Ify Chikezie
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org
ichikezie@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

    I.   The U.S. Military's Ongoing Boat Strikes Campaign ............................................................2

    II.  The OLC Memo ...............................................................................................................3

    III. Procedural History ............................................................................................................8

LEGAL STANDARD ................................................................................................................. 10

ARGUMENT ............................................................................................................................... 11

    I.   Defendants have improperly withheld the OLC memo under
        Exemption 5. ......................................................................................................................11

        A.  The deliberative process privilege does not apply to the
            OLC memo .............................................................................................................11

            1.  The OLC memo is post-decisional and non-deliberative. ....................................12

            2.  Even if the OLC memo was pre-decisional and deliberative,
                it has been expressly adopted as DOD's "working law." ......................................13

        B.  The presidential communications privilege does not apply
            to the OLC memo .................................................................................................20

        C.  The attorney-client privilege does not apply to the OLC memo. ...............................22

    II.  Defendants have improperly withheld the OLC memo's legal
        analysis under Exemptions 1 and 3 ...................................................................................23

    III. At a minimum, the Court should review the OLC memo *in camera* ................................25

CONCLUSION ............................................................................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*ACLU v. DOD*,
435 F. Supp. 3d 539 (S.D.N.Y. 2020) ................................................................ 24, 25

*ACLU v. DOJ*,
No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) .................................. 20, 21

*ACLU v. NSA*,
925 F.3d 576 (2d Cir. 2019) .............................................................................. passim

*Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*,
376 F. Supp. 3d 345 (S.D.N.Y. 2019) .................................................................... 25

*Amnesty Int'l USA v. CIA*,
728 F. Supp. 2d 479 (S.D.N.Y. 2010) .................................................................... 20

*Brennan Ctr. for Just. v. DOJ*,
697 F.3d 184 (2d Cir. 2012) .............................................................................. passim

*Burnley v. United States*,
No. 26-cv-10364-LTS (D. Mass. Jan. 27, 2026) ........................................................ 2

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
160 F. Supp. 3d 226 (D.D.C. 2016) ...................................................................... 10

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
538 F. Supp. 3d 124 (D.D.C. 2021), *aff'd sub nom.*
*Citizens for Resp. & Ethics in Wash. v. DOJ*,
45 F.4th 963 (D.C. Cir. 2022) ............................................................................ 21

*Ctr. for Effective Gov't v. Dep't of State*,
7 F. Supp. 3d 16 (D.D.C. 2013) .......................................................................... 22

*Dep't of State v. Ray*,
502 U.S. 164 (1991) ...................................................................................... 10

*Florez v. CIA*,
829 F.3d 178 (2d Cir. 2016) .............................................................................. 10, 11

*Goldberg v. Dep't of State*,
  818 F.2d 71 (D.C. Cir. 1987) ................................................................................ 10

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ........................................................................ 20, 21

*Jud. Watch, Inc. v. DOJ*,
  365 F.3d 1108 (D.C. Cir. 2004) .............................................................................. 21

*Leopold v. CIA*,
  89 F. Supp. 3d 12 (D.D.C. 2015) ............................................................................ 13

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ................................................................................................ 10

*N.Y. Times v. DOJ*,
  756 F.3d 100 (2d Cir. 2014) ............................................................................. passim

*Nat'l Council of La Raza v. DOJ*,
  411 F.3d 350 (2d Cir. 2005) ................................................................... 11, 15, 19, 20

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) ................................................................................................ 10

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) .......................................................................................... 13, 14

*Ray v. Turner*,
  587 F.2d 1187 (D.C. Cir. 1978) .............................................................................. 25

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
  421 U.S. 168 (1975) ................................................................................................ 13

*Tigue v. DOJ*,
  312 F.3d 70 (2d Cir. 2002) ..................................................................................... 11

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
  592 U.S. 261 (2021) .......................................................................................... 11, 13

*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009) .............................................................................. 10, 11, 23

iv

**Statutes**

5 U.S.C. § 552 ................................................................................................................ passim

50 U.S.C. § 3024 .................................................................................................................. 23

**Other Authorities**

Alex Horton & Ellen Nakashima, *Hegseth Order on First Caribbean Boat Strike,
    Officials Say: Kill Them All*, Wash. Post (Nov. 28, 2025)............................................. 7

*Apr. 2018 Airstrikes Against Syrian Chem.-Weapons Facilities*, 42 Op. O.L.C. 39
    (May 31, 2018) ............................................................................................................. 24

Haley Britzky, *Here's What the Trump Administration has Said About the
    'Double-tap' Strike on an Alleged Drug Boat*, CNN (Dec. 3, 2025) ........................... 7

International Covenant on Civil and Political Rights, Dec. 16, 1966,
    999 U.N.T.S. 171 ........................................................................................................... 3

Lazaro Gamio et al., *Tracking U.S. Military Killings in Boat Attacks*, N.Y. Times
    (Apr. 27, 2026) ........................................................................................................... 2, 4

Michael Schmitt et al., *Operation Southern Spear: Why the Crews, Drugs, and
    Boats Are Not Targetable*, Just Security (Dec. 7, 2025)............................................... 3

Natasha Bertrand & Zachary Cohen, *Exclusive: Classified Justice Department
    Opinion Authorizes Strikes on Secret List of Cartels, Sources Say*, CNN
    (Oct. 7, 2025) ................................................................................................................. 3

O.L.C., *Memorandum for Legal Advisor, National Security Council Re: Proposed War
    Department Operation to Support Law Enforcement Efforts in Venezuela*
    (Dec. 23, 2025)............................................................................................................. 24

Off. of Gen. Couns., U.S. Dep't of Def., *Department of Defense Law of War Manual*
    (2023) ............................................................................................................................. 3

Secretary of War Pete Hegseth (@SecWar), X (Nov. 10, 2025, at 7:44 AM) ........................ 2, 24

U.S. Southern Command (@Southcom), X (Feb. 17, 2026, at 11:05 AM) .............................. 2, 24

**PRELIMINARY STATEMENT**

This Freedom of Information Act ("FOIA") case poses a question that cuts to the cores of that critical statute and our democratic system as a whole: May the U.S. government keep secret from the American public the legal reasoning it says justifies an unprecedented military campaign? For the following reasons, the Court should answer with an emphatic "no."

Since September of last year, the U.S. military has launched dozens of lethal strikes on small boats in Latin America, killing at least 185 people. When defending these strikes as lawful—and attempting to assuage concerned members of the public and Congress—the Executive Branch has repeatedly pointed to a memo produced by the Office of Legal Counsel ("OLC"), an office within the Department of Justice ("DOJ"). Although Executive Branch officials have identified this memo as setting forth the purported legal basis for the strikes, the government has refused to publicly release it, even in part. In essence, the government has presented its ongoing boat strikes campaign as lawful based on a justification that it is, at the very same time, preventing the American people from scrutinizing.

In this case, Defendants claim that three FOIA exemptions permit this antidemocratic result: Exemption 5, which incorporates civil litigation privileges; and Exemptions 1 and 3, which shield properly classified information from disclosure. But these exemptions do not justify withholding of the memo's legal reasoning. As explained below, even assuming the invoked civil litigation privileges ever attached to the OLC memo (they did not), those privileges no longer apply because the Department of Defense ("DOD") has expressly adopted the memo as *the* legal authority justifying its military campaign and governing its execution. Defendants also cannot demonstrate that the memo's legal reasoning is inextricably intertwined with classified information, or that its disclosure would reveal intelligence sources or methods. Accordingly, this

1

Court should order Defendants to promptly release all information in the OLC memo that is not properly withheld pursuant to FOIA.

## STATEMENT OF FACTS

**I.     The U.S. Military's Ongoing Boat Strikes Campaign**

Since September 2, 2025, the U.S. military has carried out at least 54 lethal strikes on small boats in the Caribbean Sea and eastern Pacific Ocean, killing at least 185 people.[1] In social media posts announcing these strikes, Executive Branch officials, including DOD Secretary Pete Hegseth, have claimed, without evidence, that the targeted vessels were "operated by Designated Terrorist Organizations" and carried "illicit narcotics."[2] These announcements have also featured short, edited videos of the strikes themselves, which depict boats being blown out of the water and smoldering in the aftermath of deadly attacks.[3]

Congress has not authorized these strikes. Instead, the Executive Branch has acted unilaterally, claiming that its strikes comply "with the law of armed conflict" because the United States is allegedly engaged in a "non-international armed conflict" with unspecified "drug cartels."[4] But there is no such armed conflict. Contrary to the Trump administration's assertions, drug trafficking is a crime, not "protracted armed violence" within the meaning of the law of

---

[1] *See* Lazaro Gamio et al., *Tracking U.S. Military Killings in Boat Attacks*, N.Y. Times (Apr. 27, 2026), https://www.nytimes.com/interactive/2025/10/29/us/us-caribbean-pacific-boat-strikes.html. The most recent strike occurred on April 26, 2026. *See id*. Counsel for Plaintiffs filed a wrongful death action on behalf of family members of two individuals killed by one of these strikes. *See* Compl., ECF No.1, *Burnley v. United States*, No. 26-cv-10364-LTS (D. Mass. Jan. 27, 2026).

[2] *See, e.g.*, Secretary of War Pete Hegseth (@SecWar), X (Nov. 10, 2025, at 7:44 AM), https://x.com/SecWar/status/1987863821868732447; U.S. Southern Command (@Southcom), X (Feb. 17, 2026, at 11:05 AM), https://x.com/Southcom/status/2023791027383890240.

[3] *Id.*

[4] *See* ECF No. 1 ¶ 19 (describing the administration's notice to Congress).

war. Nor are drug cartels "organized armed groups" against whom the United States could be engaged in a non-international armed conflict.[5] Furthermore, domestic and international law (including the law of war) unequivocally prohibit the summary execution of civilians who are not directly participating in hostilities.[6] For these reasons, experts on lawful use of military force (among many others) have condemned the strikes as illegal.[7]

## II.    The OLC Memo

On October 6, 2025, *CNN* reported the existence of an OLC memo "that justifies lethal strikes against a secret and expansive list of cartels and suspected drug traffickers."[8] On the following day, the memo was publicly discussed at a Senate Armed Services Committee hearing, during which Senator Jeanne Shaheen and former Principal Deputy General Counsel Charles Young III engaged in the following colloquy:

> Senator Shaheen: As you heard, we had a classified briefing on the strikes in South America, and we requested . . . [the] decision by the Department of Justice that basically authorizes the administration's basis to take those actions in South America. Have you seen that DOJ opinion?

> Mr. Young: Yes, Senator, I have.

> Senator Shaheen: And is that consistent with the opinion that has been provided to the Department of Defense?

---

[5] *See* Michael Schmitt et al., *Operation Southern Spear: Why the Crews, Drugs, and Boats Are Not Targetable*, Just Security (Dec. 7, 2025), https://www.justsecurity.org/126553/operation-southern-spear-international-law.

[6] *See, e.g.*, International Covenant on Civil and Political Rights art. 6, ¶ 1, Dec. 16, 1966, 999 U.N.T.S. 171 (codifying the international human right to life); Off. of Gen. Couns., U.S. Dep't of Def., Department of Defense Law of War Manual § 4.8.2 (2023) ("Civilians may not be made the object of attack, unless they take direct part in hostilities.").

[7] *See* ECF No. 1 ¶ 16 n.2 (collecting sources).

[8] *See* Natasha Bertrand & Zachary Cohen, *Exclusive: Classified Justice Department Opinion Authorizes Strikes on Secret List of Cartels, Sources Say*, CNN (Oct. 7, 2025), https://www.cnn.com/2025/10/06/politics/classified-justice-department-memo-cartel-strikes.

Mr. Young: Senator, the Department of Justice Office of Legal Counsel opinion was derived through an interagency lawyer's working group with the CIA, the State Department, White House Counsel, Department of Justice, Department of Defense General Counsel, Judge Advocates were part of that decision. And the Office of Legal Counsel has issued an opinion on that, ma'am.

Senator Shaheen: Given that everybody seems to be very comfortable with that, don't you think it would be a good idea to share that with Congress[?]

Mr. Young: Senator, that's not within my discretion to share. I know that as that question has been asked before in other context of other strikes. If you go back to the Obama Administration, for nine years, they did not share their legal basis --

Senator Shaheen: Yeah, I didn't support that either, to be frank.

Mr. Young: -- for the manner in which they did the strike, but -- yes, Senator.[9]

As the military's lethal strikes on boats continued and intensified—killing dozens of men across twelve attacks in October 2025 alone[10]—the Trump administration embarked on an effort to persuade members of Congress that its boat strikes campaign is lawful. According to Senator Mark Warner, on October 29, "the Administration convened" their first "briefing for [a group of] senators on the recent U.S. military strikes in the Caribbean," at which "they shared the Office of Legal Counsel's opinion that tries to lay out [the] legal justification for those strikes."[11]

Over the following days, the Trump administration held a series of similar briefings for members of Congress. After attending one such briefing on November 4, Representative Jim Himes, the ranking member of the House Intelligence Committee, gave an extended interview in which he discussed having been shown by Executive Branch officials the "forty-eight, forty-

---

[9] Testimony of Mr. Charles L. Young III Before the S. Comm. on Armed Servs., 119th Cong. 76–77 (2025), https://www.armed-services.senate.gov/imo/media/doc/transcript-10-07-2025-nom.pdf (Stein Decl., Ex. A, at 76:07–77:12).

[10] *See* Gamio et al., *supra* note 1.

[11] *Sen. Warner News Conference on U.S. Boat Strikes*, C-SPAN (Oct. 30, 2025), https://www.c-span.org/program/news-conference/sen-warner-news-conference-on-us-boat-strikes/668098 (Stein Decl., Ex. B, at 5).

nine-page document" that "says that . . . these military attacks on drug boats are legal."[12] With

respect to the OLC memo's "legal rationale" for the strikes, Representative Himes explained:

> [T]hey have this concept of a non-international armed conflict, a NIAC. And a NIAC actually has a distinct legal meaning in Article III of the Geneva Conventions of 1949 . . . [I]t needs to rise to a level of violence . . . that can't be, presumably, dealt with in a law enforcement context . . . And number two, it needs to be that the entities engaged . . . have a military-like hierarchy, with military-like plans, with military-like objectives . . . [I]t's really important to the Trump administration that these be terrorists, that violence be the end in and of itself.[13]

When asked whether "U.S. military commanders are carrying out unlawful orders" by

conducting lethal strikes on boats, Representative Himes explained that the answer turns on the

OLC memo:

> [I]f an OLC opinion exists saying that this is a legitimate option for the president, and anyone engaged in this option will be protected from prosecution, and if the assistant attorney general says what he says, which is that this was subject to an intra-agency [*sic*] legal conference at which the decision was unanimous . . . that feels sufficient to tick the box for military officers . . . [O]f course, a military officer who believes an order may be illegal has a chain of command . . . which bumps pretty quickly into those who have issued the OLC opinion.[14]

The following day, DOD Secretary Hegseth, Secretary of State Marco Rubio, and an

official from OLC held another briefing about the boat strikes for a bipartisan group of twelve

members of Congress.[15] According to Representative Gregory Meeks, the ranking member of the

House Foreign Affairs Committee, at that briefing, when asserting that the Executive Branch

---

[12] *A Conversation with Representative Jim Himes*, Council on Foreign Relations (Nov. 4, 2025), https://www.cfr.org/event/conversation-representative-jim-himes (Stein Decl., Ex. C, at 2–3).

[13] *Id.* at 3–4.

[14] *Id*. at 25.

[15] *See* Alison Main et al., *Top Democrat Expresses Confidence in US Intel on Boat Strikes, but Calls for More Transparency from Trump Administration*, CNN (Nov. 5, 2025), https://www.cnn.com/2025/11/05/politics/boat-strikes-democrats-briefing-trump-admin (Stein Decl., Ex. D, at 3).

"do[es] not need congressional approval for the military action" at issue, "the administration referred to the Office of Legal Counsel memo."[16]

One day later, Senator Tim Kaine, a member of the Senate Armed Services Committee, discussed the OLC memo on the floor of the Senate:

> I have had the opportunity, as have some of my colleagues, to . . . review the legal authorization document that the Trump administration has presented recently to the Senate concerning the military strikes against boats in the Caribbean and Pacific . . . [It contains] critical errors . . . [such as] a mistaken philosophy of Executive war powers that derives from a misquotation of constitutional-era documents that the Framers were using as they grappled with war powers questions; [and] a domestic legal rationale for when the President can unilaterally wage war that is completely contrary to the Constitution.[17]

Over the course of November, news media reports corroborated public officials' accounts of the OLC memo. On November 12, the *Washington Post* reported that the memo states "that personnel taking part in military strikes on alleged drug-trafficking boats in Latin America would not be exposed to future prosecution."[18] And on November 22, confirming the testimony of former DOD Principal Deputy General Counsel Young, the *Post* also reported that the memo "memorialized a decision taken by a restricted interagency lawyers group" which "unanimously concluded" that the boat strikes campaign is lawful.[19]

As the death toll from the boat strikes campaign continued to mount, on November 24, thirteen members of the Senate Armed Services Committee wrote to then-Attorney General

---

[16] Ex. D at 4.

[17] 171 Cong. Rec. S7931, S7945 (daily ed. Nov. 6, 2025) (statement of Sen. Tim Kaine) (Stein Decl., Ex. E, at S7945).

[18] Ellen Nakashima et al., *U.S. Troops not Liable in Boat Strikes, Classified Justice Dept. Memo Says*, Wash. Post (Nov. 12, 2025), https://www.washingtonpost.com/national-security/2025/11/12/trump-drug-boat-venezuela-legal (Stein Decl., Ex. F, at 1–2).

[19] Ellen Nakashima et al., *White House Blew Past Legal Concerns in Deadly Strikes on Drug Boats*, Wash. Post (Nov. 22, 2025), https://www.washingtonpost.com/national-security/2025/11/22/drug-boats-strikes-cia-legal-concerns (Stein Decl., Ex. G, at 7).

Pamela Bondi and DOD Secretary Hegseth "to request expeditious declassification and public release of the Department of Justice Office of Legal Counsel's written opinion, dated September 5, 2025, concerning the domestic and international legal basis for" the boat strikes.[20]

One week later, reporting revealed that the U.S. military had deliberately killed two survivors of the first lethal strike, on September 2, even though they had been "clinging to the smoldering wreck" of their vessel.[21] When defending this attack as lawful, White House Press Secretary Karoline Leavitt made the following remarks:

> I would reiterate to you the strike was conducted in international waters and in accordance with the law of armed conflict . . . I also want to add that Secretary Hegseth spoke with members of Congress who may have expressed some concerns over the weekend, and there have also been 13 bipartisan briefings to Congress on the Venezuelan strikes. There have been a number of document reviews for members of Congress to review the classified DOJ Office of Legal Counsel opinion and other related documents . . . [T]hey have been made available to all 100 senators, all 435 members of the House, and to general counsels of the relevant committees on a bipartisan basis for their review.[22]

As debate over the propriety of the September 2 "double-tap" strike dominated national news media coverage,[23] on December 3, Senator Jack Reed, ranking member of the Senate Armed Services Committee, made the following remarks on the Senate floor:

> [T]he White House must declassify the Department of Justice's Office of Legal Counsel's opinion underpinning their legal argument for this operation. There is

---

[20] Letter from Sen. Richard Blumenthal et al., to Att'y Gen. Pamela Bondi & Sec'y of Def. Pete Hegseth (Nov. 24, 2025), https://www.kaine.senate.gov/imo/media/doc/2025-11-24_declassify_olc_opinion_southcom_strikes_letter.pdf (Stein Decl., Ex. H).

[21] *See* Alex Horton & Ellen Nakashima, *Hegseth Order on First Caribbean Boat Strike, Officials Say: Kill Them All*, Wash. Post (Nov. 28, 2025), https://www.washingtonpost.com/national-security/2025/11/28/hegseth-kill-them-all-survivors-boat-strike.

[22] *Press Briefing: Karoline Leavitt Holds a Press Briefing at The White House - December 1, 2025*, Roll Call (Dec. 1, 2025), rollcall.com/factbase/trump/transcript/donald-trump-press-conference-briefing-karoline-leavitt-december-1-2025/ (Stein Decl., Ex. I, at 26).

[23] *See, e.g.*, Haley Britzky, *Here's What the Trump Administration has Said About the 'Double-tap' Strike on an Alleged Drug Boat*, CNN (Dec. 3, 2025), https://www.cnn.com/2025/12/03/politics/timeline-double-tap-strikes-shifting-explanation.

no reason for this document to remain hidden. The American people deserve to know why this administration believes it has a license to kill in their name and what parameters govern that authority. If the legal reasoning is sound, it should withstand public scrutiny. If it cannot, then these operations should not continue."[24]

That week, at least one congressional proponent of the boat strikes campaign similarly described the OLC memo as authorizing the military's ongoing actions. On December 7, Senator Eric Schmitt remarked: "They executed another strike of a narcoterrorists [*sic*] just this past week. Those will continue, and they're completely authorized. I reviewed the 40-plus page memo by the Office of Legal Counsel."[25]

Months later, members of Congress continued to press DOD to release the OLC memo. For example, on March 19, 2026, Senator Richard Blumenthal asked General Francis L. Donovan, Commander of the U.S. Southern Command ("SOUTHCOM"), whether he "believe[s] that the American people should . . . have access to [the OLC memo] that [is] the legal basis for the administration carrying out the strikes?" General Donovan responded that DOD "has kept the information release authority" over the memo and that he is "just carrying out the assigned tasks."[26]

### III.    Procedural History

Plaintiffs are nonprofit organizations that, among other missions, seek to ensure that the American public is informed about the conduct of its government in matters that affect civil

---

[24] 171 Cong. Rec. S8455, S8490–S9491 (daily ed. Dec. 3, 2025) (statement of Sen. Jack Reed) (Stein Decl., Ex. J, at S8491).

[25] Press Release, Sen. Eric Schmitt, *Senator Schmitt Defends Trump Admin's Anti-Narcoterrorist Campaign* (Dec. 7, 2025), https://www.schmitt.senate.gov/media/press-releases/senator-schmitt-defends-trump-admins-anti-narcoterrorist-campaign (Stein Decl., Ex. K, at 5).

[26] Testimony of Gen. Francis L. Donovan Before the S. Comm. on Armed Servs., 119th Cong. 42 (2026), https://www.armed-services.senate.gov/imo/media/doc/03-19-2026_full_transcript.pdf (Stein Decl., Ex. L, at 42:08–14).

liberties and human rights, including the unlawful use of lethal military force abroad. To that end, on October 15, 2025, Plaintiffs submitted identical FOIA requests to OLC, DOD, and the State Department seeking three categories of records: (1) The OLC final opinion concerning the President's authority to order lethal strikes against drug cartels; (2) President Trump's July 2025 directive to DOD authorizing the use of military force against Latin American drug cartels deemed to be terrorist organizations; and, (3) any unclassified summaries of the two above documents. *See* ECF No. 1 ¶ 27. After the agencies failed to make a "determination" as to Plaintiffs' FOIA request within twenty working days, *see* 5 U.S.C. § 552(a)(6)(A)(i), on December 9, Plaintiffs filed this action, seeking the immediate release of responsive records, *see* ECF No. 1.

In advance of Defendants' deadline to answer Plaintiffs' Complaint, the parties conferred, agreeing to a narrowed reading of Plaintiffs' request for "unclassified summaries" of the OLC memo and the July 2025 directive. *See* ECF No. 19. After Defendants notified Plaintiffs that OLC and DOD had located the records sought in the first two categories of Plaintiffs' FOIA request, Plaintiffs agreed to voluntarily dismiss the State Department as a Defendant in this action. *See* ECF Nos. 28, 34.

On February 12, 2026, the Court ordered Defendants to complete their review and processing of responsive records by March 12, 2026. *See* ECF No. 31. Pursuant to that order, Defendants produced a redacted version of an OLC email chain and withheld the OLC memo and July 2025 directive in full. *See* ECF No. 37. On March 17, 2026, the parties notified the Court that Plaintiffs' cross-motion for summary judgment would challenge only Defendants' withholding of the OLC memo. *See* ECF Nos. 37, 45. The parties also submitted letters setting

9

forth anticipated arguments in support of their respective cross-motions. *See* ECF Nos. 36, 38, 40. The Court then held a pre-motion conference for the instant cross-motions. *See* ECF No. 41.

## LEGAL STANDARD

Congress enacted FOIA "to ensure an informed citizenry, vital to the functioning of a democratic society, needed . . . to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). "The statute was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quotation marks omitted). To that end, FOIA "places the burden on the agency to justify the withholding of any requested" records, and courts apply a "strong presumption in favor of disclosure" when reviewing agencies' withholdings *de novo*. *Id.*

To demonstrate that withheld information falls within one of FOIA's "narrowly construed" exemptions, *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011), an agency must provide a "logical or plausible" justification for any nondisclosure, *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009); *see* 5 U.S.C. § 552(a)(8)(A)(i)(I) (agency may withhold information only where it is "reasonably foresee[able] that disclosure would harm an interest protected by a [FOIA] exemption"). This justification must "specifically identify the reasons why a particular exemption is relevant and correlate those claims with the particular part of a withheld document to which they apply." *Citizens for Resp. & Ethics in Wash. v. DOJ*, 160 F. Supp. 3d 226, 232–33 (D.D.C. 2016) (cleaned up). Where, however, "contrary evidence" in the record "undermine[s] or call[s] into question" an agency's claims, the agency cannot meet its burden. *Goldberg v. Dep't of State*, 818 F.2d 71, 81 (D.C. Cir. 1987). Such contrary evidence can take many forms. *See Florez v. CIA*, 829 F.3d 178, 187 (2d Cir. 2016) (holding that there is no "arbitrary limitation on the range of evidence a district court may consider in assessing" the logic and plausibility of an

10

agency's justification for withholding information). Ultimately, the reviewing court must decide "whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility," *id.* at 185 (citation omitted), and "all doubts as to the applicability of [invoked] exemption[s] must be resolved in favor of disclosure," *Wilner*, 592 F.3d at 69.

## ARGUMENT

### I.    Defendants have improperly withheld the OLC memo under Exemption 5.

Defendants have improperly withheld the OLC memo under Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption encompasses evidentiary privileges available to the government in civil discovery. *See Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002). Here, Defendants assert the deliberative process privilege, the presidential communications privilege, and the attorney-client privilege. *See* ECF No. 38 at 3. None apply to the OLC memo.

### A.    The deliberative process privilege does not apply to the OLC memo.

The deliberative process privilege applies to documents that are "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005) (cleaned up). Courts apply these overlapping prongs to distinguish "documents generated during an agency's deliberations about a policy" (which may be withheld) from those "that embody or explain a policy that the agency adopts" (which must be disclosed). *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

11

Here, the privilege does not apply for two reasons. First, the memo memorializes a unanimous interagency decision and is thus post-decisional and non-deliberative. Second, even if the memo originated as a pre-decisional and deliberative document, numerous disclosures establish that it has since been adopted as DOD's effective law and policy, or "working law."

### 1.    The OLC memo is post-decisional and non-deliberative.

As a threshold matter, multiple disclosures demonstrate that the OLC memo is neither pre-decisional nor deliberative. Former DOD Principal Deputy General Counsel Young described the memo as "derived" from an earlier "decision" reached by an "interagency" group that included DOD.[27] Representative Himes similarly described the memo's reasoning and conclusions as "subject to an intra-agency [*sic*] legal conference at which the decision was unanimous."[28] The *Washington Post* corroborated these accounts, reporting that the memo "memorialized a decision taken by a restricted interagency lawyers group," which "unanimously concluded" that lethal boat strikes would be lawful.[29] *Cf. Brennan Ctr. for Just. v. DOJ*, 697 F.3d 184, 192 n.6 (2d Cir. 2012) (citing a *Washington Post* article to corroborate officials' disclosures about an OLC memo). And the Senate Armed Services Committee further underscored the memo's post-decisional character, noting that it was finalized days after the military commenced its boat strikes campaign.[30]

Together, these disclosures establish that the OLC memo was not "originated to *facilitate*" a decision about the legal basis for the boats strikes campaign. *Brennan Ctr.*, 697 F.3d at 202 (emphasis added; citation omitted). Rather, they show that the memo "embod[ies] or

---

[27] Ex. A at 76:18–23.

[28] Ex. C at 25.

[29] Ex. G at 7.

[30] *See* Ex. H (noting that the memo is dated Sept. 5, 2025, three days after the first boat strike).

explain[s]" an already agreed-upon decision on this topic. *Sierra Club*, 592 U.S. at 263 (quotation marks and citations omitted). By "setting forth the reasons for an agency decision already made," the OLC memo constitutes the sort of "postdecisional memorand[um]" that falls well beyond the deliberative process privilege's ken. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975); *see also Leopold v. CIA*, 89 F. Supp. 3d 12, 20 (D.D.C. 2015) (noting the privilege does not encompass documents that "memorialize past decisions").

This is especially so given the privilege's central purpose: to encourage candid communication during the formation of agency decisions. *See Sierra Club*, 592 U.S. at 267. At issue here is a document that memorializes and explains a unanimous, final decision resulting from an interagency group's deliberations—not the contents of those deliberations, including any dissenting views or unresolved suggestions that would ordinarily be entitled to protection. As such, the memo could not plausibly reveal any "advisory opinions" offered up during the formulation of the interagency group's decision. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). It is thus illogical to suggest that disclosure of the memo might "chill[]" officials' participation in future debates. *Sierra Club*, 592 U.S. at 267. With the privilege's core concern wholly unimplicated, it cannot justify Defendants' withholding of the memo.

## 2. Even if the OLC memo was pre-decisional and deliberative, it has been expressly adopted as DOD's "working law."

Even assuming the OLC memo was pre-decisional and deliberative when drafted, DOD now treats the memo as the primary legal authority justifying and governing its boat strikes campaign—in other words, as its "working law," so it cannot be withheld.

Under the "working law" doctrine, an agency may not rely on Exemption 5 to withhold "opinions and interpretations which embody [its] effective law and policy." *Sears,* 421 U.S. at 153 (quotation marks omitted). This limit on Exemption 5 emanates from FOIA's plain text. Any

13

attempt to withhold an agency's "effective law and policy" cannot be reconciled with FOIA's affirmative disclosure provisions, which mandate disclosure of, among other things, "statements of policy and interpretations which have been adopted by [an] agency," 5 U.S.C. § 552(a)(2)(B). These provisions represent a "strong congressional aversion to secret agency law." *Sears*, 421 U.S. at 153 (cleaned up); *see also Brennan Ctr.*, 697 F.3d at 200 (noting that "the 'working law' analysis is animated by the affirmative provisions of FOIA").

While the Second Circuit has not articulated a "comprehensive definition of 'working law,'" *ACLU v. NSA*, 925 F.3d 576, 595 (2d Cir. 2019), it has recognized that a document contains "working law" when it embodies "formal or informal policy on how [an agency] carries out its responsibilities," and when it "represents" an agency's "final legal position," *Brennan Ctr.*, 697 F.3d at 201 (citations and italics omitted). The dispositive question is "whether the agency treats the document as binding." *ACLU v. NSA*, 925 F.3d at 594 (italics omitted). To guide this inquiry, courts employ a "functional test," asking, among other things, "whether agency officials feel free to disregard the document's instructions" and "whether the document is applied in the agency's dealings with the public." *Id.* at 594–95.

Although "'working law' describes a category of post-decisional material," a pre-decisional "document first drafted as legal or policy advice [may] *become* an agency's" working law through a process called "express adoption." *Id*. Such "[a]doption occurs when an agency *itself* accepts a previously deliberative document as binding" authority on a legal or policy matter. *Id*. at 596 n.106. Once "adopted, formally or informally, as the agency position on an issue," *Brennan Ctr.*, 697 F.3d at 195 (citation omitted), the document's "reasoning . . . becomes [the agency's] responsibility to defend," *Sears*, 421 U.S. at 161. "Because [this] adoption process is usually internal and hidden from public view," the Second Circuit's "'express adoption' cases

14

have generally looked for external evidence that such adoption has occurred." *ACLU v. NSA*, 925 F.3d at 595; *see La Raza*, 411 F.3d at 357 n.5 (noting that "courts must examine *all* the relevant facts and circumstances in determining whether express adoption . . . has occurred"). Especially powerful are "the Government's public statements" about a document, which may "serve as express evidence" that it has been "adopted . . . as binding." *ACLU v. NSA,* 925 F.3d at 596 n.106 (italics omitted). Courts consider such public statements "together," not in isolation. *Brennan Ctr.*, 697 F.3d at 204; *ACLU v. NSA*, 925 F.3d at 596.

Applying these principles, the Second Circuit has found express adoption of an OLC memo on three occasions.

First, in *National Council of La Raza v. DOJ*, the Second Circuit held that public comments made by the Attorney General and his high-ranking advisors evidenced DOJ's adoption of an OLC memo authorizing state and local governments to enforce civil immigration law. 411 F.3d at 357–60 (2d Cir. 2005). In particular, the court highlighted references to the OLC memo made by counsel to the Attorney General during a presentation attended by representatives from state and local police departments. *Id*. at 354–55, 357–58. According to the Second Circuit, these references demonstrated that DOJ was "using the OLC Memorandum to justify and explain the [agency's] policy and to assure the public and the very state and local government officials who would be asked to implement the new policy that the policy was legally sound." *Id*. at 358. The court held that where an agency "repeatedly depend[s] on [an OLC memo] as the primary legal authority justifying" its policy, and "repeatedly invoke[s] [an] OLC Memorandum to assure those outside of the agency that its policy [is] lawful," it is "clear that the [agency has] embraced the OLC's reasoning as its own." *Id*. at 358–59.

15

Next, the Second Circuit again found express adoption of an OLC memo in *Brennan Center for Justice v. DOJ*, 697 F.3d 184 (2d Cir. 2012). There, the court held, based on "two public statements," that an OLC memo was expressly adopted by the United States Agency for International Development ("USAID"). *Id*. at 204. The first statement, in a footnote of a USAID policy document, noted OLC's "determin[ation]" that domestic aid organizations could not be required to pledge opposition to prostitution and sex trafficking. *Id*. Then, about a year later, a USAID official testified to Congress that OLC had since reversed its position in a new memo, and that USAID was "simply following . . . [OLC's] advice" when requiring domestic organizations to make the pledge. *Id*. While noting that neither statement "discussed at length the rationale provided by the OLC for its conclusion," the Second Circuit nonetheless held that, "taken together," the two statements "demonstrate[d] sufficient reliance on both the conclusion and reasoning of the OLC memorandum to remove the protection of the deliberative-process exemption." *Id*. at 204–05. This was so, the Second Circuit said, because USAID had "referenc[ed]" the OLC memo "as authoritative" when "explaining [its] course of action." *Id*. at 205.

Finally, in *New York Times v. DOJ*, 756 F.3d 100 (2d Cir. 2014), the Second Circuit found express adoption of an OLC memo justifying the targeted killing of a U.S. citizen, Anwar al-Aulaqi. That memo's legal analysis "overlap[ped]" with aspects of a shorter, "officially disclosed" DOJ white paper. *Id*. at 110, 116. In concluding that the memo's legal analysis must be disclosed, the court surveyed evidence that the memo had become "relied-upon authority" within the Executive Branch. *Id*. at 116. It noted the Attorney General's invocation of the memo as part of a "public relations campaign to convince the public that" al-Aulaqi's killing was lawful. *Id*. at 114. And it highlighted then-Assistant to the President John Brennan's

16

congressional testimony that "Office of Legal Counsel advice establishes the legal boundaries within which we can operate." *Id*. at 115. "Together, these statements revealed that the OLC memorandum was no longer simply advice to a policy-maker, but that the Government afforded the memorandum binding force within the Executive Branch as its 'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 596 (describing *New York Times* as an "express adoption" case). The Court thus held that the government could not "invoke" the memo as binding "authority and then shield it from public view." *N.Y. Times*, 756 F.3d at 116.

Here, two sets of evidence demand a similar result.

First, Executive Branch officials have identified, described, and relied upon the OLC memo to justify and explain their ongoing boat strikes campaign. In Senate testimony, then-DOD Principal Deputy General Counsel Young stated that, like the OLC memo at issue in *New York Times*, this memo sets forth the "legal basis . . . for the manner in which" the military is carrying out lethal boat strikes.[31] Subsequently, White House Press Secretary Karoline Leavitt referenced the OLC memo when claiming that one strike in the ongoing campaign was "in accordance with the law of armed conflict" and when describing the "document reviews" afforded to members of Congress, including those "who may have expressed some concerns" about "the Venezuelan strikes."[32]

Second, members of Congress from both political parties (including its oversight committees) who have attended Executive Branch briefings on the boat strikes campaign and reviewed the OLC memo have, on numerous occasions, expressly stated that the Executive Branch, including DOD, both treats the memo as binding authority and the government's

---

[31] Ex. A at 77:06–12.

[32] Ex. I at 26.

justification, to the public and to Congress, for the campaign. Based on Executive Branch briefings and their review of the memo, members of Congress have described the memo as "*the legal authorization document*"[33] for the boat strikes campaign, and as containing both a detailed "legal justification"[34] and "rationale"[35] for the strikes, as well as the "parameters" that "govern" the military's use of lethal force in this context.[36] Senator Kaine and Representative Meeks have explained that Executive Branch officials, including from DOD, have "presented"[37] the memo to Congress as containing its final legal positions, including on the question whether it must seek "congressional approval for the military action."[38] And Representative Himes has disclosed that the Executive Branch's embrace of the memo means that "anyone engaged in [the boat strikes campaign] will be protected from prosecution" and that "military officers" will not disobey orders to carry out boat strikes, even if they consider those orders to be unlawful.[39]

Taken "[t]ogether," these Executive Branch and congressional disclosures establish that "the Government [has] afforded the [OLC] memorandum binding force within the Executive Branch as its 'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 596. Executive Branch officials, including from DOD, have "repeatedly depended" on the OLC memo "as the primary legal authority justifying" the boat strikes campaign and "repeatedly invoked" the memo "to assure those outside of the agency," including members of Congress who directly oversee the

---

[33] Ex. B at 5 (Sen. Warner); Ex. E at S7945 (Sen. Kaine); Ex. K at 5 (Sen. Schmitt).

[34] Ex. H (Senate Armed Services Committee members).

[35] Ex. C at 3 (Rep. Himes).

[36] Ex. J at S8491 (Sen. Reed).

[37] Ex. E at S7945 (Sen. Kaine).

[38] Ex. D at 4 (Rep. Meeks).

[39] Ex. C at 25 (Rep. Himes).

U.S. military, that their "policy [is] lawful." *La Raza*, 411 F.3d at 358–59. They have also invoked the memo as part of a "public relations campaign to convince the public that" the ongoing boat strikes are lawful. *N.Y. Times*, 756 F.3d at 114; *Brennan Ctr.*, 697 F.3d at 205. And they have explained that "agency officials" do not "feel free to disregard [the memo's] instructions." *ACLU v. NSA*, 925 F.3d at 595. In these circumstances, it is "clear that" DOD has "embraced the OLC's reasoning as its own." *La Raza*, 411 F.3d at 359. As such, the memo's reasoning cannot be withheld. *Id*. at 360 (describing as "offensive to FOIA" the idea that an agency "may adopt a legal position while shielding from public view the analysis that yielded that position").

For those reasons, this case is like *Brennan Center*, *La Raza*, and *New York Times*. And further, the Second Circuit's *rejection* of an "express adoption" argument in *ACLU v. NSA* reinforces that adoption has occurred here. In that case, the court held that three pieces of evidence were insufficient to conclude that an OLC memo had been expressly adopted as agency working law: (1) a press conference in which the Attorney General did not affirmatively mention the OLC memo and, when asked about it, declined to confirm or deny its existence, 925 F.3d at 586–87; (2) an internal agency report that did not explicitly mention the OLC memo and, indeed, may not have "refer[red] to a specific document at all," *id*. at 599 n.130; and (3) Senate testimony in which the Attorney General stated only that he "agreed with [OLC's] legal analysis," *id*. at 599. The court held that, "at most," these statements indicated "that OLC analyzed a legal question, that the Attorney General reviewed that analysis and agreed with it, and that the Attorney General then certified the program" analyzed in the memo—not "that the Attorney General (or any other official) ever . . . regarded [the OLC memo] as binding authority." *Id*.

19

By contrast, here, Executive Branch officials and members of Congress have repeatedly and explicitly referenced the OLC memo as binding authority. Executive Branch officials have expressly invoked the OLC memo "to assure the public and the very . . . government officials who" oversee "the new [boat strikes] policy that the policy [is] legally sound." *La Raza*, 411 F.3d at 358. And their interactions with Congress demonstrate that the memo contains their final legal positions and constrains military officers. Where, as here, an agency treats a document as binding on its officers and authoritative in its "dealings" with those beyond the agency's walls, the document has been expressly adopted. *ACLU v. NSA*, 925 F.3d at 595.

Accordingly, even if the OLC memo was pre-decisional and deliberative when drafted, it has since become "working law." Thus, the memo cannot be withheld pursuant to the deliberative process privilege.

**B.     The presidential communications privilege does not apply to the OLC memo.**

The presidential communications privilege protects "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (cleaned up). Courts have emphasized that this privilege should be construed "narrowly." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Accordingly, the privilege applies only to communications involving the President or his close advisors. *Id*. And even then, the "widespread dissemination of documents, to persons well beyond the circle of close presidential advisors, will eviscerate the presidential communications privilege." *ACLU v. DOJ*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016).

Defendants may not withhold the OLC memo pursuant to the presidential communications privilege for three reasons.

First, it is implausible, based on the disclosures canvassed above, that the OLC memo was created for the purpose of "formulating . . . advice to be given the President," *In re Sealed Case*, 121 F.3d at 752. In fact, what is known about the OLC memo's origination establishes it was created to memorialize a decision reached by lawyers from multiple Executive Branch agencies as to the legal basis for a military campaign executed by DOD. Moreover, the memo postdates the commencement of that campaign,[40] rendering illogical any suggestion that the memo was meant to inform a presidential decision about whether to carry out lethal strikes. *Cf. Citizens for Resp. & Ethics in Wash. v. DOJ*, 538 F. Supp. 3d 124, 144 (D.D.C. 2021) (holding that an OLC memo could not have informed a decision made by the Attorney General given the timing of its completion), *aff'd sub nom. Citizens for Resp. & Ethics in Wash. v. DOJ*, 45 F.4th 963 (D.C. Cir. 2022). Where, as here, the record severely undermines Defendants' claim that the OLC memo was produced to facilitate "the President's personal decision-making process," Defendants cannot rely on the presidential communications privilege. *Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108, 1118 (D.C. Cir. 2004).

Second, even if this extremely narrow privilege ever did attach to the memo, its dissemination "beyond the circle of close presidential advisors" has "eviscerate[d]" that privilege. *ACLU*, 2016 WL 889739, at *5. Former DOD Principal Deputy General Counsel Young confirmed in Senate testimony that he saw the OLC memo during his time at DOD,[41] and SOUTHCOM Commander General Donovan stated in more recent Senate testimony that DOD—not the President or his close advisors—has "kept the information release authority" over

---

[40] *See* Ex. H.

[41] Ex. A at 76:14–15.

21

the memo.[42] These disclosures indicate that the memo has been distributed well beyond the very narrow diameter within which the presidential communications privilege may be maintained.

Third, as with the other civil litigation privileges asserted by Defendants pursuant to Exemption 5, the presidential communications privilege has no application where, as here, a document has been expressly adopted as agency "working law." Indeed, courts have rejected the idea that the President may shield authoritative agency documents from public view and thus "engage in what is in effect governance by 'secret law.'" *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 29 (D.D.C. 2013) (holding the privilege inapplicable to a presidential directive used by State Department and USAID staff to guide their decisionmaking). Accordingly, even if the presidential communications privilege ever applied to the OLC memo, it cannot justify nondisclosure here.

### C.    The attorney-client privilege does not apply to the OLC memo.

Defendants' assertion that the attorney-client privilege applies to the OLC memo similarly fails. For starters, the disclosures canvassed above indicate that the memo was generated to memorialize an interagency decision about the legal basis for the boat strikes campaign, not as a "confidential communication[] between client and counsel made for the purpose of obtaining or providing legal assistance," *ACLU v. NSA*, 925 F.3d at 589. And even if the memo did originate as an attorney-client communication, the privilege cannot be maintained where, as here, the OLC memo has been adopted as DOD's "effective law and policy." *Id*. at 591. Thus, as with the other civil litigation privileges Defendants claim pursuant to Exemption 5, the attorney-client privilege cannot shield the OLC memo from disclosure.

---

[42] Ex. L at 42:12–13.

22

**II.     Defendants have improperly withheld the OLC memo's legal analysis under Exemptions 1 and 3.**

Defendants have also improperly withheld the OLC memo in full under Exemption 1, which protects information that is "properly classified" pursuant to an Executive order, 5 U.S.C. § 552(b)(1)(A), and Exemption 3, which shields information "exempted from disclosure by [a] statute," *id.* at § 552(b)(3), here, the National Security Act, 50 U.S.C. § 3024(h)(1) (exempting "intelligence sources and methods from unauthorized disclosure"). Their claims, *see* ECF No. 38 at 2, amount to the argument that *all* of the memo's contents are inextricably "intertwined" with non-segregable classified information. *N.Y. Times*, 756 F.3d at 119. But that argument is not "logical or plausible." *Wilner*, 592 F.3d at 75.

First, multiple disclosures about the OLC memo reveal that it features precisely the sort of segregable "pure legal analysis" that cannot be withheld under Exemptions 1 and 3. *N.Y. Times*, 756 F.3d at 119. For instance, Representative Himes disclosed that the memo's "legal rationale" applies the "concept of a non-international armed conflict" to the lethal strikes and concludes that "anyone engaged in" carrying them out "will be protected from prosecution."[43] Senator Kaine, for his part, revealed that, in addition to the international law and domestic criminal law analyses described by Representative Himes, the memo also articulates an interpretation of "Executive war powers that derives from a misquotation of constitutional-era documents that the Framers were using as they grappled with war powers questions," as well as "a domestic legal rationale for when the President can unilaterally wage war."[44]

It is illogical and implausible to suggest that the memo's discussion of these general legal principles would reveal "intelligence sources and methods" or "classified factual information."

---

[43] Ex. C at 3–4, 25.

[44] Ex. E at S7945.

23

ECF No. 38 at 2. This is not a case where, for instance, "the very fact that legal analysis was given" would risk revealing a classified program or operation; to the contrary, Defendants have repeatedly publicized and boasted about their campaign of lethal strikes, including by posting edited videos of the strikes themselves.[45] *Cf. ACLU v. NSA*, 925 F.3d at 601. Nor does the memo concern a single military operation and thus plausibly discuss "operational detail and strategy" in a manner that "is not meaningfully segregable" from legal analysis. *ACLU v. DOD*, 435 F. Supp. 3d 539, 564 (S.D.N.Y. 2020). Rather, disclosures indicate that this "OLC legal memorandum consist[s] primarily of legal analysis and [is] meant to be widely applicable to many operations." *Id*. In such circumstances, Exemptions 1 and 3 cannot thwart disclosure of legal analysis.

Second, the form and substance of previously disclosed OLC memos make it implausible that the memo at issue here does not contain any, if not (as Plaintiffs suspect) almost entirely, segregable legal analysis. For instance, the voluntarily disclosed OLC memo analyzing the legality of Nicolas Maduro's extraordinary rendition contains multiple largely unredacted sections applying international and domestic legal principles to facts set forth in an earlier, more heavily redacted section. *See* O.L.C., *Memorandum for Legal Advisor, National Security Council Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela* (Dec. 23, 2025), https://www.justice.gov/olc/media/1423306/dl?inline. This is consistent with the OLC memo concerning the targeted killing of Anwar al-Aulaqi, which likewise features a standalone factual background section, followed by several legal analysis sections on federal criminal and constitutional law. *N.Y. Times*, 756 F.3d at 115, 119. And it mirrors other voluntarily disclosed OLC memos about the military's use of lethal force abroad. *See, e.g., Apr. 2018 Airstrikes Against Syrian Chem.-Weapons Facilities*, 42 Op. O.L.C. 39 (May 31, 2018).

---

[45] *See, e.g., supra* note 2.

24

At the pre-motion hearing, Defendants' counsel conceded that there is no reason to believe that the OLC memo at issue here departs from this uncontroverted pattern. *See* ECF No. 42. The Court should thus reject as implausible any suggestion that the memo's legal analysis cannot be segregated from classified information. Accordingly, it should hold that Defendants have improperly invoked Exemptions 1 and 3 to shield segregable, non-classified legal analysis and order Defendants to promptly disclose that information.

**III.    At a minimum, the Court should review the OLC memo *in camera*.**

Should the Court have any doubt about the propriety of ordering immediate disclosure, Plaintiffs respectfully ask it to review the OLC memo *in camera* to ensure that Defendants' claimed exemptions apply. Courts have broad discretion to "examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B). "The ultimate criterion" for conducting *in camera* review "is simply this: whether the district judge believes that *in camera* inspection is needed." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). Courts have found such review necessary where, as here, there is a "conflict" between "record evidence" and an agency's assertions. *See, e.g.*, *Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 360 (S.D.N.Y. 2019). This Court has previously conducted *in camera* review of withheld documents in a matter implicating the Executive Branch's use of lethal force abroad. *See ACLU v. DOD*, 435 F. Supp. 3d 539. For the reasons discussed above, including Plaintiffs' substantial evidence contradicting Defendants' claims for withholding, *in camera* review is warranted here.

**CONCLUSION**

The Court should order the immediate release of all information in the OLC memo that is not properly subject to FOIA exemptions.

25

Dated: May 1, 2026
    New York, New York

Respectfully submitted,

*/s/ Jeffrey Stein*

Jeffrey Stein
Brett Max Kaufman
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
Ify Chikezie
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org
ichikezie@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org