**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, and CENTER FOR
CONSTITUTIONAL RIGHTS,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF JUSTICE, including its
component OFFICE OF LEGAL COUNSEL,
U.S. DEPARTMENT OF STATE, and U.S.
DEPARTMENT OF DEFENSE,

        Defendants.

25 Civ. 10189 (PAE)

---

**DECLARATION OF RYAN WATZEL**

I, Ryan Watzel, declare as follows:

1.      I am a Special Counsel in the Office of Legal Counsel ("OLC") of the United States Department of Justice (the "Department") and a career member of the Senior Executive Service. I joined OLC in 2017, and since 2024 I have had the responsibility, among other things, of supervising OLC's responses to requests it receives under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. I submit this declaration in support of the Department's Motion for Summary Judgment in this case. The statements that follow are based on my personal knowledge, as well as on information provided to me by OLC staff working under my supervision and by Executive Branch officials who authored or relied on the document at issue in this case.

**OLC'S RESPONSIBILITIES**

2.      OLC exercises the Attorney General's delegated authority to provide the President and executive agencies with advice on a wide range of legal questions involving the operations of the Executive Branch.  *See* 28 U.S.C. §§ 511–13; 28 C.F.R. § 0.25.  In performing this function, OLC helps fulfill the President's constitutional duties to preserve, protect, and defend the Constitution, and to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

3.      OLC's legal advice and analysis may inform the decisionmaking of Executive Branch officials on matters of policy, but OLC does not make—and does not have authority to make—policy decisions on behalf of the agency requesting OLC's advice.  Although by Executive Branch custom and practice, agencies traditionally will adhere to OLC's advice regarding what the agency is lawfully permitted to do, the client agency, not OLC, decides which legally permissible policy to adopt, or whether to adopt the policy at all.  OLC's advice is thus one of many inputs into a larger decisionmaking process.

4.      To further the interests of transparency into the workings of the Executive Branch, OLC discretionarily makes many of its significant opinions available online to the public after a process of consultation with the requesting agency and any other relevant Executive Branch stakeholders.  Other than opinions deemed appropriate for publication and documents discretionarily released (e.g., in response to FOIA requests) after similar consultations, OLC legal advice in all its forms is kept confidential, regardless of the recipient within the Executive Branch.

5.      The President and other Executive Branch officials depend upon the confidentiality of OLC's advice in order to fulfill their duties effectively.  One important reason

OLC legal advice often must remain confidential is that it is part of a larger deliberative process. If executive agencies had to conduct deliberations with knowledge that their communications were open to public view, the candor necessary to such discussions would be chilled or inhibited, and the quality of government policy making would suffer as a result.

6.     These deliberative confidentiality concerns apply with particular force to OLC advice because of OLC's role in the decisionmaking process.  OLC often is asked to provide advice and analysis on difficult and unsettled issues of law.  Frequently, such issues arise in connection with complex and sensitive activities of the Executive Branch on potentially controversial matters.  So that Executive Branch officials may continue to request, receive, and rely on advice from OLC in these sensitive matters, and so as not to impede executive officials' willingness to seek such advice, it is essential that this process not be inhibited by concerns about compelled public disclosure.

7.     The need for confidential deliberations is especially compelling in the context of legal advice.  A client seeking candid legal advice has a special relationship of trust with the attorney who provides it.  Protecting this attorney-client relationship by maintaining its confidentiality improves the quality of the advice and, in the case of government legal advice, promotes broader public interests in the observance of law and the administration of justice.

8.     The principles underlying the attorney-client privilege have heightened force in the context of OLC's relationships with its clients.  The legality of potential government actions, particularly when they raise challenging or sensitive legal questions, are the kinds of matters on which Executive Branch officials often most need, and should be encouraged to seek, objective and candid legal advice.  For this attorney-client relationship to operate effectively, OLC and its clients must be able to engage in full and frank communications.  The quality of the legal advice

OLC provides depends on clients' candor, including their willingness to provide OLC with relevant facts and context, which in turn depends on clients' belief that their communications will remain confidential. Disclosing OLC's advice may reveal client confidences shared in the course of seeking this advice and would seriously undermine the relationship of trust between OLC and its clients. Such unwanted disclosure could lead future decisionmakers to seek less detailed oral advice or even to hesitate before seeking OLC's advice at all.

9. Finally, when OLC's client is the President or his advisers, OLC's advice also requires confidentiality for another reason: its disclosure would inhibit the President's ability to engage in effective decisionmaking. In order to discharge his duties under Article II of the Constitution, the President must be able to receive confidential advice of all kinds, including legal advice. Absent this assurance of confidentiality, the President would not be able to freely explore all options in the process of shaping policies and making decisions. For this reason, confidential OLC legal advice solicited by or given to the President, his advisers, or their staff to aid presidential decisionmaking is protected by the presidential communications privilege.

10. The presidential communications, deliberative process, and attorney-client privileges[1] continue to apply to confidential OLC legal advice in circumstances where an Executive Branch agency elects, in the interest of transparency, to explain publicly its understanding of the legal basis for current or contemplated conduct. There is a fundamental distinction between a public explanation of the basis for a decision and legal advice received prior to making that decision. When the Executive Branch explains its understanding of an action's legal basis without disclosing confidential advice that decisionmakers may have

---

[1] Each of these is a component of executive privilege, *see In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997), but for ease of use I will refer to them as distinct "privileges."

received before deciding to take the action, the Executive Branch is not disclosing privileged information and there is no waiver over any confidential legal advice that is privileged. If merely explaining the legal basis for Executive Branch conduct were understood to remove the protection of these privileges, it would substantially harm the ability of Executive Branch decisionmakers to request, receive, and rely upon full and frank advice from government lawyers as part of the decisionmaking process. So, too, would it harm the public by discouraging the Executive Branch from publicly explaining the legal basis for its actions in the future.

## PLAINTIFF'S FOIA REQUEST

11.    On October 15, 2025, during a lapse in the appropriations funding for the Department, OLC received a letter from Jeffrey Stein and Brett Max Kaufman of the American Civil Liberties Union Foundation, and Baher Azmy and Ian Head of the Center for Constitutional Rights (together, "Plaintiffs"), requesting the following:

1.  The OLC final opinion concerning the President's authority to order lethal strikes against drug cartels;

2.  President Trump's July 2025 directive to the Department of Defense authorizing the use of military force against Latin American drug cartels deemed to be terrorist organizations; and,

3.  Any unclassified summaries of the two above documents.

Ex. A, at 4–5 (FOIA Request (Oct. 15, 2025) (hereinafter, "the FOIA Request")); *see also id.* at 1 (requesting "(1) the President's July 2025 'directive' to the Department of Defense authorizing the use of military force against Latin American drug cartels the executive branch deems to be 'terrorist organizations'; (2) the recent [OLC] opinion concluding that the President has the authority to order lethal strikes against drug cartels, including those that have not been

5

designated as 'terrorist organizations,' as well as individuals 'affiliated' with such cartels; and

(3) any unclassified summaries of either document").  The FOIA Request sought records from

"January 1, 2025, through the present."  *Id.* at 4.  Plaintiffs requested expedited processing of the

request.  *Id.* at 5.

12.    By letter dated November 25, 2025, following the conclusion of the lapse in

appropriations, OLC responded, acknowledging receipt of the FOIA Request and informing the

requesters that the request for expedited processing had been denied.  *See* Ex. B, at 1 (OLC

Acknowledgment (Nov. 25, 2025)).

13.    Following the commencement of this litigation and negotiations through counsel

narrowing and clarifying the scope of the request, by letter dated March 12, 2026, OLC

responded to the FOIA Request.  *See* Ex. C, at 1 (OLC Response (Mar. 12, 2026)).  OLC

informed Plaintiffs that it had identified two responsive documents.  *Id.*  OLC further informed

Plaintiffs that one document was provided in part with redactions pursuant to FOIA Exemption

Five and Exemption Six, and that OLC was withholding the second document in full pursuant to

Exemption One for being classified, Exemption Three under the National Security Act, 50

U.S.C. § 3024(i)(1), and Exemption Five.  *Id.*  OLC explained that the material withheld

pursuant to Exemption Five was protected by the attorney-client, deliberative process, and

presidential communications privileges.  *Id.*  Finally, OLC informed Plaintiffs that none of the

withheld material was appropriate for discretionary release and that OLC had considered the

foreseeable harm standard when reviewing records and applying FOIA exemptions.  *Id.*

14.    As memorialized in Plaintiffs' pre-motion letter filed in this matter, Plaintiffs

have stated that they do not intend to challenge OLC's response to their request for a presidential

directive or for unclassified summaries of any of the requested materials, including the partially

redacted document OLC provided.  *See* ECF No. 36, at 1 n.1.  Plaintiffs' challenge thus has been narrowed to the one document withheld in full by OLC.  *See id.*  That document is an OLC legal advice memorandum (the "Memorandum") responsive to the first part of Plaintiffs' request.

## OLC'S SEARCH

15.     I have been informed that Plaintiffs have not challenged the search for responsive records.  Therefore, I do not discuss it here.

## DOCUMENT AT ISSUE

16.     I have personally reviewed the Memorandum.

17.     The Memorandum is a legal advice memorandum dated September 5, 2025, authored and signed by an OLC Deputy Assistant Attorney General.  The Memorandum was solicited by and provided to legal advisers in the White House Counsel's Office who advise the National Security Council ("NSC") and its staff.  The document memorializes deliberative advice provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action, as part of a deliberative process in connection with the President's decision whether to take such action in his constitutional role as Commander in Chief of the armed forces.  The document also memorializes legal advice concerning the manner in which the Executive Branch should implement the advice in the event the President ordered such action.

18.     Based on information provided to me by Executive Branch officials familiar with the Memorandum and its use, I understand that the advice memorialized therein was initially provided to and discussed with senior attorneys from the White House Counsel's Office, the NSC, and three other Executive Branch agencies at a meeting convened several weeks prior to the Memorandum being finalized.  In addition to memorializing advice that had been provided

prior to the presidential decision authorizing military action, the Memorandum explains in further detail the legal basis for that advice.  The Memorandum also describes and memorializes confidential client communications made to OLC for the purpose of seeking this advice, including in an appended statement of facts.

## APPLICABLE PRIVILEGES

### *Withholding Pursuant to Exemption One and Exemption Three*

19.    OLC withheld the Memorandum in full pursuant to FOIA Exemption One, which exempts material properly classified pursuant to an Executive Order, and pursuant to FOIA Exemption Three, which exempts material specifically exempted from disclosure by another statute.  I understand that information describing the bases for those withholdings will be filed separately.

### *Withholding Pursuant to Exemption Five*

20.    FOIA's Exemption Five exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption Five incorporates the traditional privileges that the government may assert in civil litigation against a private litigant and exempts records or information covered by such privileges from FOIA's disclosure obligations.  Exemption Five applies to the Memorandum because it is protected by the presidential communications, deliberative process, and attorney-client privileges.

21.    **Presidential Communications Privilege.**  Because the Memorandum was solicited by and provided to legal advisers in the White House Counsel's Office as part of the President's decisionmaking process concerning a contemplated military action, it is subject to the presidential communications privilege.  That privilege protects confidential communications

solicited and received by the President or his advisers in connection with presidential

decisionmaking.  The privilege includes communications directly involving the President, but it

also protects communications between presidential advisers, and communications to those

advisers and their staff, made in the course of formulating advice or recommendations for the

President.  In addition, the privilege applies to documents, including final and post-deliberative

materials, in their entirety.  The privilege protects such communications in order to preserve the

President's ability to obtain frank and informed opinions without concerns about compelled

disclosure, and to ensure that the President and his advisers may explore the full range of options

in the process of making decisions.

22.    In the Memorandum and prior communications memorialized in the document,

OLC provided advice to legal advisers in the White House Counsel's Office—the chief legal

counselors to the National Security Advisor, an immediate adviser to the President—regarding

the President's authority to authorize the contemplated military action.  The Memorandum was

solicited and received by legal advisers in the White House Counsel's Office and relied on by

senior White House officials in the NSC and the Executive Office of the President as part of the

President's decisionmaking process as to whether to take such action.  Accordingly, the

Memorandum is protected in its entirety by the presidential communications privilege.

Compelled disclosure of this communication would threaten the quality of future presidential

decisionmaking by impairing the process by which those decisions are made.

23.    **Deliberative Process Privilege.**  The Memorandum is also protected by the

deliberative process privilege because the document conveys predecisional legal advice and

memorializes earlier-provided predecisional legal advice.  The advice contained in the

Memorandum is predecisional because it was prepared for the consideration of the President's

advisers to aid the President in deciding whether to authorize one or more military actions.  The fact that the Memorandum was finalized after some of this advice was provided does not affect the predecisional nature of the earlier-provided advice.  The material is deliberative because it consists of advice to legal advisers in the White House Counsel's Office for use in deliberations over whether to recommend that the President authorize the action and what advice to provide the President in connection with that decision, as well as for use by the President in making the decision.  The factual material contained in the document is closely intertwined with that legal advice and analysis.

24.    **Attorney-Client Privilege.**  Finally, the attorney-client privilege applies to the Memorandum.  The document was authored and signed by an OLC Deputy Assistant Attorney General, recording and explaining advice provided to legal advisers in the White House Counsel's Office and other senior Executive Branch attorneys for their use in advising the President and his aides.  Having been asked to provide confidential legal advice, OLC stood in a special relationship of trust with the President and his advisers.  The factual material contained in the Memorandum was provided to OLC by NSC staff or other entities within the Executive Branch for purposes of developing this advice.  The legal advice contained in the Memorandum was provided in confidence and has remained confidential—indeed, access to the Memorandum has been strictly controlled.  Just as disclosure of client confidences conveyed in the course of seeking legal advice would seriously disrupt the relationship of trust critical to formulating that advice, so too would disclosure of the legal advice itself undermine that trust.

25.    **Summary.**  Compelled disclosure of the Memorandum would undermine the President's ability to seek and receive candid, confidential advice.  It would also compromise the deliberative processes of the Executive Branch, including of the President and his national

security advisers, and the attorney-client relationship on which OLC's clients depend. Attorneys at OLC often are asked to provide advice and analysis on difficult and unsettled questions of law, and on matters that can be quite controversial. It is essential to the President in carrying out his mission and to the proper functioning of the Executive Branch that OLC's legal advice not be inhibited by concerns about the risk of public disclosure. Protecting the confidentiality of OLC's advice provided during presidential and other Executive Branch deliberations is critical to ensuring that the full range of legal arguments are examined candidly, effectively, and in writing, and to ensuring that the President, his advisers, and other Executive Branch officials continue to request and rely on frank legal advice from OLC on sensitive matters.

### *Foreseeable Harm*

26.    To promote interests in Executive Branch transparency, OLC strives to make public its significant legal advice, often in the form of opinions published on OLC's website, when possible and consistent with the confidentiality interests and obligations of the requesting agency. These disclosures are made with the consent and cooperation of OLC's clients and other relevant Executive Branch stakeholders. At the same time, countervailing considerations can lead OLC to conclude that public release of an opinion or portions thereof would not be appropriate, such as when disclosure would reveal classified or other sensitive information, or when confidentiality is necessary to preserve internal Executive Branch deliberative processes or protect OLC's attorney-client relationships. That is the case here. Compelled disclosure of this highly sensitive legal memorandum provided to the chief counselors to the President's National Security Advisor when applicable privileges have not been waived would damage presidential decisionmaking, disrupt existing attorney-client relationships, and deter government decisionmakers in the future from seeking written OLC legal advice.

11

27.     First, disclosure of the Memorandum would cause foreseeable harm to the decisionmaking processes of the President and his senior advisers.  OLC provides legal advice in connection with presidential decisionmaking on a variety of topics, which include some of the most difficult and important issues the President faces—indeed, Presidents and their advisers often request OLC advice precisely because a legal issue is difficult and important.  The presidential communications privilege protects in their entirety communications solicited and received by the President or his advisers during the course of this decisionmaking.  It ensures that the President has access to honest and informed advice, and provides the President with the confidentiality necessary to consider all potential options, including novel or controversial ones. Compelled disclosure of OLC's advice to the President or his advisers would breach that confidentiality, impede the President's decisionmaking processes, and impair his ability in the future to rely on the availability of candid, confidential legal advice when carrying out the responsibilities of office.

28.     Second, disclosure of the Memorandum would cause foreseeable harm to the interests protected by the attorney-client privilege.  Disclosure of OLC's confidential legal advice would reveal core client confidences, including in this case highly classified facts provided in confidence for the purpose of seeking OLC's advice, in addition to the details of the advice itself.  If the confidentiality of legal advice on a particular question and the sharing of sensitive facts in the process cannot be assured, the foreseeable harm to the attorney-client relationship would be significant.  The proper functioning of the Executive Branch depends on clients being willing to seek and rely on OLC's legal advice on hard or controversial questions without being inhibited by concerns about the risk of public disclosure.  Likewise, protecting the

confidentiality of OLC's legal advice is essential to ensuring that all potential legal arguments are properly considered and addressed.

29.     Finally, disclosing the Memorandum would cause foreseeable harm to the interests protected by the deliberative process privilege for many of the same reasons. Compelled disclosure of the Memorandum would undermine government decisionmakers' ability to seek and receive confidential advice from OLC, compromising the deliberative processes of the Executive Branch.  OLC's legal advice can be a key input into Executive Branch deliberations.  These deliberations benefit from the careful, detailed, written advice that OLC provides.  And decisionmakers benefit from the ability to consider all options, including those that they may choose not to take.  OLC has repeat clients throughout the Executive Branch, and whether OLC maintains the confidentiality of prior advice will impact the willingness of these and other clients to request written advice from OLC in the future.  Decisionmakers fearing forced disclosure of the legal issues that were considered during their deliberations may be less likely to seek advice from OLC on challenging or sensitive matters, causing harm to future Executive Branch decisionmaking and ultimately to the public itself.

### Segregability, Adoption, and Waiver

30.     I have personally reviewed the document at issue to determine whether any withheld portion or portions could be released without divulging information protected by FOIA Exemption Five and have determined that the document does not contain reasonably segregable nonexempt information.  As an initial matter, the presidential communications privilege applies to documents in their entirety, and therefore the entirety of the Memorandum is subject to Exemption Five.  In any event, all factual information contained in the document was provided

13

to OLC in confidence for the purpose of seeking legal advice from OLC and is inextricably intertwined with that analysis.

31.    To my knowledge, based on information provided to me by Executive Branch officials familiar with the Memorandum and its use, the document has not been publicly adopted or incorporated by reference by any policymaker as a basis for a policy decision.

32.    To my knowledge, the document has not been previously disclosed publicly. Although I am aware of a small number of public statements by Executive Branch officials acknowledging the existence of the Memorandum, I am not aware of any public statements by government officials that would constitute waiver of the privileges applicable to any portion of the document.

\* \* \* \* \* \* \*

33.    In conclusion, I respectfully submit that the document described herein is protected by the presidential communications, deliberative process, and attorney-client privileges.  Accordingly, the document falls squarely within Exemption Five.  The compelled disclosure of this document would disrupt the President's ability to carry out his constitutional responsibilities, interfere with the government's deliberative processes, and disrupt the attorney-client relationship between OLC and its clients throughout the Executive Branch.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that Exhibits A through C attached hereto are true and correct copies.


Executed: May 1, 2026

_____
RYAN WATZEL

14

# Exhibit A

Request 26-014, Rec'd 10/15/25





October 15, 2025

Melissa Golden
Lead Paralegal and FOIA Specialist
Office of Legal Counsel
Room 5517, 950 Pennsylvania Avenue, N.W.
Department of Justice
Washington, DC 20530-0001

U.S. Department of State
Information Access Liaison Office, A/SKS/IAP/IAL
2201 C Street N.W., Suite B266
Washington, D.C. 20520-0000

OSD/JS FOIA Requester Service Center
Office of Freedom of Information
1155 Defense Pentagon
Washington, DC 20301-1155

**Re:    Request Under Freedom of Information Act (Expedited Processing and Fee Waiver Requested)**

To Whom It May Concern:

This is a request for records under the Freedom of Information Act (FOIA). Through this request, the ACLU[1] and the Center for Constitutional Rights (CCR) (collectively, Requesters) seek (1) the President's July 2025 "directive" to the Department of Defense authorizing the use of military force against Latin American drug cartels the executive branch deems to be "terrorist organizations"; (2) the recent Office of Legal Counsel (OLC) opinion concluding that the President has the authority to order lethal strikes against drug cartels, including those that have

---

[1] The term "ACLU" refers collectively to the American Civil Liberties Union Foundation and the American Civil Liberties Union. The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about civil rights and civil liberties issues across the country. The American Civil Liberties Union is a separate, non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.

125 Broad Street, Floor 18, New York, NY 10004

 

not been designated as "terrorist organizations," as well as individuals "affiliated" with such cartels; and (3) any unclassified summaries of either document.

## I.    Background

Since early September, President Trump has ordered lethal strikes against five private vessels traveling in international waters, reportedly killing at least twenty-seven people.[2] Although President Trump has characterized the victims of these attacks as "terrorists," all publicly available information—including the Trump administration's own disclosures— indicates that the strikes' victims were civilians who were merely suspected of smuggling drugs.[3] For this reason, members of Congress from across the political spectrum,[4] former government officials who served in presidential administrations of both parties,[5] civil society organizations,[6]

---

[2] *See* Charlie Savage, *Trump, Drug Cartels, Venezuela and War: What We Know*, N.Y. Times (Oct. 6, 2025), https://www.nytimes.com/2025/10/06/us/politics/trump-cartels-what-we-know.html; Charlie Savage, *U.S. Military Kills Another 6 People in 5th Caribbean Strike, Trump Says*, N.Y. Times (Oct. 14, 2025), https://www.nytimes.com/2025/10/14/us/politics/trump-drugs-boat-attack.html.

[3] *See, e.g.*, Natasha Bertrand & Zachary Cohen, *Senior Democrat Says Pentagon Didn't Present Conclusive Evidence Alleged Drug Smugglers Killed in Strike Were Gang Members*, CNN (Sep. 11, 2025), https://www.cnn.com/2025/09/11/politics/senior-democrat-pentagon-strike-gang-members-evidence.

[4] *See, e.g.*, Rep. Ilhan Omar, *Rep. Omar's Statement on Trump's Unconstitutional Military Strike on Vessel in Caribbean* (Sep. 4, 2025), https://omar.house.gov/media/press-releases/rep-omars-statement-trumps-unconstitutional-military-strike-vessel-caribbean; Sen. Rand Paul, *The Constitution Does Not Allow the President To Unilaterally Blow Suspected Drug Smugglers to Smithereens*, Reason (Oct. 8, 2025), https://reason.com/2025/10/08/the-constitution-does-not-allow-the-president-to-unilaterally-blow-suspected-drug-smugglers-to-smithereens.

[5] *See, e.g.*, Marty Lederman, *The Many Ways in Which the September 2 Caribbean Strike was Unlawful ... and the Grave Line the Military Has Crossed*, Just Security (Sep. 10, 2025), https://www.justsecurity.org/120296/many-ways-caribbean-strike-unlawful/; Brian Finucane, *Legal Issues Raised by a Lethal U.S. Military Attack in the Caribbean*, Just Security (Sep. 3, 2025), https://www.justsecurity.org/119982/legal-issues-military-attack-carribean/; John Yoo, *A Military Campaign Against the Drug Trade Would Be Unconstitutional*, Wash. Post (Sep. 23, 2025), https://www.washingtonpost.com/opinions/2025/09/23/trump-boat-strikes-drug-cartels-venezuela/.

[6] *See, e.g.*, New York City Bar Ass'n, *Unlawful Attacks on Venezuelan Vessels* (Oct. 6, 2025), https://www.nycbar.org/press-releases/unlawful-attacks-on-venezuelan-vessels/; Human Rights Watch, US: Maritime Strikes Amount to Extrajudicial Killings (Sep. 18, 2025), https://www.hrw.org/news/2025/09/18/us-maritime-strikes-amount-to-extrajudicial-killings.

2




and international bodies[7] have concluded that these strikes appear to have violated international and domestic law.

Notwithstanding this broad consensus, the Trump administration claims that these strikes were lawful. In a September 4 letter to Congress, President Trump asserted that one such strike was conducted "in self-defense" against "affiliate[s]" of an unidentified "designated terrorist organization" pursuant to the President's "constitutional authority as Commander in Chief"[8]— even though the Department of Defense reportedly was unable to confirm the victims' identities and acknowledged to the Senate Armed Services Committee that the targeted vessel had "turned around" before it was bombed.[9] In an October 2 notice to Congress, the Trump administration went further, stating that the President has "determined" that "drug cartels" who have been "designated" as "terrorist organizations" are also "non-state armed groups" whose "actions constitute an armed attack against the United States" and whose "affiliate[s]" are "unlawful combatants" against whom he may authorize the use of lethal force.[10] These assertions of authority are also consistent with those reportedly set forth in a July 2025 presidential directive to the Department of Defense authorizing the use of military force "against certain Latin American drug cartels that [the Trump] administration has deemed terrorist organizations."[11]

Recent reporting indicates that OLC has memorialized an even more sweeping understanding of the President's authority to order lethal strikes against suspected drug traffickers. According to CNN, an OLC legal opinion "argues that the president is allowed to authorize deadly force against a broad range of cartels," including "those the administration has [not] publicly designated as terrorist organizations."[12] This opinion thus "appears to justify an

---

[7] *See* U.N. Human Rights Office of the High Commissioner, *US War on "Narco-terrorists" Violates the Right to Life, Warn UN Experts After Deadly Vessel Strike* (Sep. 16, 2025), https://www.ohchr.org/en/press-releases/2025/09/us-war-narco-terrorists-violates-right-life-warn-un-experts-after-deadly.

[8] Letter from President Donald Trump to Hon. Charles Grassley, President pro tempore of the Senate (Sep. 4, 2025), https://warpowers.lawandsecurity.org/reports/20250904a/.

[9] *See supra* note 3.

[10] Marty Lederman, *Legal Flaws in the Trump Administration's Notice to Congress on "Armed Conflict" with Drug Cartels*, Just Security (Oct. 3, 2025), https://www.justsecurity.org/121844/trump-notice-drug-cartels/ (reproducing the notice).

[11] Helene Cooper, Maggie Haberman, Charlie Savage and Eric Schmitt, *Trump Directs Military to Target Foreign Drug Cartels,* N.Y. Times (Aug. 8, 2025), https://www.nytimes.com/2025/08/08/us/trump-military-drug-cartels.html.

[12] Natasha Bertrand & Zachary Cohen, *Exclusive: Classified Justice Department opinion authorizes strikes on secret list of cartels, Sources Say*, CNN (Oct. 6, 2025), https://www.cnn.com/2025/10/06/politics/classified-justice-department-memo-cartel-strikes.

125 Broad Street, Floor 18, New York, NY 10004





open-ended war against a secret list of groups, giving the president power to designate drug traffickers as enemy combatants and have them summarily killed without legal review."[13] On October 7, 2025, Charles Young, who has been nominated to serve as the U.S. Army's general counsel, acknowledged the existence of this opinion in a colloquy with Senator Jeanne Shaheen, explaining that the "opinion was derived through an interagency lawyers working group with the CIA, the State Department, White House counsel, Department of Justice, Department of Defense general counsel, [and the] chairman's legal uniformed judge advocates."[14]

Because the public is entitled to know the full extent of the President's asserted authority to summarily kill suspected drug smugglers, this opinion and the related July 2025 presidential directive must be disclosed. OLC opinions are "treated as conclusive and binding within the executive branch."[15] Given that OLC's opinion and the President's July 2025 directive appear to, as Senator Chris Coons observed, lack any "limiting principle" and could be used to justify the extrajudicial killing of "people [the President] just declares are cartel members, as well as unlawful combatants, inside the United States, or if they were American citizens," the contents of these documents are of the utmost public concern.[16]

## II.    Requested Records

We request records created from January 20, 2025, to the present, falling within the following categories:

1. The OLC final opinion concerning the President's authority to order lethal strikes against drug cartels;

2. President Trump's July 2025 directive to the Department of Defense authorizing the use of military force against Latin American drug cartels deemed to be terrorist organizations; and,

---

[13] *Id.*

[14] *Id.*

[15] Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1305 (2000) (stating that OLC's views "on the question of the legality of a proposed executive branch action . . . are typically treated as conclusive and binding within the executive branch."); S. Rep. No. 110-528, at 2 ("An opinion issued by OLC is not just a piece of legal advice, such as the advice individuals or corporations might solicit from their lawyers. An OLC opinion binds the entire executive branch, just like the ruling of a court.").

[16] PBS NewsHour, *WATCH: Sen. Coons Questions Attorney General Pam Bondi on Prison Reform, Public Safety Funding Cuts* (Oct. 7, 2023), https://www.youtube.com/watch?v=oqFCwN8kdpo.

125 Broad Street, Floor 18, New York, NY 10004



3. Any unclassified summaries of the two above documents.

\*        \*        \*

A record is responsive to this request if it is substantially encompassed by one of the descriptions above, notwithstanding minor discrepancies in date or title, and regardless of whether it is styled an "opinion," "memorandum," "memorandum opinion," "directive," "guidance," or something else.

Please provide responsive electronic records electronically, in their native file format.[17] If that is not possible, please provide responsive records electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession. Either way, please provide responsive records in separate, Bates-stamped files.

### III.    Application for Expedited Processing

Requesters seek expedited processing.[18] This request satisfies the statutory criteria for expedited processing because it seeks records "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity."[19]

**A. The ACLU and CCR are organizations primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.**

The ACLU is "primarily engaged in disseminating information" within the meaning of FOIA.[20] Obtaining information about government activity, analyzing it, publishing it, and widely disseminating it to the press and public are critical and substantial components of the ACLU's work; indeed, they are among its primary activities.[21] The ACLU plans to analyze, publish, and

---

[17] *See* 5 U.S.C. § 552(a)(3)(B).

[18] *See* 5 U.S.C. § 552(a)(6)(E); *see also* 6 C.F.R. § 5.5(e).

[19] *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).

[20] *See id.*; *see also* 6 C.F.R. § 5.5(e)(1)(ii).

[21] *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information"). Courts have found that the ACLU and other organizations with similar missions that engage in information-dissemination activities like the ACLU are "primarily engaged in disseminating information." *See, e.g.*, *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. DOD,* 241 F. Supp. 2d 5, 11 (D.D.C. 2003).

125 Broad Street, Floor 18, New York, NY 10004

 

disseminate to the public the information gathered through this request. It does not seek the requested records for commercial use, and it intends to disseminate the information disclosed as a result of this request to the public at no cost.

The ACLU regularly publishes the *ACLU* magazine, which reports on and analyzes civil liberties-related current events. The magazine is disseminated to over 1 million donors. The ACLU also publishes regular updates and alerts via email to millions of subscribers (both ACLU members and non-members). These updates are additionally broadcast to millions of social media followers. The magazine as well as the email and social-media alerts often include descriptions and analysis of information obtained through FOIA requests.

The ACLU regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news,[22] and ACLU attorneys are interviewed frequently for news stories about documents released through ACLU FOIA requests.[23]

The ACLU publishes reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA requests. This material is broadly circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee. ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[24] The ACLU also regularly publishes books, "know

---

[22] *See, e.g.*, Press Release, ACLU, Government Releases New Court Opinions Highlighting Further Abuse of Warrantless FISA Surveillance Program (July 21, 2023) (here); Press Release, ACLU, New Records Detail DHS Purchase and Use of Vast Quantities of Cell Phone Location Data (July 18, 2022) (here); Press Release, ACLU, ACLU Files FOIA Request Seeking Records Related to Detained Immigrants' Ability to Access Counsel (December 17, 2021) (here); Press Release, ACLU, ACLU Files FOIA Request to Uncover COVID Impact and Cost of Federal Executions (August 6, 2022) (here); Press Release, ACLU, New Records Detail How the FBI Pressures Police to Keep Use of Shady Phone Surveillance Technology a Secret (June 22, 2023) (here); Press Release, ACLU, ACLU Announces Major Settlement in Family Separation Lawsuit (October 16, 2023) (here).

[23] *See, e.g.*, Corin Faife, *Feds Are Tracking Phone Locations With Data Bought From Brokers*, The Verge (July 18, 2022) (here); Jessica Votipka, *ACLU Files Suit Against Grand Island School That Ended High School Newspaper*, Journal Star (Mar. 31, 2023) (here); Charlie Savage, *N.S.A. Gathered Domestic Calling Records It Had No Authority to Collect*, N.Y. Times (June 26, 2019) (quoting ACLU attorney Patrick Toomey) (here); Rachel Frazin, *ACLU Sues FBI Over Black Activist Surveillance Records*, The Hill (Mar. 21, 2019) (quoting ACLU attorney Nusrat Choudhury) (here); Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavioral Screen Program*, The Intercept (Feb. 8, 2017) (quoting ACLU attorney Hugh Handeyside) (here).

[24] *See, e.g.*, ACLU, *Bad Trip: Debunking the TSA's 'Behavior Detection' Program* (Feb. 2017) (here); Carl Takei, *ACLU-Obtained Emails Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site,* ACLU: News & Commentary (Nov. 22, 2016) (here); Brett Max Kaufman, *Details Abound in Drone 'Playbook' – Except for the Ones That Really Matter Most*, ACLU: News &

125 Broad Street, Floor 18, New York, NY 10004




your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties.

The ACLU publishes a widely read blog on which it posts original editorial content reporting on and analyzing civil rights and civil liberties news.[25] The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features.[26] The ACLU also publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU's website also serves as a clearinghouse for news about ACLU cases, including analysis about case developments and an archive of case-related documents. Through these pages, and with respect to each specific civil liberties issue, the ACLU provides the public with educational material, recent news, analyses of relevant congressional or executive branch action, government documents obtained through FOIA requests, and further in-depth analytic and educational multi-media features.[27]

---

Commentary (Aug. 8, 2016) (here); ACLU, *Leaving Girls Behind: An Analysis of Washington D.C.'s "Empowering Males of Color" Initiative*, ACLU: Research & Analysis (May 5, 2016) (here); Nathan Freed Wessler, *ACLU-Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida*, ACLU: News & Commentary (Feb. 22, 2015) (here); Nathan Freed Wessler, *FBI Documents Reveal New Information on Baltimore Surveillance Flights,* ACLU: News & Commentary (Oct. 30, 2015) (here); Ashley Gorski, *New NSA Documents Shine More Light into Black Box of Executive Order 12333*, ACLU: News & Commentary (Oct. 30, 2014) (here).

[25] *See* ACLU: News & Commentary (here).

[26] *See* ACLU: Multimedia (here).

[27] *See, e.g., ACLU v. ODNI—FOIA Lawsuit Seeking Records About Government Surveillance Under the USA Freedom Act*, ACLU Case Page (last updated Sept. 14, 2023) (here); *ACLU v. DOJ—FOIA Lawsuit Seeking Information on Federal Agencies' Surveillance of Social Media*, ACLU Case Page (last updated Apr. 8, 2024) (here); *ACLU v. DOJ—FOIA Case for Records Relating to Targeted Killing Law, Policy, and Casualties*, ACLU Case Page (last updated Apr. 23, 2019) (here); *Executive Order 12,333—FOIA Lawsuit*, ACLU Case Page (last updated Dec. 3, 2018) (here); *ACLU v. United States*, ACLU Case Page (here); *ACLU v. DOJ—FOIA Lawsuit Demanding OLC Opinion "Common Commercial Service Agreements"*, ACLU Case Page (last updated Apr. 6, 2016) (here); *FOIA Request for Justice Department Policy Memos on GPS Location Tracking*, ACLU Case Page (last updated Mar. 12, 2024) (here); *Florida Stingray FOIA*, ACLU Case Page (last updated Feb. 22, 2015) (here); Nathan Freed Wessler, *ACLU-Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida,* ACLU: News & Commentary (Feb. 22, 2015) (here).

125 Broad Street, Floor 18, New York, NY 10004

 

The ACLU website includes many features on information obtained through FOIA. The ACLU maintains an online "Torture Database," a compilation of over 100,000 pages of FOIA documents that allows researchers and the public to conduct sophisticated searches of its contents relating to government policies on rendition, detention, and interrogation.[28] The ACLU has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through FOIA.[29]

CCR is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around militarism, mass incarceration and prisoners' rights, racial justice and the protection of human rights defenders and the right to dissent. CCR's Open Records Project files numerous FOIA requests related to these issues, often litigates those requests in court, and has released thousands of pages of documents produced via those requests over the past decade.

CCR's primary and regular activities include the publication of newsletters, know-your-rights handbooks, legal analysis of current human rights issues, and other similar materials for public dissemination. Records received through FOIA requests have served as the basis for a number of these materials, and are available via CCR's Development, Communications, and Advocacy Departments, as well as CCR website, http://ccrjustice.org and social media channels. CCR staff members often serve as sources for journalists and national media outlets, including on issues related to international human rights, war crimes, the War on Terror, detention practices, and abusive practices against refugees, asylum seekers, and immigrants, among others. CCR regularly issues press releases, has an active social media presence with tens of thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

### B. The records sought are urgently needed to inform the public about actual or alleged government activity.

The records sought are urgently needed to inform the public about actual or alleged government activity.[30] As noted in Part I, *supra*, the requested records will provide the public with critical insight into the full extent of the President's asserted authority to summarily kill

---

[28] *The Torture Database*, ACLU Database (here); *see also Countering Violent Extremism FOIA Database*, ACLU Database (here); *TSA Behavior Detection FOIA Database*, ACLU Database (here); *Targeted Killing FOIA Database*, ACLU Database (here).

[29] *Index of Bush-Era OLC Memoranda Relating to Interrogation, Detention, Rendition and/or Surveillance*, ACLU (Mar. 5, 2009) (here); *Summary of FISA Amendments Act FOIA Documents Released on November 29, 2010*, ACLU (Nov. 29, 2010) (here); *Statistics on NSL's Produced by Department of Defense*, ACLU (here).

[30] *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); *see also* 6 C.F.R. § 5.5(e)(1)(ii).

125 Broad Street, Floor 18, New York, NY 10004




suspected drug smugglers. Such insight is especially necessary given recent statements indicating that the U.S. government may soon use lethal force against suspected drug smugglers or so-called "terrorists" in places other than on the high seas, including President Trump's statement that future strikes may occur on "land,"[31] Secretary of Defense Pete Hegseth's claim that "[i]f you're north of Venezuela and you want to traffic drugs to the United States, you are a legitimate target,"[32] and Attorney General Pamela Bondi's statement that the Trump administration intends to "take the same approach" with "Antifa"—which the administration has called a "domestic terrorist organization"—as it "did with cartels."[33] Moreover, courts have concluded that requests for similar records implicate "important issues" concerning "the public's opportunity to obtain information about their government's" asserted legal authority to engage in "targeted killings."[34]

## IV.    Application for Waiver or Limitation of Fees

Requesters seek a waiver of document search, review, and duplication fees because disclosing the requested records is in the public interest, "likely to contribute significantly to public understanding of the operations or activities of the government," and "not primarily in the commercial interest of" the ACLU or CCR.[35]

Additionally, Requesters seek a waiver of search fees on the grounds that the ACLU and CCR qualify as "representative[s] of the news media" and the records are not sought for commercial use.[36]

### A.    The Request is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU or CCR.

---

[31] *Trump Says US Hit Another Boat Off Venezuela Coast on Saturday*, Reuters (Oct. 5, 2025), https://www.reuters.com/world/us/trump-says-us-hit-another-boat-off-venezuela-coast-saturday-2025-10-05/.

[32] Aishwarya Kavi, *Trump Calls Deadly Strikes on Boats in Caribbean an 'Act of Kindness,'* N.Y. Times (Oct. 5, 2024), https://www.nytimes.com/2025/10/05/us/politics/trump-caribbean-strikes-drugs-kindness.html.

[33] Betsy Klein & Donald Judd, *Trump Takes Aim at Antifa — and the Press — in White House Roundtable*, CNN (Oct. 8, 2025), https://www.cnn.com/2025/10/08/politics/antifa-white-house-roundtable.

[34] *See, e.g.*, *New York Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 103 (2d Cir.), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

[35] 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k)(1).

[36] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

125 Broad Street, Floor 18, New York, NY 10004




This request seeks OLC's final opinions and memoranda concerning the President's authority to order lethal strikes against drug cartels and their affiliates, including on U.S. soil against U.S. persons. Accordingly, there can be no question that the records' release would contribute significantly to public understanding of the operations or activities of the government.

As stated above, any information disclosed by the ACLU or CCR as a result of this request will be available to the public at no cost. Disclosing the requested records is not "primarily in the commercial interest" of Requesters; nor does the ACLU or CCR intend to put the requested records to "commercial use."[37] Thus, granting a fee waiver would be consistent with Congress's intent. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters.") (quotation marks omitted).

### B. The ACLU and CCR are representatives of the news media and the records are not sought for commercial use.

Requesters meet the statutory and regulatory definitions of "representative[s] of the news media" because both are an "entity that gathers information of potential interest to a segment of the public" and that "uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III); 6 C.F.R. § 5.11(b)(6).[38] Accordingly, fees associated with responding to FOIA requests are regularly waived for the ACLU and CCR.[39]

---

[37] 5 U.S.C. § 552(a)(4)(A)(iii); *id.* § § 552(a)(4)(A)(ii)(II).

[38] *Nat'l Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network v. Dep't of Defense*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. Dep't of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information").

[39] For example, in June 2018, the U.S. Citizenship and Immigration Services granted a fee-waiver request regarding a FOIA request for documents relating to the use of social media surveillance. In August 2017, CBP granted a fee-waiver request regarding a FOIA request for records relating to a muster sent by CBP in April 2017. In June 2017, the Department of Defense granted a fee-waiver request regarding a FOIA request for records pertaining to the authorities approved by President Trump in March 2017 which allowed U.S. involvement in Somalia. In June 2017, the Department of Defense, the CIA, and the Office of Inspector General granted fee-wavier requests regarding a FOIA request for records pertaining to U.S.

125 Broad Street, Floor 18, New York, NY 10004

 

Courts have likewise found other organizations whose mission, function, publishing, and public education activities are similar in kind to Requesters to be "representatives of the news media." *See, e.g.*, *Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[40]

As stated above, neither the ACLU nor CCR seeks the requested records for commercial use.

\* \* \*

Thank you for your prompt attention to this matter. Please furnish the applicable records to:

Jeffrey Stein
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
jstein@aclu.org

---

involvement in the torture of detainees in prisons in Yemen, Eritrea, and aboard Yemeni or Emirati naval vessels. In May 2017, CBP granted a fee-waiver request regarding a FOIA request for documents related to electronic device searches at the border. In April 2017, the CIA and the Department of State granted fee-waiver requests in relation to a FOIA request for records related to the legal authority for the use of military force in Syria. In March 2017, the Department of Defense Office of Inspector General, the CIA, and the Department of State granted fee-waiver requests regarding a FOIA request for documents related to the January 29, 2017 raid in al Ghayil, Yemen. In June 2016, the Office of the Director of National Intelligence granted a fee-waiver request regarding a FOIA request related to policies and communications with social media companies' removal of "extremist" content. In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the Department of Justice for documents related to Countering Violent Extremism Programs.

[40] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information and public education activities. *See, e.g.*, *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; s*ee also Leadership Conf. on CR*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53–54.

11

 

If you deny this request in whole or in part, please justify all withholdings by reference to specific FOIA exemptions and release all segregable portions of otherwise exempt material. Requesters reserve the right to appeal any responses to this Request.

We anticipate your determination regarding expedited processing within 10 days.[41] I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).


Respectfully submitted,


*/s/ Jeffrey Stein*

Jeffrey Stein
Brett Max Kaufman
National Security Project
American Civil Liberties Union Foundation
125 Broad St., 18th Fl.
New York, NY 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Baher Azmy
Ian Head
Center for Constitutional Rights
666 Broadway, 7th Fl.
New York, NY 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org
ihead@ccrjustice.org

---

[41] *See* 5 U.S.C. § 552(a)(6)(E)(ii); 6 C.F.R. § 5.5(e)(4).

12

# Exhibit B



**U.S. Department of Justice**

Office of Legal Counsel

*Washington, D.C.  20530*

November 25, 2025

Jeffrey Stein
American Civil Liberties Union Foundation
jstein@aclu.org

> **Re:    FOIA Tracking No. FY26-014**

Dear Mr. Stein:

This letter acknowledges receipt of your October 15, 2025 Freedom of Information Act ("FOIA") request to the Office of Legal Counsel ("OLC"), among others, on behalf of the ACLU and the Center for Constitutional Rights ("CCR"), in which you seek the following "records created from January 20, 2025, to the present[:]" "(1) the President's July 2025 'directive' to the Department of Defense authorizing the use of military force against Latin American drug cartels the executive branch deems to be 'terrorist organizations'; (2) the recent [OLC] opinion concluding that the President has the authority to order lethal strikes against drug cartels, including those that have not been designated as 'terrorist organizations,' as well as individuals 'affiliated' with such cartels; and (3) any unclassified summaries of either document."  Your request has been assigned tracking number **FY26-014.**  Based on our preliminary review of your request, and pursuant to 28 C.F.R. § 16.5(b), your request has been tentatively assigned to the "complex" processing track.  If you would like to narrow your request so that it can be transferred to the "simple" track and processed more quickly, please contact Melissa Golden at the addresses and phone number provided below. We have not yet made a decision on your request for a fee waiver.  We will do so after we determine whether fees will be assessed for this request.

You have requested expedited treatment of your request on the ground that the documents sought are "urgently needed to inform the public about actual or alleged government activity."  *See* 5 U.S.C. § 552(a)(6)(E); 28 C.F.R. § 16.5(e)(1)(ii).  Department of Justice regulations set forth the basis for expedited processing, providing for expedited treatment when a request involves "[a]n urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in disseminating information."  28 C.F.R. § 16.5(e)(1)(ii).

I have determined that your request for expedited processing under 28 C.F.R. § 16.5(e)(1)(ii) should be denied.  While you have stated that "[o]btaining information about government activity, analyzing it, publishing it, and widely disseminating it to the press and public are critical and substantial components of the ACLU's work," and that the "CCR's primary and regular activities *include* the publication of newsletters, know-your-rights handbooks, legal analysis of current human rights issues, and other similar materials for public dissemination," (emphasis added), you have not established that either organization is "primarily engaged in disseminating information."  Courts have held that to qualify under this standard, an organization must be "primarily, and not just incidentally, engaged in information dissemination."  *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 276 (D.D.C. 2012).  Put another way, information dissemination must be "*the* main activity" of the requestor, and not merely "*a* main activity."  *ACLU of N. Cal. v. DOJ*, No. 04-4447, 2005 WL

588354, at \*14 (N.D. Cal. Mar. 11, 2005). Accordingly, courts have upheld the denial of requests for expedited processing from such legal policy advocacy organizations as the American Civil Liberties Union of Northern California and the Landmark Legal Foundation. *See Landmark Legal Found.*, 910 F. Supp. 2d at 275-76; *ACLU of N. Cal.*, 2005 WL 588354, at \*14. A review of the ACLU and the CCR's public statements about their mission and work indicates that their primary activity is legal policy advocacy and not information dissemination. *See, e.g., About the ACLU*, https://www.aclu.org/about-aclu (last visited Nov. 21, 2025) (describing the ACLU as "our nation's guardian of liberty, working in courts, legislatures, and communities to defend and preserve the individual rights and liberties that the Constitution and the laws of the United States guarantee everyone in this country"); *What We Do*, https://ccrjustice.org/home/what-we-do (last visited Nov. 21, 2025) (describing the CCR as "dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights" and as "committed to the creative use of law as a positive force for social change" through the use of "cutting-edge litigation, advocacy and strategic communications in work on a broad range of civil and human rights issues"). Therefore, because information dissemination is neither the ACLU's, nor the CCR's main activity, you have not satisfied this standard.

Because of the considerable number of FOIA requests received by OLC prior to your request, we are unable to comply with the twenty-day statutory deadline for responding to your request. I regret the necessity of this delay, but I assure you that your request will be processed as soon as practicable. In the meantime, if you have any questions or wish to discuss your request, you may contact Melissa Golden, OLC's FOIA Public Liaison, at usdoj-officeoflegalcounsel@usdoj.gov, (202) 514-2053, or at Office of Legal Counsel, United States Department of Justice, 950 Pennsylvania Ave., N.W., Room 5517, Washington, DC 20530.

Additionally, you may contact the Office of Government Information Services ("OGIS") at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

You have the right to an administrative appeal. You may administratively appeal by writing to the Director, Office of Information Policy ("OIP"), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date of this letter. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

*Jared Kaprove*

Jared Kaprove
FOIA and Records Management Attorney

2

# Exhibit C



**U.S. Department of Justice**

Office of Legal Counsel

*Washington, D.C. 20530*

March 12, 2026

Jeffrey Stein
American Civil Liberties Union Foundation
jstein@aclu.org

      **Re:**    **FOIA Tracking No. FY26-014; ACLU v. DOJ, No. 25 Civ. 10189 (S.D.N.Y.)**

Dear Mr. Stein:

      This letter responds to your October 15, 2025 Freedom of Information Act ("FOIA") request to the Office of Legal Counsel ("OLC"), among others, on behalf of the ACLU and the Center for Constitutional Rights ("CCR"), in which you sought the following "records created from January 20, 2025, to the present[:]" "(1) the President's July 2025 'directive' to the Department of Defense authorizing the use of military force against Latin American drug cartels the executive branch deems to be 'terrorist organizations'; (2) the recent [OLC] opinion concluding that the President has the authority to order lethal strikes against drug cartels, including those that have not been designated as 'terrorist organizations,' as well as individuals 'affiliated' with such cartels; and (3) any unclassified summaries of either document." Pursuant to 28 C.F.R. § 16.5(b), your request was processed in the complex track. As you know, the request is also a subject of the above-captioned litigation and has been narrowed and clarified in certain ways by negotiation through counsel.

      We have completed our search of OLC files and have identified two documents that are responsive to your request. Of these two documents, we are enclosing one document with some material redacted pursuant to FOIA Exemption Five, 5 U.S.C. § 552(b)(5), because the material is protected by the presidential communications, deliberative process, and attorney-client privileges, and pursuant to FOIA Exemption Six, *id.* § 552(b)(6), because disclosure of the material would constitute a clearly unwarranted invasion of personal privacy.

      We are withholding the other record in full pursuant to FOIA Exemption One, *id.* § 552(b)(1), because it is classified; FOIA Exemption Three, *id.* § 552(b)(3), because it is specifically exempted from disclosure under the National Security Act, 50 U.S.C. § 3024(i)(1); and FOIA Exemption Five, 5 U.S.C. § 552(b)(5), because it is protected by the presidential communication, deliberative process, and attorney-client privileges.

      We have determined that none of the withheld material is appropriate for discretionary release. Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

To discuss any aspect of your request, your counsel may contact Assistant U.S. Attorney Peter Aronoff, at Peter.Aronoff@usdoj.gov. Additionally, you may contact the Office of Government Information Services ("OGIS") at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Although your request is the subject of ongoing litigation, and administrative appeals are not ordinarily acted upon in such situations, I am required by statute and regulation to inform you of your right to file an administrative appeal. You may administratively appeal by writing to the Director, Office of Information Policy ("OIP"), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

*Jared Kaprove*

Jared Kaprove
FOIA and Records Management Attorney

Enclosure

cc:    Peter Aronoff, Assistant United States Attorney
       Office of the U.S. Attorney for the Southern District of New York

2