UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION, *et al.*,

                Plaintiffs,

      v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

                Defendants.

Civil Action No. 25-10189 (PAE)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Jeffrey Stein
Brett Max Kaufman
Natalie Smith (admitted pro hac vice)
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
Ifeyinwa Chikezie
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org
ichikezie@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

    I.   Factual Background ..........................................................................................................2

    II.  Procedural History ...........................................................................................................3

LEGAL STANDARD ............................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

    I.   Defendants cannot withhold the OLC memo under Exemption 5. ....................................4

        A.  DOD has expressly adopted the OLC memo as its "working law,"
            which defeats all of the government's claimed Exemption 5 privileges. ......................5

        B.  The government's conclusory and incomplete declarations do not
            establish that the claimed Exemption 5 privileges apply. ...........................................14

           1.   The OLC declaration impermissibly relies on hearsay to
               justify withholding. .......................................................................................14

           2.   The government has not shown that the deliberative process
               privilege applies. ...........................................................................................15

           3.   The government has not shown that the attorney–client or
               presidential communications privileges have not been waived. ..........................18

    II.  The government fails to establish that the OLC memo's legal analysis
        cannot be segregated. ....................................................................................................22

    III. The Court should conduct *in camera* review given contrary record evidence. .................25

CONCLUSION ...................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**

*ACLU v. DOD (Yemen FOIA)*,
  435 F. Supp. 3d 539 (S.D.N.Y. 2020)................................................................. passim

*ACLU v. DOD*,
  901 F.3d 125 (2d Cir. 2018) ............................................................................... 4

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012) ................................................................................. 4

*ACLU v. DOJ*,
  No. 15 Civ. 1954 (CM), 2016 WL 889739
  (S.D.N.Y. Mar. 4, 2016) ....................................................................... 13, 18, 21, 22

*ACLU v. NSA*,
  925 F.3d 576 (2d Cir. 2019) ............................................................................... passim

*Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*,
  376 F. Supp. 3d 345 (S.D.N.Y. 2019)................................................................. 25

*Amnesty Int'l USA v. CIA*,
  728 F. Supp. 2d 479 (S.D.N.Y. 2010)................................................................. 18

*Brennan Ctr. for Just. v. Dep't of State*,
  No. 17 Civ. 7520 (PGG), 2025 WL 753870
  (S.D.N.Y. Mar. 10, 2025) .................................................................................. 18

*Brennan Ctr. for Just. v. Dep't of State*,
  No. 17 Civ. 7520 (PGG), 2019 WL 10984173
  (S.D.N.Y. Mar. 29, 2019). ................................................................................. 21

*Brennan Ctr. for Just. v. DOJ*,
  697 F.3d 184 (2d Cir. 2012) ............................................................................... passim

*Campaign for Accountability v. DOJ*,
  155 F.4th 724 (D.C. Cir. 2025)........................................................................... 12

*Carney v. DOJ*,
  19 F.3d 807 (2d Cir. 1994) ................................................................................. 15

*Carter v. Dep't of Com.*,
830 F.2d 388 (D.C. Cir. 1987) ........................................................................... 25

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
922 F.3d 480 (D.C. Cir. 2019) ........................................................................... 13

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ........................................................................... 19

*Cook v. Nat'l Archives & Recs. Admin.*,
758 F.3d 168 (2d Cir. 2014) ................................................................................. 4

*Ctr. for Effective Gov't v. Dep't of State*,
7 F. Supp. 3d 16 (D.D.C. 2013) ........................................................... 13, 20, 21

*Dep't of State v. Ray*,
502 U.S. 164 (1991) .............................................................................................. 3

*Electronic Frontier Foundation v. DOJ*,
739 F.3d 1 (D.C. Cir. 2014) ............................................................................... 12

*Florez v. CIA*,
829 F.3d 178 (2d Cir. 2016) ................................................................................. 4

*Goldberg v. Dep't of State*,
818 F.2d 71 (D.C. Cir. 1987) ............................................................................... 4

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) ......................................................................... 14, 16

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ........................................................................... 18

*Jud. Watch, Inc. v. Dep't of Com.*,
224 F.R.D. 261 (D.D.C. 2004) ........................................................................... 15

*Jud. Watch, Inc. v. DOD*,
913 F.3d 1106 (D.C. Cir. 2019) ......................................................................... 14

*Jud. Watch, Inc. v. DOJ*,
365 F.3d 1108 (D.C. Cir. 2004) ......................................................................... 18

*Knight First Amend. Inst. v. CDC*,
560 F. Supp. 3d 810 (S.D.N.Y. 2021) ................................................................ 21

iv

*Londrigan v. FBI*,
   670 F.2d 1164 (D.C. Cir. 1981) ............................................................................ 14

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011) ..................................................................................... 3, 18

*N.Y. Times Co. v. OMB*,
   531 F. Supp. 3d 118 (D.D.C. 2021) .............................................................. 14, 15

*Nat'l Council of La Raza v. DOJ*,
   411 F.3d 350 (2d Cir. 2005) ................................................................... passim

*Nat'l Day Laborer Org. Network v. ICE*,
   811 F. Supp. 2d 713 (S.D.N.Y. 2011) .......................................................... 19, 22

*New York Times v. DOJ*,
   756 F.3d 100 (2d Cir. 2014) ................................................................... passim

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ................................................................................ 5, 6, 14

*Ray v. Turner*,
   587 F.2d 1187 (D.C. Cir. 1978) ........................................................................ 25

*Seife v. FDA*,
   553 F. Supp. 3d 148 (S.D.N.Y. 2021) ............................................................... 22

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ...................................................................................... 21

*Wilner v. NSA*,
   592 F.3d 60 (2d Cir. 2009) ................................................................................. 4

**Statutes**

5 U.S.C. § 522(a)(4)(B) ................................................................................... 4, 25

5 U.S.C. § 552(a)(2)(B) ......................................................................................... 6

5 U.S.C. § 552(b) ................................................................................................. 22

**Other Authorities**

*Apr. 2018 Airstrikes Against Syrian Chem.-Weapons Facilities*, 42 Op. O.L.C. 39
   (May 31, 2018)........................................................................................................... 29

O.L.C., *Memorandum for Legal Advisor, National Security Council Re: Proposed War
   Department Operation to Support Law Enforcement Efforts in Venezuela*
   (Dec. 23, 2025)........................................................................................................... 29

**PRELIMINARY STATEMENT**

Over the past eight months, the U.S. military has killed nearly two hundred people through a series of deadly strikes on small boats in the Caribbean Sea and eastern Pacific Ocean. To justify its lethal campaign to both members of Congress and the American public, the Executive Branch has repeatedly invoked a single memorandum drafted by the Department of Justice's Office of Legal Counsel ("OLC"). Executive Branch officials and members of Congress who have reviewed the memo confirm that it contains legal analysis purporting to justify these lethal strikes and that the Executive Branch regards it as providing the legal basis and parameters for the ongoing campaign.

To inform the American public about the government's justification for this unlawful use of military force abroad, Plaintiffs submitted a Freedom of Information Act ("FOIA") request seeking release of this OLC memo. But despite openly relying on the memo to justify an ever-mounting number of deaths, Defendants have withheld it, refusing to subject it to public scrutiny.

Defendants' motion argues that the OLC memo is a pre-decisional, advisory, and presidential document subject to withholding under FOIA Exemption 5. But Defendants have forsaken any claim to those privileges by expressly adopting the OLC memo as "working law." The record makes clear that whatever the memo began as, it has now become a binding document within the Department of Defense ("DOD")—and its continued withholding makes it the very kind of "secret law" that the drafters of FOIA meant to eliminate.

And even if the memo had not been expressly adopted, Defendants have not satisfied their burden to justify withholding under these privileges. Their sparse and conclusory declarations do not establish that the deliberative process privilege even applies. And had the presidential communications and attorney–client privileges ever applied, dissemination of the memo beyond their narrow confines would have waived them. Finally, Defendants fail to demonstrate that

1

disclosure of the memo's legal analysis would plausibly reveal classified information, as they must

to justify withholding under FOIA Exemptions 1 and 3.

The Court should deny Defendants' motion.

**STATEMENT OF FACTS**

**I.      Factual Background**

Plaintiffs incorporate the Statement of Facts produced in their Cross-Motion for Summary

Judgment, *see* ECF No. 49 at 2–8, and rely on the exhibits filed in support of that motion. *See* ECF

No. 50. However, Plaintiffs here highlight another relevant source that arose the day before

Plaintiffs filed their motion and which Plaintiffs were unable to incorporate at that time.

At a Senate Armed Services Committee hearing on April 30, 2026, Chairman of the Joint

Chiefs of Staff General Dan Caine discussed the OLC memo in a colloquy with Senator Tim Kaine:

> Sen. Kaine: General Caine, I want to ask you a question about Southern Spear. It's an operational question. I know from your background that you carefully act to keep military actions within the rules of war. What legal justification could there possibly be that would allow the US military to strike boats in international waters and kill the occupants of those boats without a showing of evidence that there's narcotics on those boats?
>
> Gen. Caine: Well, sir, as you know, our job is to show the range of options, the associated risks, and then take those execution orders, transmit them down to the COCOMs on legally appropriate and legally backstopped actions.
>
> Sen. Kaine: Could you give me a legal justification . . . that would authorize striking boats that do not have evidence that they're carrying narcotics?
>
> Gen. Caine: . . . I don't have a copy of the order issued to SOUTHCOM with me today. It's classified in its own right, which clearly articulates based on a variety of criteria, what constitutes a valid military and legally valid target in that theater. And I just want to say I know and trust that our commanders at Echelon are rigorously following that legal opinion and those legal boundaries upon which we've been issued those orders.
>
> Sen. Kaine: And General Caine, I would encourage, again, my colleagues, I am at a disadvantage. I've seen the legal opinion, but I can't talk about it because it's classified. I've seen the targeting criteria, but I can't talk about them because they're classified. I've seen the secret list of DTOs against whom we have declared war that even they haven't been informed of, but I can't talk about it because it's classified. But I would urge all of my colleagues to go to the SCIF and read the targeting criteria and

2

get briefed about it, and then also look at all of the files of all the strikes that have taken place. I've done that with the first 46 strikes or so. And I think there's a profound mismatch between what is occurring and the underlying assumptions in the legal opinion.[1]

As this and Plaintiffs' other sources make clear, the Executive Branch, and specifically DOD, continues to rely on the OLC memo as the binding legal basis and parameters—and public justification—for its ongoing boat strikes campaign.

## II.    Procedural History

To inform the American public about the legal rationale underlying the administration's boat strikes campaign, on October 15, 2025, Plaintiffs submitted identical FOIA requests to DOD, OLC, and the Department of State. They sought (1) the OLC final opinion concerning the President's authority to order lethal strikes against drug cartels; (2) President Trump's July 2025 directive to DOD authorizing the use of military force against Latin American drug cartels; and (3) any unclassified summaries of the above two documents. *See* ECF No. 1 ¶ 27. After Defendants notified Plaintiffs that OLC and DOD had identified responsive records, Plaintiffs voluntarily dismissed the Department of State as a Defendant in this action. *See* ECF No. 34. On March 17, 2026, the parties notified the court that their cross-motions for summary judgment would be narrowed to the OLC memo's withholding. *See* ECF Nos. 37, 45.

## LEGAL STANDARD

Enacted to promote government transparency and accountability, FOIA establishes a strong presumption towards public disclosure. *See Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). An agency may withhold from public scrutiny only information that falls within one of FOIA's "narrowly construed" exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Courts

---

[1] Testimony of Chairman of the Joint Chiefs of Staff Gen. J. Daniel Caine Before the S. Comm. on Armed Servs., 119th Cong. 1, 78–80 (2026), https://www.armedservices.senate.gov/ imo/media/doc/04-30-2026_transcript-full.pdf (Smith Decl. Ex. A, at 78–80).

3

review such agency determinations *de novo*, "resolving doubts in favor of disclosure." *Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 173 (2d Cir. 2014); *see* 5 U.S.C. § 522(a)(4)(B).

FOIA places the burden on the government to provide a "logical" or "plausible" justification for nondisclosure. *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009). An agency may satisfy that burden through government declarations, which courts afford "substantial weight." *ACLU v. DOJ*, 681 F.3d 61, 69 (2d Cir. 2012) (cleaned up). But such deference is appropriate only where agency declarations are "reasonably specific" and "not controverted by either contrary evidence in the record or by evidence of agency bad faith." *ACLU v. DOD*, 901 F.3d 125, 133 (2d Cir. 2018) (cleaned up). Where "contrary evidence" in the record "undermine[s] or call[s] into question" an agency's assertions, the agency cannot meet its burden. *Goldberg v. Dep't of State*, 818 F.2d 71, 81 (D.C. Cir. 1987). Such contrary evidence can take many forms. *See Florez v. CIA*, 829 F.3d 178, 187 (2d Cir. 2016) (holding that there is no "arbitrary limitation on the range of evidence a district court may consider in assessing" the logic and plausibility of an agency's justification for withholding information). Ultimately, the reviewing court must decide "whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility," *id.* at 185 (citation omitted), and "all doubts as to the applicability of [invoked] exemption[s] must be resolved in favor of disclosure," *Wilner*, 592 F.3d at 69. To assess the validity of the government's claimed exemptions, courts have broad discretion to conduct *in camera* review of records an agency seeks to withhold. *See* 5 U.S.C. § 522(a)(4)(B).

## ARGUMENT

### I.      Defendants cannot withhold the OLC memo under Exemption 5.

Because DOD has expressly adopted the OLC memo as its "working law," it cannot justify withholding the memo under any of its claimed privileges. Since the government fails to meet its burden on those grounds, the Court need not determine whether the government has established

withholding in the first instance. If the Court did undertake that inquiry, though, the government would fail to meet its burden. OLC's conclusory declaration addressing Exemption 5, *see* Decl. of Ryan Watzel, ECF No. 52 ("Watzel Decl."), does not establish that the deliberative process privilege ever applied to the memo. And whether or not the presidential communications privileges and attorney–client privileges ever attached, both were waived through dissemination to DOD officials.

A. **DOD has expressly adopted the OLC memo as its "working law," which defeats all of the government's claimed Exemption 5 privileges.**

As explained below, the government's bare-bones declaration does not meet its burden to logically and plausibly establish that the OLC memo is privileged—and, at a minimum, further declarations, and perhaps even discovery, would be required to resolve those questions. *See infra* § I.B.1. But the Court need not even decide whether the government has established (or eventually can establish) the threshold application of the deliberative process, attorney–client, and presidential communications privileges, because this case can be decided on more straightforward grounds. The Executive Branch, including DOD, has expressly adopted the OLC memo as the "working law" governing the boat strikes campaign. Because of that, Exemption 5 does not protect the memo, and it must be disclosed.

Under the "working law" doctrine, an agency may not rely on Exemption 5 to withhold "opinions and interpretations which embody [its] effective law and policy." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (quotation marks omitted); *see also Brennan Ctr. for Just. v. DOJ*, 697 F.3d 184, 208 (2d Cir. 2012) (describing how "express adoption . . . vitiates Exemption 5 protection"). This limit on Exemption 5 emanates from FOIA's plain text. Any attempt to withhold an agency's "effective law and policy" cannot be reconciled with FOIA's affirmative disclosure provisions, which mandate the public release of, among other things,

"statements of policy and interpretations which have been adopted by [an] agency," 5 U.S.C. § 552(a)(2)(B). These provisions "represent[] a strong congressional aversion to secret agency law." *Sears*, 421 U.S. at 153 (cleaned up); *see also Brennan Ctr.*, 697 F.3d at 200 (noting that "the 'working law' analysis is animated by the affirmative provisions of FOIA").

While the Second Circuit has not articulated a comprehensive definition of 'working law,'" *ACLU v. NSA*, 925 F.3d 576, 595 (2d Cir. 2019), it has recognized that a document contains "working law" when it embodies "formal or informal policy on how [an agency] carries out its responsibilities," and when it "represents" an agency's "final legal position," *Brennan Ctr.*, 697 F.3d at 201 (cleaned up). The dispositive question is "whether the agency treats the document as binding." *ACLU v. NSA*, 925 F.3d at 594 (italics omitted). To guide this inquiry, courts employ a "functional test," asking, among other things, "whether agency officials feel free to disregard the document's instructions" and "whether the document is applied in the agency's dealings with the public." *Id.* at 594–95.

The government has not established that the deliberative process privilege applies. *See infra* § I.B.2. But even if it had, a privileged "document first drafted as legal or policy advice [may] *become* an agency's" working law through a process called "express adoption." *ACLU v. NSA*, 925 F.3d at 594–95. Such "[a]doption occurs when an agency *itself* accepts a previously deliberative document as binding" authority on a legal or policy matter. *Id.* at 596 n.106. Once "adopted, formally or informally, as the agency position on an issue," *Brennan Ctr.*, 697 F.3d at 195 (citation omitted), the document's "reasoning becomes . . . the agency['s] . . . responsibility to defend," *Sears*, 421 U.S. at 161. "Because th[is] adoption process is usually internal and hidden from public view," the Second Circuit's "'express adoption' cases have generally looked for external evidence that such adoption has occurred." *ACLU v. NSA*, 925 F.3d at 595; *see Nat'l Council of La Raza v.*

6

*DOJ*, 411 F.3d 350, 357 n.5 (2d Cir. 2005) (noting that "courts must examine *all* the relevant facts and circumstances in determining whether express adoption . . . has occurred"). Especially powerful are "the Government's public statements" about a document, which may "serve as express evidence that" it has been "adopted . . . as binding." *ACLU v. NSA,* 925 F.3d at 596 n.106 (italics omitted). Courts consider such public statements "together," not in isolation. *Brennan Ctr.*, 697 F.3d at 204; *ACLU v. NSA*, 925 F.3d at 596.

Applying these principles, the Second Circuit has found express adoption of an OLC memo on three occasions.

First, in *National Council of La Raza v. DOJ*, the Second Circuit held that public comments made by the Attorney General and his high-ranking advisors evidenced DOJ's adoption of an OLC memo authorizing state and local governments to enforce civil immigration law. 411 F.3d at 357–60. In particular, the court highlighted references to the OLC memo made by counsel to the Attorney General during a presentation attended by representatives from state and local police departments. *Id*. at 354–55, 357–58. According to the Second Circuit, these references demonstrated that DOJ was "using the OLC Memorandum to justify and explain the [agency's] policy and to assure the public and the very state and local government officials who would be asked to implement the new policy that the policy was legally sound." *Id*. at 358. The court held that where an agency "repeatedly depend[s] on [an OLC memo] as the primary legal authority justifying" its policy, and "repeatedly invoke[s] [an] OLC Memorandum to assure those outside of the agency that its policy [is] lawful," it is "clear that the [agency has] embraced the OLC's reasoning as its own." *Id*. at 358–59.

Next, the Second Circuit again found express adoption of an OLC memo in *Brennan Center for Justice v. DOJ*, 697 F.3d 184 (2d Cir. 2012). There, the court held, based on "two public

statements," that an OLC memo was expressly adopted by the United States Agency for International Development ("USAID"). *Id*. at 204. The first statement, in a footnote of a USAID policy document, noted OLC's "determin[ation]" that domestic aid organizations could not be required to pledge opposition to prostitution and sex trafficking. *Id*. Then, about a year later, a USAID official testified to Congress that OLC had since reversed its position in a new memo, and that USAID was "simply following . . . [OLC's] advice" when requiring domestic organizations to make the pledge. *Id*. While noting that neither statement "discussed at length the rationale provided by the OLC for its conclusion," the Second Circuit nonetheless held that, "taken together," the two statements "demonstrate[d] sufficient reliance on both the conclusion and reasoning of the OLC memorandum to remove the protection of the deliberative-process exemption." *Id*. at 204–05. This was so, the Second Circuit said, because USAID had "referenc[ed]" the OLC memo "as authoritative" when "explaining [its] course of action." *Id*. at 205.

Finally, in *New York Times v. DOJ*, 756 F.3d 100 (2d Cir. 2014), the Second Circuit found express adoption of an OLC memo justifying the targeted killing of a U.S. citizen, Anwar al-Aulaqi. That memo's legal analysis "overlap[ped]" with aspects of a shorter, "officially disclosed" DOJ white paper. *Id*. at 110, 116. In concluding that the memo's legal analysis must be disclosed, the court surveyed evidence that the memo had become "relied-upon authority" within the Executive Branch. *Id*. at 116. It noted the Attorney General's invocation of the memo as part of a "public relations campaign to convince the public that" al-Aulaqi's killing was lawful. *Id*. at 114. And it highlighted then-Assistant to the President John Brennan's congressional testimony that "Office of Legal Counsel advice establishes the legal boundaries within which we can operate." *Id*. at 115. "Together, these statements revealed that the OLC memorandum was no longer simply

8

advice to a policy-maker, but that the Government afforded the memorandum binding force within the Executive Branch as its 'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 596 (describing *New York Times* as an "express adoption" case). The Court thus held that the government could not "invoke" the memo as binding "authority and then shield it from public view." *N.Y. Times*, 756 F.3d at 116.

Here, two sets of evidence demand a similar result.

First, Executive Branch officials have identified, described, and relied upon the OLC memo as the legal justification their ongoing boat strikes campaign, adopting its reasoning as their own. In Senate testimony, then-DOD Principal Deputy General Counsel Charles Young III stated that, like the OLC memo at issue in *New York Times*, this memo sets forth the "legal basis . . . for the manner in which" the military is carrying out lethal boat strikes. Stein Decl. Ex. A at 77. Subsequently, White House Press Secretary Karoline Leavitt referenced the OLC memo when claiming that one strike in the ongoing campaign was "in accordance with the law of armed conflict" and when describing the "document reviews" afforded to members of Congress, including those "who may have expressed some concerns" about "the Venezuelan strikes." Stein Decl. Ex. I, at 26. And just a few weeks ago, General Caine, Chairman of the Joint Chiefs of Staff, further explained the role of the OLC memo. General Caine acknowledged that the ongoing boat strikes campaign was based on an "order issued to SOUTHCOM" that "clearly articulates, based on a variety of criteria, what constitutes a valid military and legally valid target in that theater." Smith Decl. Ex. A, at 79. And he emphasized that military commanders—like those who issued the SOUTHCOM order—"are rigorously following *that legal opinion* and those legal boundaries *upon which* we've been issued those orders." *Id.* General Caine was, obviously, talking about the OLC memo—something that Senator Kaine's immediate response ("I have seen the legal opinion,

but I can't talk about it because it is classified") made clear. *Id.* General Caine's testimony establishes beyond doubt that DOD is issuing operational orders based on the OLC memo and the controlling law it represents within the agency.

Second, members of Congress from both political parties (including its oversight committees) who have attended Executive Branch briefings on the boat strikes campaign and reviewed the OLC memo have, on numerous occasions, expressly stated that the Executive Branch, including DOD, treats the memo as both binding authority and the government's justification, to the public and to Congress, for the campaign. Based on Executive Branch briefings and their review of the memo, members of Congress have described the memo as "*the* legal authorization document"[2] for the boat strikes campaign, and as containing both a detailed "legal justification"[3] and "rationale"[4] for the strikes, as well as the "parameters" that "govern" the military's use of lethal force in this context.[5] Senator Kaine and Representative Gregory Meeks have explained that Executive Branch officials, including from DOD, have "presented"[6] the memo to Congress as containing its final legal positions, including on the question whether it must seek "congressional approval for the military action."[7] And Representative Jim Himes has disclosed that the Executive Branch's embrace of the memo means that "anyone engaged in [the boat strikes campaign] will be protected from prosecution" and that "military officers" will not disobey orders to carry out boat strikes, even if they consider those orders to be unlawful.[8]

---

[2] Stein Decl. Exs. B, at 5 (Sen. Warner); E, at S7945 (Sen. Kaine); K, at 5 (Sen. Schmitt).

[3] Stein Decl. Ex. H (Senate Armed Services Committee members).

[4] Stein Decl. Ex. C, at 3 (Rep. Himes).

[5] Stein Decl. Ex. J, at S8491 (Sen. Reed).

[6] Stein Decl. Ex. E., at S7945 (Sen. Kaine).

[7] Stein Decl. Ex. D, at 4 (Rep. Meeks).

[8] Stein Decl. Ex. C, at 25 (Rep. Himes).

10

Taken "[t]ogether," these Executive Branch and congressional disclosures establish that "the Government [has] afforded the [OLC] memorandum binding force within the Executive Branch as its 'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 596. Executive Branch officials, including from DOD, have "repeatedly depended" on the OLC memo "as the primary legal authority justifying" the boat strikes campaign and "repeatedly invoked" the memo "to assure those outside of the agency," including members of Congress who directly oversee the U.S. military, that their "policy [is] lawful." *La Raza*, 411 F.3d at 358–59. They have also invoked the memo as part of a "public relations campaign to convince the public that" the ongoing boat strikes are lawful. *N.Y. Times*, 756 F.3d at 114; *Brennan Ctr.*, 697 F.3d at 205. And they have explained that "agency officials" do not "feel free to disregard [the memo's] instructions." *ACLU v. NSA*, 925 F.3d at 595. In these circumstances, it is "clear that" DOD has "embraced the OLC's reasoning as its own." *La Raza*, 411 F.3d at 359. As such, the memo's reasoning cannot be withheld. *Id*. at 360 (describing as "offensive to FOIA" the idea that an agency "may adopt a legal position while shielding from public view the analysis that yielded that position").[9]

---

[9] Defendants' declarations do not address any of these sources, even though Plaintiffs provided Defendants with many of them well in advance of the filing of Defendants' motion. *See* ECF No. 36. The declaration submitted by DOD General Counsel Earl Matthews, which addresses FOIA Exemptions 1 and 3, does state that he is "unaware of any authorized public disclosures . . . that could reduce the need to protect the information within it," Decl. of Earl G. Matthews ("Matthews Decl.") ¶ 20, ECF No. 53, but that qualified and unspecific statement appears to address the waiver-based doctrine of "official acknowledgment," which is not at issue here. *See ACLU v. DOD (Yemen FOIA)*, 435 F. Supp. 3d 539, 555–56 (S.D.N.Y. 2020). And the Watzel Declaration conclusorily states that "based on information provided to me by Executive Branch officials familiar with the Memorandum and its use, the document has not been publicly adopted or incorporated by reference by any policymaker as a basis for a policy decision," Watzel Decl. ¶ 31. That is contradicted by the record, *see, e.g.*, Smith Decl. Ex. A, at 79, and asserts, or at least incorporates, a generalized legal conclusion (itself based on a misunderstanding of the correct legal test for adoption) rather than contributing to the factual record. *See infra* § I.B.1.

For those reasons, this case is like *Brennan Center*, *La Raza*, and *New York Times*. And further, the Second Circuit's *rejection* of an "express adoption" argument in *ACLU v. NSA* reinforces that adoption has occurred here. In that case, the court held that three pieces of evidence were insufficient to conclude that an OLC memo had been expressly adopted as agency working law: (1) a press conference in which the Attorney General did not affirmatively mention the OLC memo and, when asked about it, declined to confirm or deny its existence, 925 F.3d at 586–87; (2) an internal agency report that did not explicitly mention the OLC memo and, indeed, may not have "refer[red] to a specific document at all," *id*. at 599 n.130; and (3) Senate testimony in which the Attorney General stated only that he "agreed with [OLC's] legal analysis," *id*. at 599. The court held that, "at most," these statements indicated "that OLC analyzed a legal question, that the Attorney General reviewed that analysis and agreed with it, and that the Attorney General then certified the program" analyzed in the memo—not "that the Attorney General (or any other official) ever . . . regarded [the OLC memo] as binding authority." *Id*.

Similarly, D.C. Circuit cases finding certain OLC memos exempt from disclosure are also inapt. In *Electronic Frontier Foundation v. DOJ*, for instance, the D.C. Circuit concluded that an OLC memo had not been adopted by an agency only after observing that the agency had never "affirmatively rais[ed] [the memo] to justify the [agency's] policy" and had even explicitly "disavowed reliance" on the memo in congressional testimony. 739 F.3d 1, 11–12 (D.C. Cir. 2014) (specifically distinguishing these facts from *Brennan Center* and *La Raza*). And the D.C. Circuit's cases concluding that DOJ need not affirmatively disclose all or some subset of OLC memos stand only for the proposition that OLC memos are not "categorically" "working law" but instead must be adopted to become "working law." *See, e.g.*, *Campaign for Accountability v. DOJ*, 155 F.4th 724, 740 (D.C. Cir. 2025); *Citizens for Resp. & Ethics in Wash. v. DOJ*, 922 F.3d 480, 486 (D.C.

Cir. 2019) ("An OLC opinion . . . qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own.").

By contrast, here, Executive Branch and DOD officials have repeatedly and explicitly referenced the OLC memo as binding authority *within DOD*. Those officials have expressly invoked the OLC memo "to assure the public and the very . . . government officials who" oversee "the new [boat strikes] policy that the policy [is] legally sound." *La Raza*, 411 F.3d at 358. And their interactions with Congress demonstrate that the memo contains *their own* final legal positions—not just OLC's—and that it is binding on and constrains military officers. Where, as here, an agency treats a document as binding on its officers and authoritative in its "dealings" with those beyond the agency's walls, the document has been expressly adopted. *ACLU v. NSA*, 925 F.3d at 595 (explaining that the hallmarks of "working law" include the facts that "agency officials [do not] feel free to disregard" its contents and that "agency superiors direct their subordinates to follow [a] document's" contents).

Accordingly, even if the government could eventually establish that the OLC memo was protected by the deliberative process, attorney–client, or presidential communications privileges when drafted, it has since become "working law," and it must be disclosed. To do otherwise would be to empower the Executive Branch to "engage in . . . governance by secret law"—the antithesis of FOIA's purpose. *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 29 (D.D.C. 2013) (cleaned up); *accord ACLU v. DOJ*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016). Indeed, the government concedes that endorsing the government's withholding of a document that "ha[s] the force of law" within an agency and that "guide[s] a wide array of Executive Branch activity . . . would amount to an endorsement of 'secret law,' undermining a core purpose of FOIA." Defs.' Br. 18–19, ECF No. 54. And that is exactly right: As the Second Circuit

13

has long held, Exemption 5 provides no license for the government to rely on a document as binding legal authority but "then shield it from public view." *Brennan Ctr.*, 697 F.3d at 208; *see Jud. Watch, Inc. v. DOD*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) (explaining that "secret law" under the FOIA "set[s] forth a decision that binds subordinates") (citing *Sears*, 421 U.S. at 153). What the government has expressly adopted as "working law," FOIA requires it to disclose.

### B. The government's conclusory and incomplete declarations do not establish that the claimed Exemption 5 privileges apply.

As a general matter, the OLC declaration cannot justify withholding under Exemption 5 because it is not sufficiently "detailed and nonconclusory." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488–89 (2d Cir. 1999); *see also ACLU v. DOD* (*Yemen FOIA*), 435 F. Supp. 3d 539, 560 (S.D.N.Y. 2020). At least in part, that seems to be because it impermissibly relies on hearsay, not Mr. Watzel's personal knowledge. Regardless, the facts it alleges are insufficient to support the government's claim that any Exemption 5 privileges apply.

### 1. The OLC declaration impermissibly relies on hearsay to justify withholding.

The OLC declaration makes vague assertions for which the declarant has no personal knowledge. *See* Watzel Decl. ¶ 18 ("Based on information provided to me by Executive Branch officials familiar with the Memorandum and its use, I understand that . . . ."). Courts do routinely accept hearsay declarations, including those that attest to some facts outside of one's firsthand knowledge, in FOIA cases for certain purposes. Most commonly, those are cases where a declarant supervised a search for records and is addressing the adequacy of that search—but "courts have not always found hearsay to be sufficient when it is offered to justify the withholding of records based on an exemption." *N.Y. Times Co. v. OMB*, 531 F. Supp. 3d 118, 124 (D.D.C. 2021) (citing *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981); *Jud. Watch, Inc. v. Dep't of Com.*, 224

14

F.R.D. 261, 264–65 (D.D.C. 2004)). This case is one in which a secondhand declaration is inadequate.

At issue is a request for a single document, the legitimacy of whose withholding (in the first instance, apart from adoption) turns entirely on the specific details of that document's creation, purpose, use, and dissemination. Contrary record evidence casts the government's explanation for those details into doubt. *See N.Y. Times Co.*, 531 F. Supp. 3d at 129 (affording no deference to the government and rejecting its reliance on hearsay where "the statements of declarants who lacked personal knowledge . . . were contradicted by other evidence in the record"). Under such circumstances, the government cannot satisfy its burden without producing a declaration from someone with actual knowledge of the relevant events, and of the OLC memo itself. *See id.* (finding that the government did not meet its burden for the deliberative process or presidential communications privileges); *infra* § I.B.2–3.

In the event that the Court addresses whether OLC properly invoked these privileges in the first instance (and it need not, *see supra* § I.A), targeted discovery—limited to uncovering the facts essential to this matter's resolution—would be warranted. *See Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (Discovery may be suitable where an agency's submissions are not "adequate on their face.").

### 2.    The government has not shown that the deliberative process privilege applies.

The government's general account of the OLC memo at issue, as presented in its declarations, is this: A group of White House lawyers sought legal advice from OLC "for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action." Watzel Decl. ¶ 17. "[S]everal weeks prior to the Memorandum being finalized," OLC attorneys met with attorneys from the White House, the NSC, and "three other

Executive Branch agencies," to whom they "provided" and with whom they "discussed" their advice. *Id.* ¶ 18. All of this, the government represents, was part of a "deliberative process in connection with the President's decision whether to take [military] action." *Id.* ¶ 17. On September 5, 2025, OLC finalized the memo. *Id.* Though the government does not acknowledge that the OLC memo even concerns the boat strikes campaign, the government conducted (and announced) its first lethal strike on September 2, three days earlier. Stein Decl. Ex. G, at 7.

The government's account falls short of providing enough information to meet its burden to establish the deliberative process privilege. *See Grand Cent. P'ship, Inc.*, 166 F.3d at 478 (requiring agency declarations to "contain reasonable specificity of detail rather than merely conclusory statements") (cleaned up). The memo is pre-decisional, the government says, "because it was prepared for the consideration of the President's advisers to aid the President in deciding whether to authorize one or more military actions." Watzel Decl. ¶ 23. And it is deliberative, the government says, because it contains "advice . . . for use in deliberations over whether to recommend that the President authorize the action, . . . as well as for use by the President in making the decision." *Id.*

That is not enough. The government never identifies the specific decision to which the memo relates, or when—or even if—it was made. *See Brennan Ctr.*, 697 F.3d at 202 (A pre-decisional document is one "originated to facilitate an *identifiable* final agency decision." (emphasis added) (citation omitted)). Nor does the government ever explain how the OLC memo was "*actually* related to the process" through which the President's decision was made, or what role the OLC memo played in that process. *La Raza*, 411 F.3d at 356 (citation modified).

These details, and in particular the timeline, are important. Three days before the memo was finalized, the government announced that it had engaged in the first of dozens of lethal boat

strikes in international waters. Stein Decl. Ex. G, at 7. Bizarrely, even though the government has acknowledged that strike and dozens of others, the government's declaration does not discuss any of them, or how they might relate to the OLC memo. Moreover, the declaration does nothing to dispel the possibility—or even probability, based on public reporting—that the relevant policy decision was not to engage in any *particular* strike, including the first of them, but whether to engage in the boat strikes *campaign* writ large.

And the declaration provides no information whatsoever about when *that* decision was made. Indeed, long before the first strike actually took place, the President had reportedly issued a classified directive—which, in response to Plaintiffs' initial FOIA request, the government acknowledged exists, *see* ECF No. 28—that authorized the use of "military force against certain Latin American drug cartels that his administration has deemed terrorist organizations."[10] Moreover, while the government's declaration pins the interagency meeting of "senior attorneys" to "several weeks" before the OLC memo's finalization, Watzel Decl. ¶ 18, it was reported that the memo "was being drafted" far earlier—"[o]ver the late summer and into the fall."[11]

The government has failed to contend with—indeed, even to acknowledge—these inconsistencies. On such contested grounds, it has not logically or plausibly demonstrated that the deliberative process privilege applies with its declaration.

---

[10] Helene Cooper et al., *Trump Directs Military to Target Foreign Drug Cartels*, N.Y. Times (Aug. 8, 2025), https://www.nytimes.com/2025/08/08/us/trump-military-drug-cartels.html (Smith Decl. Ex. B, at 1); *see* Ellen Nakashima et al., *Stephen Miller's Hard-Line Mexico Strategy Morphed Into Deadly Boat Strikes*, Wash. Post. (Dec. 18, 2025), https://www.washingtonpost.com/national-security/2025/12/18/stephen-miller-boat-strikes-mexico-venezuela-execute-order (Smith Decl. Ex. C, at 4) (dating the directive to July 2025).

[11] Smith Decl. Ex. C, at 7.

17

### 3.   The government has not shown that the attorney–client or presidential communications privileges have not been waived.

The government's declaration hardly does better with the attorney–client and presidential communications privileges, but Plaintiffs do not care to quibble with whether the government could eventually establish, with the bare minimum, that those privileges apply in the first instance. What the government's declaration does not even attempt to do, however, is address any of the record evidence establishing that the OLC memo has been so widely distributed that the government has waived both privileges.

The presidential communications privilege covers "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (cleaned up). Like all evidentiary privileges (and FOIA exemptions, *see Milner*, 562 U.S. at 565), it is construed "narrowly," in a way that is "carefully circumscribed to accomplish the purposes of the privilege." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *see also Yemen FOIA*, 435 F. Supp. 3d at 559 (recognizing the "narrow diameter" of the privilege) (citation omitted). Its aim is to facilitate "the President's personal decision-making process," not Executive Branch deliberations writ large. *Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108, 1118 (D.C. Cir. 2004). As this Court has recognized, distribution of otherwise privileged documents to officials other than close presidential advisors and their staff will waive the privilege. *See Yemen FOIA*, 435 F. Supp. 3d at 559. Such dissemination "eviscerate[s]" the privilege, *ACLU v. DOJ*, 2016 WL 889739, at *5, because it exceeds the privilege's scope and undermines its justifying purpose. *See Brennan Ctr. for Just. v. Dep't of State*, No. 17 Civ. 7520 (PGG), 2025 WL 753870, at *9 (S.D.N.Y. Mar. 10, 2025).

The attorney–client privilege is similarly narrow, applying only to "confidential communications between client and counsel made for the purpose of obtaining or providing legal

assistance." *ACLU v. NSA*, 925 F.3d at 589. Disclosure beyond the confines of that relationship waives the privilege, and the agency must prove that the communication remained confidential. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (recognizing that "confidentiality both at the time of the communication and maintained since" is "a fundamental prerequisite to assertion of the privilege"); *Nat'l Day Laborer Org. Network v. ICE*, 811 F. Supp. 2d 713, 736, 743–44 (S.D.N.Y. 2011) (The agency must "have sufficiently investigated and reported whether the confidentiality of the documents was maintained such that the attorney-client privilege applies.").

The government makes no attempt to demonstrate that the OLC memo has only been distributed within the narrow limits of these two privileges—and the record demonstrates that it cannot. The OLC memo has been disseminated well beyond both the President's close circle of advisors and the bounds of the attorney-client relationship, waiving both privileges (if they ever applied). As General Caine recently confirmed in Senate testimony, the DOD "commanders" leading the boat strikes campaign have reviewed and continue to rely on the OLC memo as the legal basis for their campaign. Smith Decl. Ex. A, at 79. Soon after the boat strikes campaign began, former Principal Deputy General Counsel Young stated that he had also reviewed the memo during his time at DOD. Stein Decl. Ex. A, at 76. And SOUTHCOM Commander General Francis Donovan disclosed that DOD, not the President or his close advisers, maintains "information release authority" over the memo. Stein Decl. Ex. L, at 42. This evidence makes clear that the memo has not been maintained as a presidential advisory document or a communication from executive branch lawyers to a client, but has become something else—a functional, binding agency record. *Cf. supra* § I.A.

19

Nowhere does the government acknowledge DOD officials' review or control of the memo, nor does it suggest that they constitute the type of close presidential advisors to whom the privilege applies. *Cf. Yemen FOIA*, 435 F. Supp. 3d at 559. The government emphasizes that the presidential communications privilege applies not only to the President but to his advisors, Defs.' Br. 14–15, but that is a different question, one about the initial application of the privilege, not its waiver. Rather than confronting this contrary evidence, the government argues that this Court's "dicta" and others' conclusions that the presidential communications privilege can be waived through distribution are wrong. Instead, the government maintains, the narrow ambit of the privilege is relevant only at the point of attachment, and that once the privilege applies to a document, distribution within the Executive Branch will not disturb it. Defs.' Br. 18.

The government's attempt to distinguish *Center for Effective Government v. Department of State*, 7 F. Supp. 3d at 16, is unpersuasive. Even though the OLC memo is not a presidential directive, this case raises the same fundamental concerns that animated that court's reasoning. The DOD and congressional disclosures in the record here demonstrate that the Executive Branch, including DOD, treats the OLC memo as binding and relies on it to guide the implementation of the boat strikes campaign. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29. As in that case, the Executive Branch officials to whom this OLC memo was disseminated have no advisory relationship to the President that falls within the privilege. *Id*. at 27, 29. Here as there, the distribution of the document at issue was not plausibly related to the President's decision-making process and raises serious concerns about the development of "secret law." *See id*. at 29–30. Indeed, were the presidential communications privilege permitted to attach to a document and then, forever forward, retain that protection despite an agency's conversion of the document into a binding and controlling agency precedent, it would threaten to permit withholding of a wide

range of agency records so long as the President or his advisors had initially asked for or received them. And in a world of an encroachingly unitary executive, *cf. Trump v. Wilcox*, 145 S. Ct. 1415 (2025), *every* agency decision, in some relevant sense, could be said to ultimately rest with the President. The government's view of the privilege, and the inability of dissemination throughout an agency to change the character of a once-privileged document, is wildly overbroad.

The other waiver cases the government unsuccessfully seeks to distinguish are best read to recognize waiver of the privilege where, as here, a document has been distributed beyond the narrow circle within which the privilege applies. In *ACLU v. DOJ*, the court, explicitly agreeing with *Center for Effective Government*'s reasoning, ordered the government to disclose the document's recipients and the purpose for distribution so that it could conduct a waiver evaluation. 2016 WL 889739, at *5. (A similar order would be appropriate here.) In *Brennan Center for Justice v. Department of State*, the court ordered *in camera review* of an allegedly privileged document precisely because it lacked "sufficient information to gauge whether the information contained in the withheld records has been disseminated in a manner that undermines application of the presidential communications privilege." No. 17 Civ. 7520 (PGG), 2019 WL 10984173, at *6 (S.D.N.Y. Mar. 29, 2019). And contrary to the government's assertions, two of the four bases on which the court in *Knight First Amendment Institute v. CDC* rejected a presidential communications privilege claim related to dissemination. 560 F. Supp. 3d 810, 829–30 (S.D.N.Y. 2021) (reasoning that the documents in question had been distributed to some Executive Branch officials whom the government did not establish were within the privilege's scope or for a non-advisory purpose).

Its waiver argument unavailing, the government must satisfy its burden at the factual level. But the only contrary evidence it proffers is its claim that the memo has been "strictly controlled."

Defs.' Br. 16, 19; Watzel Decl. ¶ 24. The above DOD disclosures demonstrate that whatever form that "strict control" took necessarily exceeded the narrow scope of the presidential communications privilege. Because the OLC memo has been distributed to DOD officials "well beyond the circle of close presidential advisors," *ACLU v. DOJ*, 2016 WL 889739, at *5, the government has waived the privilege, to the extent it ever attached.

Likewise, the DOD officials who have reviewed the memo plainly fall beyond the scope of the attorney-client relationship the government describes. The government's declaration states that the clients for whom OLC prepared the memo were "legal advisers in the White House Counsel's Office" and "senior White House officials in the NSC and the Executive Office of the President." *See* Watzel Decl. ¶ 22. The DOD officials responsible for implementing the boat strikes campaign are well outside this group. Further, the officials for whom the government claims OLC prepared the memo no longer maintain its information release authority; DOD now controls it. The most natural conclusion is that to the extent the privilege ever attached, it was waived by disclosure to third parties within DOD. In any event, the government's declaration plainly fails to satisfy its burden of proving that the document remained confidential. *See Nat'l Day Laborer*, 811 F. Supp. 2d at 744.

## II. The government fails to establish that the OLC memo's legal analysis cannot be segregated.

Plaintiffs do not dispute that certain information in the OLC memo, including factual information, may be withheld. But Defendants cannot evade the obligation FOIA imposes to disclose reasonably segregable information. *See* 5 U.S.C. § 552(b). While the government is entitled to a presumption of compliance with this obligation, contrary evidence may rebut that presumption. *See Seife v. FDA*, 553 F. Supp. 3d 148, 171 (S.D.N.Y. 2021). Because the record demonstrates that the memo contains segregable "pure legal analysis," *N.Y. Times*, 756 F.3d at 119;

*Yemen FOIA*, 435 F. Supp. 3d at 556, Defendants cannot logically or plausibly justify withholding the OLC memo in full under Exemptions 1 and 3.

First, the government acknowledges that the OLC memo contains "unclassified . . . portions of the legal analysis," Matthews Decl. ¶ 21, and officials who have reviewed the OLC memo describe it as containing discrete sections of legal analysis. Representative Himes explained that the memo's "legal rationale" analyzes the "concept of a non-international armed conflict" and concludes that military officials who participate in the boat strikes campaign "will be protected from prosecution." Stein Decl. Ex. C, at 3–4, 25. According to Senator Kaine, the memo also espouses a "philosophy of Executive war powers" based on analysis of "constitutional-era documents" and presents a "domestic legal rationale for when the President can unilaterally wage war." Stein Decl. Ex. E, at S7945. These disclosures describe a document whose primary purpose is to provide legal analysis "widely applicable to many operations," not to analyze "operational detail and strategy" for a single military operation. *Yemen FOIA*, 435 F. Supp. 3d at 563–64. They indicate that the memo contains constitutional, criminal, and international legal interpretation and conclusions independent from application to properly classified facts. Such "pure legal analysis" is "meaningfully segregable" from classified information. *Id.* at 563–64; *see also N.Y. Times*, 756 F.3d at 119.

In the face of these disclosures, it is neither logical nor plausible that the OLC memo's legal analysis is so closely intertwined with classified facts that its disclosure would indirectly reveal classified information, sources, or associations. *Cf. ACLU v. NSA*, 925 F.3d at 601; *see* Matthews Decl. ¶ 21; Watzel Decl. ¶ 23. Indeed, nowhere in its brief does the government argue that Exemptions 1 or 3 justify withholding OLC memo's legal analysis. The Matthews Declaration even admits that some parts of the legal analysis reference merely *sensitive,* not classified,

23

information. *See* Matthews Decl. ¶ 21 (stating that the memo "contains information that is not marked as classified, . . . including portions of the legal analysis," that merely "cite classified materials"—which could be redacted—"and sensitive legal opinions that have not been previously released to the public" and whose "existence . . . has not been publicly acknowledged").

Moreover, as Defendants' counsel conceded at the pre-motion hearing, *see* ECF No. 42, there is no reason to believe that this OLC memo differs fundamentally from the form of previously disclosed OLC memos that demonstrably contain segregable legal analysis. For example, mere months ago, OLC voluntarily released its memo analyzing the legality of Nicolas Maduro's extraordinary rendition.[12] *See* O.L.C., *Memorandum for Legal Advisor, National Security Council Re: Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela* (Dec. 23, 2025), https://www.justice.gov/olc/media/1423306/dl?inline. That memo featured multiple passages of largely unredacted legal analysis, in which international and domestic legal principles were applied to facts provided in an earlier, more heavily redacted section. That structure—a factual background section followed by distinct legal analysis sections—mirrors the OLC memo concerning the targeted killing of Anwar al-Aulaqi and other voluntarily disclosed OLC memos related to the lethal use of military force abroad. *See, e.g., N.Y. Times*, 756 F.3d at 115, 119; *Apr. 2018 Airstrikes Against Syrian Chem.-Weapons Facilities*, 42 Op. O.L.C. 39 (May 31, 2018).

Defendants' attempt to withhold the OLC memo's legal analysis under Exemptions 1 and 3 is illogical and implausible.

---

[12] At a March 23, 2026, conference, *see* ECF No. 46 (transcript forthcoming), the Court specifically asked the government to address, in its brief, why the OLC memo at issue here was different from the Maduro memo. Neither the government's brief nor its declarations ever mentions the Maduro memo.

**III.    The Court should conduct *in camera* review given contrary record evidence.**

The government advances an improperly narrow standard for *in camera* review—though even that standard is met here. *See* Defs.' Br. 4 n.2 (*in camera* review appropriate "only where agency declarations lack sufficient detail"); *see supra* § I.B. It fails to acknowledge that courts' interest in conducting *in camera* review is equally—perhaps especially—strong where, as here, contrary evidence in the record undermines the government's assertion that it has met its burden of proof. *See Carter v. Dep't of Com.*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[I]f information contained in agency affidavits is contradicted by other evidence in the record," *in camera* review is "necessary to insure that agencies do not misuse the FOIA exemptions to conceal non-exempt information."); *see also Adelante Ala. Worker Ctr. v. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 360 (S.D.N.Y. 2019) (conducting *in camera* review given a "conflict" between evidence in the record and agency declarations). Even in the absence of contrary record evidence, this Court has previously exercised its discretion to conduct *in camera* review of withheld documents related to the Executive Branch's use of lethal force abroad. *See Yemen FOIA*, 435 F. Supp. 3d 539. The considerations which informed that decision are heightened here, given that the record rebuts the presumption that Defendants have complied with their obligation to disclose reasonably segregable information. Further, as this Court has recognized, *in camera* review is especially appropriate where, as here, the parties' dispute "turns on the contents" of a single document. *Id*. at 560.

The "ultimate criterion" for determining whether to conduct *in camera* review is "simply" this Court's discretion. *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978); *see also* 5 U.S.C. § 552(a)(4)(B). To confirm the government's assertions in the face of contrary evidence, the Court can, and should, conduct *in camera* review.

## CONCLUSION

The Court should deny the government's motion for summary judgment.

Dated: May 22, 2026
     New York, New York

Respectfully submitted,

/s/ *Jeffrey Stein*
Jeffrey Stein
Brett Max Kaufman
Natalie Smith (admitted pro hac vice)
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
Ifeyinwa Chikezie
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org
ichikezie@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org