UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, and CENTER FOR
CONSTITUTIONAL RIGHTS,

                Plaintiffs,

                v.

DEPARTMENT OF JUSTICE including its
component OFFICE OF LEGAL COUNSEL,
DEPARTMENT OF STATE, and
DEPARTMENT OF DEFENSE,

                Defendants.

25 Civ. 10189 (PAE)

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2697
peter.aronoff@usdoj.gov

Of Counsel:

PETER ARONOFF
Assistant United States Attorney

**CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT.............................................................................................................. 2

    I.   The Memorandum Is Protected by Exemption 5 ...................................................... 2

      A.    The Memorandum Is Protected by the
Presidential Communications Privilege ....................................................................... 2

      B.    The Memorandum Is Protected by the Deliberative Process Privilege ............. 5

      C.    The Memorandum Is Protected by the Attorney-Client Privilege................... 19

    II.   The Government Properly Asserted Exemptions 1 and 3....................................... 20

    III.  In Camera Review Is Not Necessary ..................................................................... 22

CONCLUSION............................................................................................................ 23

# AUTHORITIES

Page(s)

**Cases**

*ACLU of N. California v. DOJ*,
880 F.3d 473 (9th Cir. 2018) ...................................................................................... 4

*ACLU v. DOD*,
435 F. Supp. 3d 539 (S.D.N.Y. 2020)..................................................................... 21, 22

*ACLU v. NSA*,
925 F.3d 576 (2d Cir. 2019)................................................................................. passim

*Brennan Ctr. for Just. v. DOJ*,
697 F.3d 184 (2d Cir. 2012).................................................................... 9, 10, 15, 16

*Bureau of Nat. Affs., Inc. v. DOJ*,
742 F.2d 1484 (D.C. Cir. 1984)...................................................................... 6, 7

*Buzzfeed, Inc. v. FBI*,
613 F. Supp. 3d 453 (D.D.C. 2020) ................................................................... 3

*Center for Effective Gov't v. Dep't of State*,
4 F. Supp. 3d  (D.D.C. 2013)................................................................................ 4

*Coastal States Gas Corp. v. DOE*,
617 F.2d 854 (D.C. Cir. 1980)............................................................................ 6

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988)............................................................................................ 13

*Elec. Frontier Found. v. DOJ*,
739 F.3d 1 (D.C. Cir. 2014)......................................................... 8, 13, 14, 17

*In re Cnty. of Erie*,
473 F.3d 413 (2d Cir. 2007).............................................................................. 20

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997).................................................................. 2, 3, 5, 21

*Judicial Watch, Inc. v. DOJ*,
365 F.3d 1108 (D.C. Cir. 2004).......................................................................... 3

*Murphy v. Dep't of Army*,
613 F.2d 1151 (D.C. Cir. 1979)................................................................... 16, 19

*National Council of La Raza v. DOJ*,
411 F.3d (2d Cir. 2005)................................................................................. 9, 10, 15

*New York Times Co. v. DOJ*,
756 F.3d 100 (2d Cir. 2014)...................................................................... 10, 15, 21

*New York Times Co. v. DOJ*,
939 F.3d 479 (2d Cir. 2019)................................................................................. 7

*New York Times Co. v. DOJ*,
282 F. Supp. 3d 234 (D.D.C. 2017) ................................................................. 14

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975).............................................................................................. 8

ii

*Protect Democracy Project, Inc. v. NSA*,
    10 F.4th 879 (D.C. Cir. 2021)................................................................................. 3
*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
    421 U.S. 168 (1975)....................................................................................... 7, 14
*Santos v. Murdock*,
    243 F.3d 681 (2d Cir. 2001).................................................................................. 18
*United States v. Reynolds*,
    345 U.S. 1 (1953)................................................................................................ 22
*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)................................................................................. 17

### Statutes

5 U.S.C. § 552(a)(2)(A) ........................................................................................ 14
5 U.S.C. § 552(a)(4)(B) ........................................................................................ 22

### Rules

Fed. R. Civ. P. 56(c)(4).......................................................................................... 18

**PRELIMINARY STATEMENT**

The Memorandum at issue in this case memorializes legal advice given by the Office of Legal Counsel, which was "provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action, as part of a deliberative process in connection with the President's decision whether to take such action in his constitutional role as Commander in Chief of the armed forces." Watzel Decl. ¶ 17.[1] As the government's opening papers explain, the Memorandum was properly withheld in full under FOIA's exemption 5 and the presidential communications privilege and attorney-client privilege, and its deliberative legal advice and certain facts are also protected by the deliberative process privilege. In addition, portions were properly withheld under exemptions 1 and 3 because they contain properly classified facts and intelligence sources and methods.

Plaintiffs' brief ("Pl. Br."), ECF No. 49, principally argues that the OLC Memorandum must be disclosed because (they claim) it is "working law" or that it has been expressly adopted. These arguments are mistaken. The Memorandum is not working law: it reflects advice given by a component of the Department of Justice to help inform Presidential decisionmaking; it does not make, or bind the President to make, any such decision, and indeed OLC would lack authority to do so. Nor has any Executive Branch component or official expressly adopted the Memorandum. The Executive Branch remarks that plaintiffs cite, which were made either in Congressional testimony or about the process of sharing information with Congress, simply acknowledge existence of the Memorandum and its subject matter. Plaintiffs' attempts to use statements of members of Congress do not advance their arguments: only statements from the Executive Branch can bind the Executive Branch. Plaintiffs' other arguments are without merit. Thus, the Court

---

[1] Unless otherwise noted, this brief repeats abbreviations used in the government's opening brief.

should deny plaintiffs' motion for summary judgment and grant the government's cross-motion.

## ARGUMENT

### I.     The Memorandum Is Protected by Exemption 5

Plaintiffs devote the bulk of their argument attempting to show that the Memorandum—a closely-held confidential legal analysis reflecting advice given to inform presidential decisionmaking—is not protected by the presidential communications privilege, attorney-client privilege, or deliberative process privilege. Plaintiffs are mistaken.

### A.  The Memorandum Is Protected by the Presidential Communications Privilege

Plaintiffs make three arguments for why the presidential communications privilege should not apply to the Memorandum, but each one fails on the facts, the law, or both.

First, plaintiffs argue that it is "implausible" that the Memorandum was created "for the purpose of 'formulating . . . advice to be given to the President.'" Pl. Br. 21 (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)). But OLC's declaration explains that the Memorandum memorializes advice given to members of the White House Counsel's Office who advise the National Security Council—including the chief legal counselors to the National Security Advisor, an immediate advisor to the President—and that advice was "provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action." Watzel Decl. ¶¶ 17, 22. It is hardly implausible that the President's advisors would consult OLC on legal questions about potential military action—indeed, OLC routinely advises on "difficult and unsettled questions of law." Watzel Decl. ¶ 25. Plaintiffs are correct that the Memorandum postdates the commencement of the military action (Pl. Br. 21), but as OLC has explained, the Memorandum memorializes advice that was provided at a meeting several weeks before the document was finalized. *Id*. ¶ 18. Thus, its substantive content still consists of advice given to inform Presidential decisionmaking. In any event, the presidential communications

privilege encompasses not only predecisional documents, but post-decisional ones as well, rendering this inquiry irrelevant. *Judicial Watch*, *Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (quoting *In re Sealed Case*, 121 F.3d at 745); *see also In re Sealed Case*, 121 F.3d at 745. And the privilege extends to both presidential communications and to records memorializing or reflecting such communications. *See Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 887 (D.C. Cir. 2021) (document written to memorialize conversation with president).

Second, plaintiffs argue that the Memorandum was disseminated beyond the "circle of close presidential advisors" whose communications are eligible for the privilege. Pl. Br. 21 (quotation marks omitted). But as the government's opening brief ("Govt. Br."), ECF No. 54, explained in detail, this argument relies on a mistaken understanding of the law. Govt. Br. 16-22. In short, the presidential communications privilege is not waived or otherwise rendered inapplicable whenever a person other than an immediate presidential advisor receives a document that carries its protection. The government's opening brief explains that this standard would be unworkable, particularly for OLC advice, and is at odds with the basic purpose of the privilege. Govt. Br. 21-22.[2]

In any event, the facts in this case are nothing like the cases where courts have (mistakenly) purported to find a waiver of the privilege based on circulation. The Memorandum at issue here is classified, and access has been "strictly controlled." Watzel Decl. ¶ 24. Plaintiffs note that the former Acting General Counsel of DOD testified that he had seen the Memorandum (Pl. Br. 21 & n.41 (quoting Stein Decl. Ex. A)). But the most senior lawyer at the Department of Defense seeing

---

[2] As discussed in more detail below, the fact that Congress was permitted to review the Memorandum in a secure facility likewise does not constitute a waiver of any privilege, including the presidential communications privilege. *See Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453, 471 (D.D.C. 2020).

3

the Memorandum is hardly the sort of widespread circulation that the court in *Center for Effective Gov't v. Dep't of State*, 4 F. Supp. 3d 16 (D.D.C. 2013) ("*CEG*") confronted.[3] Plaintiffs also note that General Donovan, the Commander of SOUTHCOM, testified in Congress that DOD "'has kept the information release authority,'" and that he was "just carrying out the assigned tasks," Pl. Br. 22 & n.42 (quoting testimony); Stein Decl. Ex. L. But in context, that remark only communicated that General Donovan himself did not believe he had the authority to unilaterally release the Memorandum—an unsurprising conclusion for any number of reasons, including that he is a military leader, not a lawyer; that the document was created by another department, and to advise the White House, *see* Watzel Decl. ¶ 17; and that the document contains the equities of non-DOD agencies, *see* Matthews Decl. ¶ 5. In short, these facts do not undercut the presidential communications privilege.

Third, plaintiffs claim that the presidential communications privilege is abrogated because the Memorandum "has been expressly adopted as agency 'working law.'" Pl. Br. 22. As explained below, this argument is factually mistaken: there is no indication that the Memorandum has been expressly adopted or constitutes working law. But more fundamentally, the Court need not reach this argument, because it is inapplicable to the presidential communications privilege.

Working law is not an all-purpose exception to exemption 5. *See, e.g.*, *ACLU of N. California v. DOJ*, 880 F.3d 473, 490 (9th Cir. 2018) (agreeing with D.C. Circuit that the working law exception does not extend to the attorney work product privilege incorporated under FOIA's exemption 5). As the district court in *ACLU v. NSA* noted, the presidential communications

---

[3] Nor does the testimony indicate that Mr. Young had seen the Memorandum for a non-advisory reason. We also note that Mr. Young was the Acting General Counsel of the Department during much of 2025. *See, e.g.*, https://www.wicker.senate.gov/2025/10/chairman-wicker-leads-sasc-hearing-to-consider-four-senior-defense-nominations.

privilege protects not only deliberative materials, but also "'final and post-decisional materials.'" *ACLU v. NSA*, No. 13 Civ. 9198 (KMW), 2017 WL 1155910, at *12 (S.D.N.Y. Mar. 27, 2017) (quoting *In re Sealed Case,* 121 F.3d at 745). Therefore, "the working law exception does not apply to the presidential communication privilege." *Id*.

Plaintiffs attempt to refute this conclusion by citing *CEG*. Pl. Br. 22. But as the government's opening brief explained, *CEG* involved an array of dramatically different facts indicating that the presidential directive at issue was never confidential, which simply rendered the presidential communications privilege inapplicable in the first place. Govt. Br. 18-19. Thus, *CEG* does not stand for the proposition that working law is an exception to the presidential communications privilege. Rather, it shows that an unclassified, widely distributed presidential directive with the force of law and intended to guide Executive Branch action, which the president personally touted in public and which the government largely revealed through an official publication, was never confidential, and thus falls outside both the purposes and protections of the presidential communications privilege. 7 F. Supp. 3d at 19-30.

In sum, none of the plaintiffs' arguments undermine the government's presidential communications privilege assertions. Because the privilege applies to the entire Memorandum, that suffices to decide this case.

### B.  The Memorandum Is Protected by the Deliberative Process Privilege

Plaintiffs' arguments on the deliberative process privilege are equally without merit.

#### 1.  The Memorandum Is Both Predecisional and Deliberative

Plaintiffs' first argument is that the deliberative process privilege does not apply to the Memorandum, both on the ground that the privilege's elements are not met and on the ground that it has been expressly adopted and is working law. These arguments misapprehend the relevant facts undergirding the Memorandum and the applicable law.

First, the Memorandum contains predecisional advice. Watzel Decl. ¶ 23. Although plaintiffs correctly note that the Memorandum itself was finalized after the decision was made, Pl. Br. 12, the Memorandum memorializes advice that was given before the decision. Specifically, the Memorandum's legal advice was originally provided to, and discussed with, senior attorneys from the White House Counsel's Office, including those who advise NSC, as well as three other Executive Branch agencies, at a meeting convened several weeks before the Memorandum was finalized. *Id*. ¶ 18. That advice was provided before the President decided to authorize military action. *Id*.

The deliberative process privilege applies to information that would reveal the substance of intra- or inter-agency deliberations. *See, e.g.*, *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 867 (D.C. Cir. 1980) (the privilege protects the "the give-and-take of the consultative process"). Thus, while it is true that the Memorandum (the document memorializing the advice) was finalized after the decision to take action was made, what matters is whether the protected information (the advice) is predecisional. Here, as OLC's declaration explains, it is. The government's opening brief cited several cases upholding exemption 5 assertions over predecisional material contained in a postdecisional document. *See* Govt. Br. 25-26.

Second, the Memorandum's advice is deliberative. It reflects legal advice that was one component of the decisionmaking process, not the final result of that process. Watzel Decl. ¶ 23. Plaintiffs suggest, based on testimony before Congress, that the Memorandum reflects a "decision" of an interagency working group. Pl. Br. 12. But even assuming that attorneys representing multiple agencies agreed on a preliminary decision about *how to advise the President*, that does not render the resulting advice anything other than predecisional and deliberative, given that the President had the final say. *See Bureau of Nat. Affs., Inc. v. DOJ*, 742 F.2d 1484, 1497 (D.C. Cir.

6

1984). A final recommendation is still a recommendation; otherwise, "any interim recommendation or piece of advice from one policymaker to another" would be placed outside the privilege. *Id.*

Given the context, it should be unsurprising that OLC legal advice about contemplated military action is protected by the deliberative process privilege: OLC has "no legal authority to decide" whether to authorize a military course of action. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 185 (1975). Legal advice is just one input into the decision whether to proceed with military action. A decisionmaker would not seek OLC advice on a wide variety of relevant non-legal inputs—for example, the technical feasibility of the operation, the national security implications of assigning forces to the operation rather than to another task, domestic and foreign policy considerations, or whether non-military alternatives might achieve the same objectives. This is why the Second Circuit has noted that "OLC's legal advice and analysis informs the decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted." *ACLU v. NSA*, 925 F.3d 576, 592 (2d Cir. 2019).

## 2. The Memorandum Is Not Working Law and Has Not Been Expressly Adopted

Plaintiffs next argue that, even if the deliberative process privilege originally applied, two doctrines—working law and express adoption—render the privilege inapplicable in this case. That is mistaken.

The Second Circuit has held that information originally protected by the deliberative process privilege may lose that protection when it is shown to be an agency's "working law" on an issue that binds the public. *See New York Times Co. v. DOJ*, 939 F.3d 479, 490-91 (2d Cir. 2019) (citing *ACLU v. NSA*, 925 F.3d at 592-98). The doctrine is rooted in the Supreme Court's decision in *Sears*, which distinguished between privileged predecisional communications that

7

would shed light on deliberations, and nonprivileged documents that embody the agency's "'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 593 (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)).

The *ACLU v. NSA* court explained that "'working law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional." 925 F.3d at 593. Deliberative information that began as mere advice or input into a decision can become working law when it "has operative effect—i.e., binding rather than persuasive power," and "announces what an agency's law is, not what the law might be." *Id*. at 594. As this discussion makes clear, the doctrine is focused on a distinction fundamental to the deliberative process privilege: the line between predecisional and postdecisional material. That distinction is not relevant to the presidential communications privilege, so the working law exception does not apply in that context.[4]

The Memorandum is not working law. To begin with, it is clear that the Memorandum could not have been working law when it was created, and plaintiffs do not argue otherwise. The Memorandum originated from OLC within the Department of Justice, but provides advice to the President's advisors with regard to military action, an area where OLC and DOJ have no decisional role. Govt. Br. 26-27. Here, as in *Elec. Frontier Found. v. DOJ*, OLC "does not speak with authority on" military matters; therefore, the Memorandum "could not be the 'working law'" of any Executive Branch component unless it "'adopted' what OLC offered." 739 F.3d 1, 9–10 (D.C. Cir. 2014) ("*EFF*"). OLC advice "does not provide an authoritative statement" of the client's policy; "[i]t merely examines policy options available" to the requester. *Id*. at 10. Likewise, the

---

[4] Thus, as explained above, because the Memorandum is fully protected by the presidential communications privilege, plaintiffs' claims therefore would fail even if the Memorandum were working law.

Second Circuit recognized that because OLC lacked authority to make policy decisions for agencies that sought its legal advice, that advice when given was not "working law." *Brennan Ctr. for Just. v. DOJ*, 697 F.3d 184, 203-05 (2d Cir. 2012).[5] This conclusion is all the more obvious where, as here, the decisionmaker is the President, who as the head of the Executive Branch is not bound to follow the views or advice of any Executive Branch component or office.

Nor has the Memorandum *become* working law through adoption. To argue otherwise, plaintiffs seek to analogize this case to three Second Circuit decisions holding that OLC memoranda were not exempt from disclosure under FOIA. We thus review these decisions in some detail to explain both their legal reasoning and the facts that distinguish them from this case.

The Second Circuit first required release of an OLC memorandum in *National Council of La Raza v. DOJ*, 411 F.3d at 357–60 (2d Cir. 2005), because it concluded that statements made by the Attorney General and a close advisor demonstrated that DOJ had adopted its conclusion and reasoning as Department policy authorizing state and local enforcement of immigration law. There, the Attorney General had publicly referred to the specific OLC memorandum when seeking to "'state clearly the policy of the Department on this issue,'" and made similar statements in writing. *Id*. at 353 (quoting remarks). Further, a senior advisor to the Attorney General spoke at length about the same document at a public event that included state and local government officials who were being asked to enforce federal law. *Id*. at 354-55. The advisor reviewed the reasoning of the OLC memorandum and used it "to assure third parties as to the legality of the actions the third parties were being urged to take." *Id*. at 354-55, 57. Taking these public pronouncements together, the court determined that, because DOJ had "repeatedly invoked the OLC Memorandum

---

[5] As discussed further below, the *Brennan Center* court ultimately concluded that a document must nonetheless be released, but that was because it determined that the client agency had later adopted OLC's advice as its own policy. *Id*. at 204-05.

to assure those outside of the agency that its policy was lawful and to encourage states and localities to take actions that the Department desired," the document must be disclosed. *Id*. at 359.

The court again considered an OLC memorandum in *Brennan Center v. DOJ*. The FOIA request at issue sought OLC legal advice given to USAID and HHS about a statutory requirement that organizations receiving funding for HIV/AIDS work have a policy explicitly opposing prostitution and sex trafficking (the "pledge requirement"). 697 F.3d 184, 188 (2d Cir. 2012). In February 2004, OLC provided a one-page memorandum concluding that it would violate the First Amendment to apply the pledge requirement to domestic organizations, but several months later, OLC withdrew that advice and provided a draft memorandum expressing the contrary view. *Id*. at 190-92. A USAID publication noted that OLC had determined that the requirement could only be applied to foreign organizations; a USAID official later testified in Congress that its implementation was based on "following the advice" from OLC. *Id*. at 204. The court determined that those statements together established "sufficient reliance on both the conclusion and reasoning of the OLC memorandum to remove the protection of the deliberative-process exemption." *Id*. at 205.

Finally, in *New York Times Co. v. DOJ*, the Second Circuit required the release of an OLC memorandum on the targeted use of lethal force where a separate, shorter white paper with "nearly all the legal reasoning" of the memorandum had been officially disclosed. 756 F.3d 100, 116 (2d Cir.), *opinion amended on denial of reh'g,* 758 F.3d 436 (2d Cir. 2014), *supplemented,* 762 F.3d 233 (2d Cir. 2014). In reaching that conclusion, the court noted that in a hearing on his nomination to be CIA director, a senior executive branch official stated that OLC's advice "'establishes the legal boundaries within which we can operate.'" *Id*. (quoting testimony). Given the official disclosure, however, the court's reasoning was overdetermined. *Id*. at 116-17; *see also id.* at 119-

20 (noting that certain information could no longer be withheld as classified given official disclosures).

As the *ACLU v. NSA* court explained, what motivated both *La Raza* and *New York Times* was a concern that the Executive Branch was trying to have it both ways: on the one hand, offering an OLC opinion as evidence that its conduct was lawful; and on the other hand, avoiding scrutiny of that opinion by withholding it under FOIA. *ACLU v. NSA*, 925 F.3d at 591 (analogizing waiver to "fairness doctrine" from attorney-client privilege that prevents a litigant from selectively disclosing attorney advice). But as shown by a review below of the actual statements plaintiffs cite, that is not what happened here.

In addition, none of these cases considered (much less rejected) a claim of the presidential communications privilege over the OLC memorandum at issue. As we explained above, that privilege is not subject to the working law exception.

Ultimately, these three cases are factually distinguishable from this one.[6] We review plaintiffs' factual citations and place them against the relevant standards.

### 3.   Plaintiffs' Factual Citations Do Not Show Express Adoption

**Principal Deputy General Counsel of DOD statement.** Plaintiffs overread the statement of the Principal Deputy General Counsel Charles Young III before Congress. Mr. Young did not raise the Memorandum; rather, the senator questioning him did, noting that senators had requested the Memorandum and had not yet been provided it. ECF 50-1 at 76:3-14. Mr. Young noted that the Memorandum "was derived through an interagency lawyer's working group" of several agencies. *Id*. at 76:18-24. The senator then asked, "don't you think it would be a good idea to share

---

[6] The government does not concede that these cases were correctly decided, but recognizes that they are binding on this Court.

that with Congress," to which Mr. Young responded as follows, in an exchange worth quoting in full:

> Mr. Young: Senator, that's not within my discretion to share. I know that as that question has been asked before in other context of other strikes. If you go back to the Obama Administration, for nine years, they did not share their legal basis –
>
> Senator Shaheen: Yeah, I didn't support that either, to be frank.
>
> Mr. Young: -- for the manner in which they did the strike, but -- yes, Senator.
>
> Senator Shaheen: And I don't think the inappropriate behavior of other administration should guide inappropriate behavior in this administration.
>
> Mr. Young: No, Senator, I don't disagree. It's a matter of the discretion of the President under his Article 2 authority releasing that information to the Congress. At this point in time, it's not within my control in the current position that I'm in.

*Id.* 76:4-20.

Plaintiffs characterize this testimony to say that Mr. Young confirmed the Memorandum is "the[] legal basis" for the strikes. But that is not what Mr. Young said. He noted that a previous administration had not shared "their legal basis" for carrying out other strikes. But the point he was making—in response to the senator's question asking "don't you think it would be a good idea to share [the Memorandum] with Congress"—was that he had no authority to release it: the Memorandum was "not within my discretion to share," and that it was instead "a matter of the discretion of the President" on whether to release the document, a situation that he believed had arisen in past administrations.

More broadly, Mr. Young could not have opined on what the legal basis for the strikes was, because the decision on whether to proceed with contemplated military action was the President's, not DOD's. As OLC's declaration explains, the Memorandum "memorializes deliberative advice provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action, as part of a deliberative process in connection

12

with the President's decision whether to take such action in his constitutional role as Commander in Chief of the armed forces." Watzel Decl. ¶ 17. Mr. Young was not purporting to speak for the President. He did just the opposite: he deferred to the President.

Mr. Young's statement is thus fully consistent with the OLC declaration. Both the decision whether to proceed with military action, as well as any decision to disclose the legal basis for any action was up to the President as Commander in Chief. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (presidential authority to control classified information and determine procedures for individuals to access it flows primarily from constitutional role as Commander in Chief). Mr. Young could not bind the President on that question. It would defy logic and invert the statement's facial meaning to read a few words in Mr. Young's answer—in which Mr. Young disclaims authority over the Memorandum—to require its disclosure.

In addition, courts recognize that to find adoption of a privileged document, a statement must be from a source that can authoritatively state that what was once mere advice has been adopted as binding policy. That cannot occur when the statement comes from another agency (or here, when the President is the decisionmaker, from a source that cannot speak for the President). For example, in *EFF*, the D.C. Circuit concluded that the FBI had not expressly adopted an OLC memorandum—and in doing so, squarely distinguished both *La Raza* and *Brennan Center*— because "the FBI never *itself* publicly invoked or relied upon the contents of the OLC Opinion." 739 F.3d at 11. The FOIA requester pointed only to statements from DOJ's Office of the Inspector General and from Congress, but neither could "establish that *the FBI* adopted the OLC Opinion as *its own* reasoning." *Id*. Similarly, in *ACLU v. NSA*, a report from an interagency group of five Inspectors General discussed an OLC memorandum about a surveillance program under the heading "A New Legal Basis for the Program Is Adopted." 925 F.3d at 587. The Second Circuit

13

acknowledged that the IG report might be "informative," but concluded that it did not "amount to official decision[] or 'final opinion[].'" *Id*. at 600 (quoting 5 U.S.C. § 552(a)(2)(A)).

Apart from these considerations, courts have also recognized a distinction between an agency's affirmatively raising or relying on a document, and merely mentioning it in response to questions from Congress. For example, in *EFF*, when concluding that an OLC opinion was not the FBI's working law, the court noted that the FBI's then-General Counsel referenced the opinion only in response to questions from Congress; she did not affirmatively raise it to show what the agency's policy or "working law" was. *EFF*, 739 F.3d at 11. Similarly, in *New York Times Co. v. DOJ*, the court noted that testimony about a specific OLC memorandum in the Attorney General's confirmation hearing could not demonstrate adoption in part because the topic was raised by a senator. 282 F. Supp. 3d 234, 242 (D.D.C. 2017). The distinction makes sense for policy reasons as well: if merely answering questions from Congress could suffice to waive privileges, it would create incentives for Executive Branch officials to simply decline to answer altogether.

Finally, even if all these problems were overcome, Mr. Young's testimony was at a very high level of generality. It does not come close to the level of specificity that is necessary for express adoption: the testimony "utterly fails to support the conclusion that the reasoning in the" Memorandum was "adopted by the [President]" as his own reasoning, even if he "agrees with the conclusion" of the Memorandum. *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).

In sum, Mr. Young's testimony did not, and cannot, demonstrate that the Memorandum is working law or was expressly adopted.

**Press Secretary statement.** Plaintiffs also cite a statement of the White House Press Secretary, but that statement does not adopt the Memorandum as the Executive Branch's legal

basis for action; it merely noted that the Executive Branch had made a number of documents, including the Memorandum, available to Congress for inspection in secure facilities. ECF No. 50-9 at 27.

The Press Secretary's statement does not exhibit the features that courts have previously found sufficient to demonstrate adoption. The Press Secretary noted that the "the strike was conducted in international waters and in accordance with the law of armed conflict," without reference to any specific material or argument to substantiate the claim of legality. Then she stated that the Secretary of Defense had spoken to members of Congress, and that there had been 13 briefings to Congress. Only then did she mention the Memorandum:

> There have been a number of document reviews for members of Congress to review the classified DOJ Office of Legal Counsel opinion and other related documents… [T]hey have been made available to all 100 senators, all 435 members of the House, and to general counsels of the relevant committees on a bipartisan basis for their review.

ECF No. 50-9 at 27. The Press Secretary mentioned the Memorandum only to say that it was among the documents that had been made available for Congress to review. She did not say that it "'establishes the legal boundaries within which we can operate,'" as in *New York Times*, 756 F.3d at 116, or publicly walk through its reasoning to influence the behavior of third parties, as in *La Raza*, 411 F.3d at 354-55, or expressly cite it in a published document when noting the agency's position on a legal issue, as in *Brennan Center*, 697 F3.d at 191.

The Press Secretary's statement is even more general than statements held insufficient to create express adoption in *ACLU v. NSA*. There, the Attorney General noted that he "agreed with" OLC's "legal analysis," *id*. at 587, after he had spoken publicly about the "legal underpinnings" of the government surveillance program OLC had analyzed, *id*. at 586-87. In fact, the government later released a number of related OLC documents that contained much of the legal reasoning in a withheld OLC memorandum. *Id*. at 599. Even so, in the Second Circuit's view, this sequence

15

showed only "that OLC analyzed a legal question, that the Attorney General reviewed that analysis and agreed with it, and that the Attorney General then certified the [surveillance] program." *Id*. Because the disclosures did not "indicate that the Attorney General (or any other official) ever distributed the OLC memorandum as binding precedent, or that officials within NSA or another agency ever regarded OLC 10 as binding authority," and because none of the statements "represent an official decision or final opinion that explicitly references and relies on" the withheld opinion, they did not show adoption. As the court noted, "press briefings, congressional testimony, white papers and inspectors general reports might be informative, but they rarely, if ever, amount to official decisions or 'final opinions.'" *Id*. at 599-600.

Neither making the Memorandum available to Congress nor the Press Secretary's acknowledgment that this had been done abrogates the privileges that properly apply to the Memorandum. As was true with Mr. Young's testimony, a contrary rule would create an incentive for the Executive Branch to refrain from engaging with Congress. Indeed, the D.C. Circuit relied on precisely this concern when it concluded that, as a general matter, the Executive Branch does not waive FOIA exemptions by sharing material with Congress. *See Murphy v. Dep't of Army*, 613 F.2d 1151, 1155 (D.C. Cir. 1979). As the D.C. Circuit recognized, if "every disclosure to Congress would be tantamount to a waiver of all privileges and exemptions, executive agencies would inevitably become more cautious in furnishing sensitive information to the legislative branch—a development at odds with public policy which encourages broad congressional access to governmental information." *Id*. at 1156.

**Various statements from Senators and Members of Congress.** Plaintiffs cite a number of remarks by members of Congress, but as a matter of logic, these cannot show the *Executive Branch's* adoption of the Memorandum.

16

To start, as noted above, Congress is entitled to ask questions of Executive Branch officials, and may in its oversight capacity request to review documents. But the doctrines of working law and adoption are about whether the *Executive Branch* has adopted privileged documents. *See, e.g.*, *EFF*, 739 F.3d at 11.

That conclusion is consistent with the well-developed law of waiver of classification by official acknowledgment, where the Second Circuit has made clear that statements of one department or branch of the government do not constitute an official acknowledgment by another. In the leading case, *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009), a letter apparently authored by the CIA was published (and publicly available) in the Congressional Record. *Id.* at 180-81, 189-90. The Second Circuit nonetheless held that the CIA—which had never confirmed the authenticity of the published letter or its contents—had not waived any classification through official acknowledgment. *Id*. at 188-91. The CIA's own continued refusal to confirm or deny the letter's contents—that is, its refusal to make an official acknowledgment—"necessarily preserves some increment of doubt regarding the reliability of the publicly available information." *Id*. at 195. The rule is also consistent with the distinct constitutional roles of Congress and the Executive Branch, including the President's special role in protecting national security information. *Egan*, 484 U.S. at 527.

To the extent plaintiffs instead argue (Pl. Br. 17-18) that the statements from senators and representatives reveal what Executive Branch officials said in closed sessions—and that those purported Executive Branch statements demonstrated adoption—plaintiffs' argument cannot surmount factual, evidentiary, and legal hurdles.

To start, the statements plaintiffs cite simply show the legislators' own characterizations of the Memorandum, not the putative Executive Branch view. For example, Senator Kaine seems

17

to refer to the Memorandum as "the legal authorization document," ECF No. 50-5 at 3, but that is his own characterization; he does not state that any Executive Branch official told him that. Likewise, Senator Warner stated that the administration had "shared the Office of Legal Counsel's opinion that tries to lay out legal justification for those strikes," ECF No. 50-2 at 6, but did not say that any Executive Branch official, let alone the President, had affirmatively adopted the Memorandum as the Executive's own view. The same is true of Senator Schmitt's statement (he says that the strikes "are completely legally authorized" and then in the next sentence refers to the Memorandum, but makes no mention of any Executive Branch official or statement, *see* ECF No. 50-11 at 5). Plaintiffs' remaining citations are similar—the legislators do not purport to recount any Executive Branch statement, but instead offer their own characterizations of the significance of the Memorandum. *See* Pl. Br. 18 & nn.33-39 (citing statements).

Even if legislators were making that sort of definitive claim, it would not constitute evidence usable for summary judgment: using written reporting of legislators' accounts to attempt to show the truth of whatever any Executive Branch official might have said in a closed session is incurable hearsay, and cannot defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(4) (declaration for use at summary judgment must "set out facts that would be admissible in evidence"); *Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001) (party cannot defeat summary judgment with declaration that cannot be reduced to admissible form). A secondhand account of an official's alleged statement is not a reliable source of information about the Executive Branch's view of the law.

Finally, it would require an unprecedented extension of the doctrine to allow other branches' accounts of closed-door testimony to breach privileges. The government is aware of no case relying on a secondhand account to show adoption or official acknowledgment. Indeed,

18

*Wilson* and its progeny point the other way: they recognize the unique role that public, official statements by the Executive Branch play in removing doubt about the authenticity of a position, something statements from another branch cannot do. That rule also recognizes the President's distinct authority, grounded in the constitutional role of the presidency, to control national security information. *Egan*, 484 U.S. at 527. Extending the working law or express adoption exceptions along the lines plaintiffs suggest would create a strong disincentive for the Executive Branch to engage with Congress: it would create the risk that a misunderstanding about a closed-door remark could lead to waiver of important privileges. As the *Murphy* court recognized, that would have a perverse effect "at odds with public policy which encourages broad congressional access to governmental information." 613 F.2d at 1156. The doctrine must properly be limited to the Executive Branch's own statements.

### C. The Memorandum Is Protected by the Attorney-Client Privilege

Finally, plaintiffs' arguments against the applicability of the attorney-client privilege are mistaken.

Plaintiffs first contend that the Memorandum was "generated to memorialize an interagency decision about the legal basis for the boat strikes campaign, not as a 'confidential communication[] between client and counsel made for the purpose of obtaining or providing legal assistance.'" Pl. Br. 22 (quoting *ACLU v. NSA*, 925 F.3d at 589). As we have already explained, that is factually incorrect. While the interagency working group may have reached an agreement about its legal advice, unanimous legal advice is still legal advice, not a decision. Watzel Decl. ¶ 18.

Plaintiffs' only other argument is that even if the Memorandum was initially protected by attorney-client privilege, the privilege no longer applies because it is working law. Pl. Br. 22. That argument is mistaken for the same reasons discussed in the previous section.

19

It is especially clear for reasons unique to the attorney-client privilege. When clients receive legal advice, whether in government or in the private sector, the most common outcome is that they then act in a manner consistent with the advice. If a bank seeks advice from its in-house lawyers on a question of how to structure its anti-money laundering program, reviews the advice, and then decides to make changes consistent with suggestions in the advice, that does not waive attorney-client privilege over the advice. So too in government: if a client receives advice, agrees with it, and then decides to act consistently with it, that does not show that the legal advice has been expressly adopted or has become working law. *See ACLU v. NSA*, 925 F.3d at 599 (no exemption 5 exception where facts showed, "at most," that "OLC analyzed a legal question, that the Attorney General reviewed that analysis and agreed with it, and that the Attorney General then certified the program"). Indeed, the whole purpose of recognizing attorney-client privilege for government clients is to encourage public officials to seek legal advice before they act. *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) ("[T]he traditional rationale for the [attorney-client] privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law . . . be encouraged to seek out and receive fully informed legal advice.") (quotation marks omitted). If merely acting in a manner consistent with the advice served to waive the privilege, it would deter officials from seeking advice in the first place, undermining the fundamental purpose of the privilege.

## II.    The Government Properly Asserted Exemptions 1 and 3

The government's declarations logically and plausibly establish that parts of the Memorandum are protected from disclosure by FOIA's exemptions 1 and 3. Plaintiffs' arguments (Pl. Br. 23-25) focus on whether any legal analysis can be separated from classified facts, but this is relevant only if the legal analysis is not itself privileged—but, as shown above and in the government's opening papers, it is.

20

Moreover, much of the legal analysis is properly withheld under exemption 1 (and, where it relates to intelligence sources and methods, also exemption 3 and the National Security Act). As a general matter, the Second Circuit has recognized that "'in some circumstances legal analysis could be so intertwined with [classified] facts entitled to protection that disclosure of the analysis would disclose such facts.'" *ACLU v. NSA*, 925 F.3d at 601 (quoting *New York Times*, 756 F.3d at 119); *see also ACLU v. DOD*, 435 F. Supp. 3d 539, 556 (S.D.N.Y. 2020) (Engelmayer, J.) ("[A]gencies may withhold legal analysis under Exemption One when its disclosure would tend to reveal the underlying classified information.").

The government does not contend that every word of legal advice contained in the Memorandum is classified. But DOD has explained that even certain "portions of the legal analysis" that are not portion-marked as classified "heavily cite classified materials and sensitive legal opinions that have not been previously released to the public," and further notes that the existence of certain cited works has not been publicly acknowledged. Matthews Decl. ¶ 21. In addition, when considered as a compilation, disclosure of certain information not marked as classified could disclose classified information by revealing classified associations. *Id*. (citing E.O. 13526 § 1.7(e)). DOD has further explained that no information is segregable, in part because the entire Memorandum has already been properly withheld in full on exemption 5 grounds. Matthews Decl. ¶ 22.

Finally, it is worth noting that the Court need not reach the question of whether exemptions 1 and 3 apply, because the document is properly withheld in full under exemption 5 under both the presidential communications privilege and the attorney-client privilege. The presidential communications privilege protects whole documents. *In re Sealed Case*, 121 F.3d at 745. And the attorney-client privilege applies to the entirety of the Memorandum because the document consists

either of facts provided confidentially by governmental clients for the purpose of providing legal advice, or the confidential advice itself, both of which are covered by the privilege. *See, e.g.*, *ACLU v. NSA*, 925 F.3d 576 at 589 (attorney-client privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice").

### III.    In Camera Review Is Not Necessary

As the government's opening brief notes, FOIA itself authorizes in camera review, *see* 5 U.S.C. § 552(a)(4)(B), but it should be used only where agency declarations lack sufficient detail. *See* Govt. Br. 4 n.2 (citing this Court's decision in *ACLU v. DOD*, 435 F. Supp. 3d 539, 560 (S.D.N.Y. 2020)). And in camera review of classified national security information is disfavored. *See United States v. Reynolds*, 345 U.S. 1, 10 (1953).

Plaintiffs' request that the Court review the Memorandum if the Court has "any doubt about the propriety of ordering immediate disclosure" (Pl. Br. 25) exceeds the standard. The government's declarations provide sufficient detail to evaluate the claimed exemptions, rendering in camera review unnecessary. Nor, as plaintiffs suggest, is in camera review needed to resolve a "'conflict between record evidence'" and the government's assertions. Pl. Br. 25 (quoting *Adelante Ala. Worker Ctr. v. DHS*, 376 F. Supp. 3d 345, 360 (S.D.N.Y. 2019)). Rather, as the above discussion demonstrates, the government's declarations are consistent with the public record; it is plaintiffs' characterizations of the public statements that are inconsistent with their content.

Finally, the presidential communications privilege applies to the Memorandum as a whole, and review of the Memorandum itself would not significantly aid the Court's consideration of that exemption's applicability. Therefore, we respectfully suggest that it is unnecessary in this case.

22

**CONCLUSION**

Plaintiffs' motion for summary judgment should be denied, and the government's cross-motion for summary judgment should be granted.

Dated: May 22, 2026
   New York, New York

              Respectfully submitted,

              JAY CLAYTON
              United States Attorney
              Southern District of New York

By:  */s/ Peter Aronoff*
              PETER ARONOFF
              Assistant United States Attorney
              86 Chambers Street, Third Floor
              New York, New York 10007
              Telephone: (212) 637-2697
              E-mail: peter.aronoff@usdoj.gov

CERTIFICATE OF COMPLIANCE

I, Peter Aronoff, counsel of record for defendants, certify that this brief was prepared using Microsoft Word, and that this processing program has been applied to include all text other than what Local Rule 7.1(c) allows to be excluded in preparing the following word count. I further certify that this brief contains 7069 words.

By:    */s/ Peter Aronoff*
       Peter Aronoff
       Assistant United States Attorney

24