UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *and* CENTER FOR CONSTITUTIONAL RIGHTS,

Plaintiffs,

-v-

U.S. DEPARTMENT OF JUSTICE *and* DEPARTMENT OF DEFENSE,

Defendants.

25 Civ. 10189 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge:

This case involves a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for the disclosure of a single document: a September 2025 memorandum authored by the Office of Legal Counsel ("OLC") of the United States Department of Justice ("DOJ") regarding the Executive Branch's legal authority to order lethal drone strikes on boats allegedly engaged in narcotics trafficking.

Plaintiffs, a coalition of non-profit organizations, made a FOIA request to DOJ and the United States Department of Defense ("DOD") for the memorandum (the "OLC Memo" or "Memo").[1] The agencies withheld the Memo in full. As their basis for withholding, the agencies invoked three FOIA exemptions: Exemption One, *id*. § 552(b)(1), which covers classified material; Exemption Three, *id*. § 552(b)(3), which covers material whose disclosure is prohibited by another federal statute, as to which the agencies cited the National Security Act, 50

[1] Plaintiffs also made the same request of the State Department, *see* Dkt. 1, but later voluntarily dismissed their claims against it, Dkt. 34.

U.S.C. § 3024(i)(1); and Exemption Five, 5 U.S.C. § 552(b)(5), which covers internal government records that would normally be shielded from civil discovery during a lawsuit, *i.e.*, privileged.

The parties now cross-move for summary judgment as to all three exemptions, under Federal Rule of Civil Procedure 56. Through briefs and argument, common ground emerged that: (1) to resolve the agencies' arguments under Exemptions One and Three will require the agencies to review the Memo to identify exempt content and will likely require the Court to review the proposed redactions *in camera*; (2) certain portions of the Memo (*e.g.*, factual portions which may reflect classified data) are likely to be found exempt under one or both exemptions; but (3) other portions, notably the Memo's pure legal analysis, which is the focus of plaintiffs' interest, are unlikely to be found covered by these exemptions. In contrast, the agencies' argument under Exemption Five—that they can withhold the Memo *in toto* based on a bona fide claim of privilege—is one that, the agencies assert, can be resolved without *in camera* review.

This decision addresses that issue. For the reasons that follow, the Court rejects the privilege claim with respect to two of the three privileges the agencies invoke (the deliberative process and attorney-client privileges). But the existing record does not permit the Court to reliably resolve whether the agencies have waived their right to invoke the third (the presidential communications privilege). The Court accordingly orders the agencies to furnish information to enable it to resolve that question.

## I. Background[2]

### A. Parties

The American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively, the "ACLU") are non-profit organizations dedicated to advancing civil rights and civil liberties. Dkt. 1 ("Compl.") ¶¶ 7–8. These entities are, respectively, a 26 U.S.C. § 501(c)(4) and a § 501(c)(3) organization. *Id.*

The Center for Constitutional Rights ("CCR") is a non-profit organization dedicated to civil and international humanitarian rights. *Id.* ¶ 10. CCR operates the "Open Records Project," which frequently files FOIA requests for records related to mass incarceration and prisoners' rights, racial justice, and human rights. *Id.*

DOJ is an Executive Branch department and agency as defined under FOIA. *See* 5 U.S.C. § 552(f)(1). The OLC, to which the FOIA request at issue was directed, is a component of DOJ. Compl. ¶ 11.

---

[2] The facts cited herein are drawn from the parties' submissions in support of and in opposition to the instant motions. These are: the declaration of Jeffrey Stein in support of plaintiffs' motion for summary judgment, Dkt. 50 ("Stein Decl."); the declaration of Ryan Watzel in support of defendants' motion for summary judgment, Dkt. 52 ("Watzel Decl."); the declaration of Earl G. Matthews in support of defendants' motion, Dkt. 53 ("Matthews Decl."); the declaration of Natalie Smith in opposition to defendants' motion and in support of plaintiffs' motion, Dkt. 58 ("Smith Decl."); the supplemental declaration of Stein in support of plaintiffs' motion, Dkt. 61 ("Stein Supp. Decl."); the supplemental declaration of Matthews in support of defendants' motion, Dkt. 63 ("Matthews Supp. Decl."); and the exhibits attached to these declarations.

Plaintiffs' motion papers contain links to publicly available articles, websites, and transcripts. The Court takes judicial notice of the fact of these publications. *See, e.g.*, *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 685 n.2 (S.D.N.Y. 2020) (Engelmayer, J.) (taking judicial notice of publicly available documents at summary judgment stage in FOIA action); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

DOD is an Executive Branch department and agency as defined under FOIA. *See* 5 U.S.C. § 552(f)(1). The Office of the Secretary of Defense and Joint Staff, to which the FOIA request at issue was directed, is a component of DOD. Compl. ¶ 13.

**B. The Military Strikes on Boats in the Caribbean Sea and Pacific Ocean**

On July 25, 2025, President Trump issued a directive to DOD, authorizing the use of military force against "foreign criminal groups" designated as terrorist organizations. Smith Decl., Ex. C ("*Wash. Post* (Dec. 18, 2025)") at 5. The directive's annex listed 24 such entities. *Id*. at 9.

On August 5, 2025, pursuant to this directive, Secretary of Defense Pete Hegseth issued an "execute order." *Id*. at 5–8. Directed at the same 24 entities identified in the President's July directive, it set out targeting guidelines for DOD in conducting lethal operations aimed at stopping the flow of drugs into the United States by sea. *Id*. at 5–7. According to public reports, the targeting criteria were drawn from the counterterrorism campaign against al-Qaeda and the Islamic State. *Id*. at 6, 8. The execute order did not require that DOD, before a lethal attack, "positive[ly] identif[y] any individual," but it required that DOD "determine with reasonable certainty" that the boat contained "adult males" who are "members of, or affiliated with, a designated terrorist organization." *Id*. at 9 (citing "five current and former U.S. officials familiar" with the targeting criteria). The order identified the geographic boundary for such lethal attacks as the international waters off the coast of Venezuela. *Id*. at 8. In August 2025, a White House spokesperson stated that the President's decision to pursue these strikes was intended to "protect[] the homeland," and was a "bold step to designate several cartels and gangs as foreign terrorist organizations." Smith Decl., Ex. B ("*N.Y. Times* (Aug. 8, 2025)") at 4.

On September 2, 2025, DOD began conducting boat strikes pursuant to President Trump's directive and Secretary Hegseth's execute order. *See* Stein Decl., Ex. I ("Leavitt

Briefing (Dec. 1, 2025)"). That day, Secretary Hegseth authorized Admiral Frank Bradley, commander of the U.S. Navy, to conduct "kinetic" strikes on boats believed to be trafficking drugs in the Caribbean. *See id*. at 12. The strikes that day included, at Secretary Hegseth's direction, two rounds of strikes directed at a vessel, with the second set aimed at two survivors of the initial strike. *Id*. at 30; Dkt. 49 ("Ps' MOL") at 7. Public reporting called this the "double-tap" strike. Ps' MOL at 12. The Pentagon termed the strikes "Operation Southern Spear." Stein Decl., Ex. G ("*Wash. Post* (Nov. 22, 2025)") at 5.

In or about October 2025, DOD expanded the geographic boundary for the execute order to cover the eastern Pacific. *Wash. Post* (Dec. 18, 2025) at 8. Over the late summer and into the fall, strikes against boats in the Caribbean and eastern Pacific continued. *Id*. The Administration reported these strikes in speeches, notices to Congress, and on social media. On October 2, 2025, for example, the White House submitted a notice to Congress, pursuant to its reporting obligations under the 2024 National Defense Authorization Act, which stated:

> [T]he President determined that the United States is in a non-international armed conflict with these designated terrorist organizations. The President directed the Department of War to conduct operations against them pursuant to the law of armed conflict. The United States has now reached a critical point where we must use force in self-defense and defense of others against the ongoing attacks by these designated terrorist organizations.
>
> Accordingly, at the President's direction, and in compliance with the law of armed conflict, on September 15, 2025, U.S. forces struck an unflagged vessel at a location beyond the territorial seas of any nation. The vessel was assessed by the U.S. intelligence community to be affiliated with a designated terrorist organization and, at the time, engaged in trafficking illicit drugs, which could ultimately be used to kill Americans.

Ps' MOL at 2 & n.4 (citation omitted); Compl. ¶ 19 & n.5 (citation omitted).

On October 29, 2025, a group of Republican senators were briefed about the ongoing boat strikes. Stein Decl., Ex. B ("Sen. Mark Warner Br. (Oct. 30, 2025)") at 1; Stein Decl., Ex. D ("*CNN* (Nov. 5, 2025)") at 2. On November 5, 2025, Secretary Hegseth, Secretary of State

Marco Rubio, and an OLC official conducted another briefing about the strikes, this time for the "Gang of 12," a bipartisan group of 12 congressional leaders. *CNN* (Nov. 5, 2025) at 3. After these briefings, House Speaker Mike Johnson stated that the strikes were:

> [A] necessary, appropriate and legal response to effectively, the cartels having declared war on us . . . [I]f you look statistically, cocaine has been the cause of death for more Americans in the last two years than all of the casualties that we suffered in the Vietnam War combined.

*Id*. at 5.

On November 10, 2025, Secretary Hegseth posted on X a report regarding additional strikes, and included a video in the post:

> Yesterday, at the direction of President Trump, two lethal kinetic strikes were conducted on two vessels operated by Designated Terrorist Organizations.
>
> These vessels were known by our intelligence to be associated with illicit narcotics smuggling, were carrying narcotics, and were transiting along a known narco-trafficking transit route in the Eastern Pacific.
>
> Both strikes were conducted in international waters and 3 male narco-terrorists were aboard each vessel. All 6 were killed. No U.S. forces were harmed.
>
> Under President Trump, we are protecting the homeland and killing these cartel terrorists who wish to harm our country and its people.

Ps' MOL at 2 n.2 (citing Secretary of War Pete Hegseth (@SecWar), X (Nov. 10, 2025, at 07:44 ET), https://x.com/SecWar/status/1987863821868732447 ("Hegseth Post (Nov. 10, 2025)")).

In November, the *Washington Post* reported new details about the boat strike strategy. *Wash. Post* (Nov. 22, 2025) at 2–5. "[D]eadly attacks on small boats," it stated, "are being carried out by the Pentagon, which at Trump's orders has amassed a vast array of warships, aircraft and troops in the region, including the largest U.S. aircraft carrier." *Id*. at 5.

Drawing on public reports and posts by the Executive Branch including "short, edited videos" of some strikes, plaintiffs calculate that, since early September 2025, under Operation Southern Spear, the U.S. military has conducted at least 54 lethal strikes on boats in the

Caribbean and eastern Pacific, killing 185 people. Ps' MOL at 2 (citing Lazaro Gamio et al., *Tracking U.S. Military Killings in Boat Attacks*, N.Y. TIMES (updated Sep. 21, 2026), https://www.nytimes.com/interactive/2025/10/29/us/us-caribbean-pacific-boat-strikes.html).

### C. The OLC Memo

This FOIA litigation concerns the OLC Memo—a memorandum addressing the legal standards governing the boat strikes. The parties have supplied largely consistent accounts of the Memo's origins, with plaintiffs drawing on public testimony and other reports and the agencies drawing on declarations filed in this litigation by Ryan Watzel, a special counsel in OLC, Dkt. 52, and Earl G. Matthews, DOD's general counsel, Dkt. 53.

***Plaintiffs' account***: The legality of the boat strikes was addressed in a restricted "interagency" working group of lawyers drawn from the Central Intelligence Agency ("CIA"), State Department, White House counsel, DOJ, DOD, and the Joint Chiefs of Staff. Stein Decl., Ex. A ("Charles Young Testimony (Oct. 7, 2025)") at 76–77; *Wash. Post* (Nov. 22, 2025) at 7–8. The group consisted "of four career lawyers, including two uniformed military attorneys, and four political appointees." *Id*. at 8 (citing a senior administration official). It unanimously concluded that conducting strikes on boats believed to be engaged in narcotrafficking was "a legally available option for the president." *Id*.

In late summer, Administration officials told policy personnel that an "Office of Legal Counsel memo was being drafted that determined that the lethal targeting of suspected drug runners was lawful under the president's power to ascertain that the U.S. is in a formal state of war," *e.g.*, against alleged drug traffickers. *Wash. Post* (Dec. 18, 2025) at 8–9; *see also N.Y. Times* (Aug. 8, 2025) at 2–3 (unclear whether, as of August 2025, OLC had produced "an authoritative opinion assessing the legal issues"). On September 5, 2025, three days after the first strikes, OLC issued the Memo. Stein Decl., Ex. H ("Sen. Richard Blumenthal Letter (Nov.

24, 2025)") at 1. The Memo has been described by persons who have read it as a written opinion setting out the legal basis and parameters for the Executive Branch to order military strikes of vessels near South America and the Caribbean. Ex. J ("Sen. Jack Reed Floor St'mt (Dec. 3, 2025)") at 2. It was signed by OLC's head, Assistant Attorney General T. Elliot Gaiser. *Wash. Post* (Dec. 18, 2025) at 9. It runs 48 to 49 pages. Stein Decl., Ex. C ("Rep. Jim Himes (Nov. 4, 2025)") at 3–4.

***The agencies' account***: The OLC Memo was solicited by and provided to legal advisers in the White House Counsel's Office who advise the National Security Council ("NSC") and its staff. Dkt. 52 ("Watzel Decl.") ¶ 17; Dkt. 53 ("Matthews Decl.") ¶ 3. The Memo was issued several weeks after the meeting of lawyers to discuss the legality of boat strikes. Watzel Decl. ¶ 18. The Memo memorializes "deliberative advice provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action, as part of a deliberative process in connection with the President's decision whether to take such action in his constitutional role as Commander in Chief of the armed forces" and "legal advice concerning the manner in which the Executive Branch should implement the advice in the event the President ordered such action." *Id*. ¶¶ 17–18. The Memo goes beyond memorializing advice that had been "provided prior to the presidential decision authorizing military action," in that it further details "the legal basis for that advice." *Id*. ¶ 18. The Memo "describes and memorializes confidential client communications made to OLC for the purpose of seeking this advice, including in an appended statement of facts." *Id*. It was signed by an OLC deputy assistant attorney general. *Id*. ¶ 17.

### D. Public Statements About the Memo by the Executive Branch and Congress

On October 6, 2025, the existence of the OLC Memo was first publicly reported by CNN, which described it as "justify[ing] lethal strikes against a secret and expansive list of cartels and

suspected drug traffickers." Ps' MOL at 3 n.8 (citing Natasha Bertrand & Zachary Cohen, *Exclusive: Classified Justice Department Opinion Authorizes Strikes on Secret List of Cartels, Sources Say*, CNN (updated Oct. 7, 2025), https://www.cnn.com/2025/10/06/politics/classified-justice-department-memo-cartel-strikes).

Since then, members of the Executive Branch have made public statements about the Memo in numerous contexts. Members of Congress, including ones who have received classified briefings on it or reviewed it, have also made public statements about the Memo.

**1. Statements by Executive Branch Officials**

Since October 2025, Executive Branch officials have discussed the OLC Memo in press statements, in congressional testimony, and on social media. These have addressed the Memo's dissemination and its influence on decisions regarding ongoing military operations. The Court here recaps these statements, in chronological sequence.

***Congressional testimony by DOD deputy general counsel***: On October 7, 2025, Charles L. Young III, DOD's principal deputy general counsel, was questioned about the Memo during a Senate Armed Services Committee hearing on his nomination to serve as general counsel of the Army.

> Senator Jeanne Shaheen: As you heard, we had a classified briefing on the strikes in South America, and we requested . . . [the] decision by the Department of Justice that basically authorizes the administration's basis to take those actions in South America. Have you seen that DOJ opinion?
>
> Young: Yes, Senator, I have.
>
> Senator Shaheen: And is that consistent with the opinion that has been provided to the Department of Defense?
>
> Young: Senator, the Department of Justice Office of Legal Counsel opinion was derived through an interagency lawyer's working group with the CIA, the State Department, White House Counsel, Department of Justice, Department of Defense General Counsel, Judge Advocates were part of that decision. And the Office of Legal Counsel has issued an opinion on that, ma'am.

Charles Young Testimony (Oct. 7, 2025) at 76–77. Asked why the OLC Memo had not been publicly released, Young stated that under a prior administration, a decision had been made "not [to] share the[] legal basis" for the "manner in which they did the strike." *Id*. at 77.

***Statements by DOJ and DOD spokespersons***: On or around November 12, 2025, a DOJ spokesperson publicly stated, "[t]he [boat] strikes were ordered consistent with the laws of armed conflict, and as such are lawful orders." Stein Decl., Ex. F ("*Wash. Post* (Nov. 12, 2025)") at 3. That day, DOD spokesman Sean Parnell stated that DOD:

> . . . categorically denies that any Pentagon lawyers, including [U.S. Southern Command] lawyers, with knowledge of these operations have raised concerns to any attorneys in the chain of command regarding the legality of the strikes conducted thus far because they are aware we are on firm legal ground . . . . Our current operations in the Caribbean are lawful under both U.S. and international law, with all actions in complete compliance with the law of armed conflict.

*Wash. Post* (Nov. 22, 2025) at 8. He added that the "current operations in the Caribbean are lawful under both U.S. and international law," in that:

> Lawyers up and down the chain of command have been thoroughly involved in reviewing these operations prior to execution . . . . [N]o lawyer involved has questioned the legality of the Caribbean strikes and instead advised subordinate commanders and Secretary Hegseth that the proposed actions were permissible before they commenced.

*Wash. Post* (Nov. 12, 2025) at 3 (cleaned up).

***Statement by a senior administration official***: On or around November 22, 2025, a "senior administration official" stated, in an email response to a reporter's questions about the boat strikes, that "President Trump is prepared to use every element of American power to stop drugs from flooding in to our country and to bring those responsible to justice." *Wash. Post* (Nov. 22, 2025) at 4. According to the *Washington Post*, the official added that the "operations have been given careful legal scrutiny and were deemed lawful." *Id*.

***Social media posts by Secretary Hegseth***: During November 2025, Secretary Hegseth posted on X about the strikes and their legality. On November 10, 2025, he posted:

> Yesterday, at the direction of President Trump, two lethal kinetic strikes were conducted on two vessels operated by Designated Terrorist Organizations.
>
> These vessels were known by our intelligence to be associated with illicit narcotics smuggling, were carrying narcotics, and were transiting along a known narco-trafficking transit route in the Eastern Pacific.
>
> Both strikes were conducted in international waters and 3 male narco-terrorists were aboard each vessel. All 6 were killed. No U.S. forces were harmed.
>
> Under President Trump, we are protecting the homeland and killing these cartel terrorists who wish to harm our country and its people.

Hegseth Post (Nov. 10, 2025).

And, on November 28, 2025, Secretary Hegseth posted:

> Our current operations in the Caribbean are lawful under both U.S. and international law, with all actions in compliance with the law of armed conflict—and approved by the best military and civilian lawyers, up and down the chain of command.

Compl. at 6 n.7 (citing Secretary of War Pete Hegseth (@SecWar), X (Nov. 28, 2025, at 18:42 ET), https://x.com/SecWar/status/1994552598142038358) ("Hegseth Post (Nov. 28, 2025)").

***Statement by White House press secretary***: On December 1, 2025, during a press briefing, former White House press secretary Karoline Leavitt, responding to a question about whether the September 2 "double-tap" strike had been lawful, stated, "President Trump and Secretary Hegseth have made it clear that presidentially designated narco terrorist groups are subject to lethal targeting in accordance with the laws of war." Leavitt Briefing (Dec. 1, 2025) at 12. She added that the strike was "conducted in international waters and in accordance with the law of armed conflict," and that there had been "13 bipartisan briefings to Congress on the Venezuelan strikes." *Id*. at 27. She further stated:

> There have been a number of document reviews for members of Congress to review the classified DOJ Office of Legal Counsel opinion and other related documents. 29 senators and 92 representatives have reviewed those documents, which is about two-thirds of those are Democrat members. And they've been -- they have been made available to all 100 senators, all 435 members of the House, and to general counsels of the relevant committees on a bipartisan basis for their review.

*Id*.

***Statement by White House chief of staff***: In December 2025, White House Chief of Staff Susan Wiles told *Vanity Fair*, about the boat strikes, "[Trump] wants to keep on blowing up boats until Maduro cries uncle. And people way smarter than me on that say that he will." *Wash. Post* (Dec. 18, 2025) at 17.

***Congressional testimony by SOUTHCOM commanding general***: On March 19, 2026, General Francis L. Donovan, the Commander of U.S. Southern Command ("SOUTHCOM"), testified before the Senate Armed Services Committee. Stein Decl., Ex. L ("Gen. Donovan Testimony (Mar. 19, 2026)"). Questioned about the OLC Memo, General Donovan did not contest Senator Richard Blumenthal's characterization of it as "the legal basis for the administration carrying out the strikes," and stated that it was the "Department" (not he) that had the authority to release the Memo and that his role was to "carry[] out the assigned tasks." *Id*. at 3.

***Congressional testimony by chairman of Joint Chiefs of Staff***: On April 30, 2026, General Dan Caine, chairman of the Joint Chiefs of Staff, testified before the Senate Armed Services Committee. Smith Decl., Ex. A ("Gen. Caine Testimony (Apr. 30, 2026)") at 3. Asked about the legal justification for "the U.S. military to strike boats in international waters and kill occupants of those boats without a showing of evidence that there are narcotics on those boats," General Caine stated: "[O]ur job is to show the range of options, the associated risks, and then take those execution orders, transmit them down to the [Unified Combatant Commands] on

legally appropriate and legally backstopped actions." *Id*. Asked what order authorized military action against boats in the Caribbean, General Caine stated:

> I don't have the order issued to SOUTHCOM with me today. It is classified in its own right, which clearly articulates, based on a variety of criteria, what constitutes a valid military and legally valid target in that theater. I just want to say, I know and trust that our commanders at Echelon are rigorously following that legal opinion and those legal boundaries upon which we have been issued those orders.

*Id*. at 3–4.

***Statement by Acting Attorney General***: On July 15, 2026, during his confirmation hearing to become attorney general, Acting Attorney General Todd Blanche was questioned by senators about the Memo.

> Senator Chris Coons: I'm curious as to why the most transparent Department has refused to release the OLC opinion that justifies the 66 strikes the military has conducted on boats in the Caribbean, which have killed more than 220 people—either a redacted version or in a classified setting to me and others who are in relevant decisionmaking positions.
>
> Acting Attorney General Blanche: Well, Senator, we made the head of OLC available on multiple occasions to explain that to you and other members of the Committee, and that is extraordinarily transparent and unprecedented that we've done that. Whether an OLC opinion is released, there's a lot of process that goes into that, but the idea that we were not transparent about our legal basis there is absolutely not true.

Dkt. 65 ("Ps' Supp. Letter (Jul. 16, 2026)") at 1.

***Statement by SOUTHCOM spokesperson***: On September 2, 2026, Steven McLoud, a spokesperson for SOUTHCOM, gave a statement to the *Intercept* in response to allegations that the United States had "killed people beyond those the OLC opinion claimed were legal targets." Dkt. 68 ("Ps' Supp. Letter (Sep. 2, 2026)") at 1. He stated: "Each operation is planned and executed within the full bounds of our legal framework, . . . ensuring that every target meets the legal criteria established by our Office of Legal Counsel." *Id*. (citing Nick Turse, *The U.S. Has*

*Killed 227 Civilians in Boat Strikes During "A Year of Murders*," INTERCEPT (Sep. 2, 2026, at 05:00 ET), https://theintercept.com/2026/09/02/military-boat-strikes-killings-year).

**2. Public Statements by Legislative Branch Officials**

Members of Congress have also made public statements about the OLC Memo's contents, dissemination, and use.

***Sen. Jeanne Shaheen***: On October 7, 2025, in her colloquy with DOD deputy general counsel Young, Senator Shaheen noted she had just received a "classified briefing on the strikes" and asked that the OLC Memo be released to other members of Congress. Charles Young Testimony (Oct. 7, 2025) at 77.

***Sen. Mark Warner***: On October 29, 2025, Senator Warner stated in a news conference that, in a briefing for Republican senators, the Administration had "shared the Office of Legal Counsel's Opinion that tries to lay out legal justification for those strikes." Sen. Mark Warner Br. (Oct. 30, 2025) at 6. He stated that, during a classified briefing a week earlier, he had been promised by Secretary Rubio to have "that Office of Legal Ethics [sic] position laid out" and that Secretary Rubio hoped that would occur that day. *Id*. He stated:

> This Office of Legal Counsel opinion should be shared with every member of the senate, not just the Gang of Eight. Every senator, Democrat, Republican, independent has a constitutional role to play when the United States uses military force. It's not optional. It's our fricking duty. When an administration decides it can pick and choose which elected representatives get the understanding of their legal argument of why this is needed for military force . . . . When you deny Congress the access, the legal rationale for military action, you also do huge erosion of trust from our public.

*Id*. at 6–7. He stated that, for Congress, viewing the Memo was necessary to "make sure we're not putting our service members in harm's way," *id*. at 9, and that "smarter members [of Congress] than me on legal opinions have raised concerns whether if these strikes violate

international law, could they be in jeopardy. That's why you have an Office of Legal Counsel that's supposed to give the rationale." *Id*. at 11–12. He stated:

> This is not some single action. This appears to be a policy that is being carried out over weeks and potentially months. There is no legitimate reason not to share at least the legal opinion[,] what the goals are with the American people.

*Id*. at 13–14.

In early November, after a briefing about the boat strikes by Secretaries Rubio and Hegseth, Senator Warner stated, in a CNN interview, that the legal opinion they had shared with lawmakers had not extended to potential military action inside Venezuela. *CNN* (Nov. 5, 2025) at 6.

***Rep. Jim Himes***: On November 4, 2025, in an interview with the Council on Foreign Relations, Congressman Himes described a classified briefing given to members of the Foreign Affairs and Intelligence Committee in which he had "an hour" to look at OLC's "forty-eight, forty-nine page document." Rep. Jim Himes (Nov. 4, 2025) at 3–4. He stated that the OLC Memo opines "that these military attacks on drug boats are legal" and sets out the "legal rationale for" them. *Id*. at 3; *id*. at 6–7 (Memo contains "legal basis" for strikes aimed at "clos[ing] of[f]" routes for transmission of cocaine). He stated that at the classified briefing, DOD officials reported on the "operational aspects of the Caribbean strikes." *Id*. at 23. As to these, he stated:

> And what I have come to learn, pulling this apart, is that for a military officer, for military personnel, the work of determining whether an order is illegal is excruciating. It is potentially career-ending.
>
> And for reasons that we may all understand and may not satisfy the idealists in all of us, if an OLC opinion exists saying that this is a legitimate option for the president, and anyone engaged in this option will be protected from prosecution, and if the assistant attorney general says what he says, which is that this was subject to an intra-agency legal conference at which the decision was unanimous—now, don't know who was there, especially since an awful lot of those folks have been fired, the JAGs and others—to me, that feels sufficient to tick the box for military

> officers. I don't know what else you could ask them to do, because, of course, a military officer who believes an order may be illegal has a chain of command—a legal chain of command to pursue, which bumps pretty quickly into those who have issued the OLC opinion.

*Id*. at 26.

***Sen. Tim Kaine***: On November 6, 2025, in a statement on the Senate floor, Senator Kaine stated he had recently "review[ed] the legal authorization document" that the Administration had recently shared with the Senate "concerning the military strikes against boats in the Caribbean and Pacific." Stein Decl., Ex. E ("Sen. Tim Kaine Floor St'mt (Nov. 6, 2025)") at 3. Noting the "ongoing and increasing pace" of the strikes and that these "are killing dozens of individuals," he expressed doubt about the legal analysis in the OLC Memo:

> I would encourage all of my colleagues to go review it, because I basically believe there are three critical errors in that: one, a mistaken philosophy of Executive war powers that derives from a misquotation of constitutional-era documents that the Framers were using as they grappled with war powers questions; two, a domestic legal rationale for when the President can unilaterally wage war that is completely contrary to the Constitution; and three, an international legal rationale that I think most of the Members of this body would find to be quite a stretch if they review it.

*Id*.

Later, on April 30, 2026, in questioning General Caine before the Senate Armed Services Committee, Senator Kaine reiterated his critique of the Memo, while noting that its classified nature prevented him from elaborating:

> I have seen the legal opinion, but I can't talk about it because it is classified. I have seen the targeting criteria, but I can't talk about them because they are classified. I have seen the secret list of DTOs against whom we have declared war that even they haven't been informed of, but I can't talk about it because it is classified. But I would urge all of my colleagues to go to the SCIF and read the targeting criteria and get briefed about it and then also look at all of the files of all of the strikes that have taken place. I have done that with the first 46 strikes or so. And I think there is a profound mismatch between what is occurring and the underlying assumptions in the legal opinion.

Gen. Caine Testimony (Apr. 30, 2026) at 4–5.

***Rep. Gregory Meeks***: On November 5, Representative Meeks, the ranking member of the House Foreign Affairs Committee, told CNN he had had a "closed-door briefing" by Secretaries Rubio and Hegseth about the boat strikes. *CNN* (Nov. 5, 2025) at 4. He stated that the officials had not "share[d] evidence that ties the vessels or their passengers to the drug trade." *Id*. But, he stated, they had "referred to the Office of Legal Counsel memo" as the basis for their assessment that congressional approval was not required for the strikes. *Id*. at 4–5. He faulted the officials for using "mental gymnastics" to justify "circumventing Congress' role on matters of war and peace," adding that "what they say is legal authorization, I don't buy it all." *Id*. at 5.

***House Speaker Mike Johnson***: The same November 5, 2025 CNN article quoted Speaker Johnson, who had attended a briefing, as stating that "'exquisite intelligence' backs the legal justification for the strikes." *Id*. He stated:

> This is a necessary, appropriate and legal response to effectively, the cartels having declared war on us. . . . [I]f you look statistically, cocaine has been the cause of death for more Americans in the last two years than all of the casualties that we suffered in the Vietnam War combined.

*Id*. He stated that he did not have an "exact answer" whether the Administration knew the identities of the persons on the targeted vessels, but that there was a "high reliability" that those persons were affiliated with cartels and not "haphazardly on a boat." *Id*. at 5–6.

***Sen. Adam Schiff***: In early November 2025, Senator Schiff said of the OLC Memo, which he had reviewed:

> It reads as if you gave a lawyer an assignment: Give me the best possible rationale for why this is legal—be as inventive as you like. If that opinion were to be adopted, it would not constrain any use of force anywhere in the world. I mean, it is broad enough to authorize just about anything. I would certainly not want to rely on the rationale I've read.

*Wash. Post* (Nov. 12, 2025) at 5. He stated that he believed the Memo exposed service members participating in the operations to legal risk, adding: "I would certainly not want to rely on the rationale I've read." *Id*.

***Members of Senate Armed Services Committee*****:** On November 24, 2025, 13 members of the Senate Armed Services Committee wrote Attorney General Pamela Bondi and Secretary Hegseth, requesting public release of the OLC Memo.[3] Sen. Richard Blumenthal Letter (Nov. 24, 2025). Their letter stated that release was necessary to "enhance transparency in the use of deadly force," and inform the public as to the "legal justification supporting these strikes." *Id*. at 1.

***Sen. Jack Reed***: On December 3, 2025, in a floor speech, Senator Reed expressed concerns about the legality of the boat strikes in general and the September 2 strike specifically. Sen. Jack Reed Floor St'mt (Dec. 3, 2025) at 2. He stated that he had "formally requested the Executive orders that guide these operations and the full, unedited videos and audio from each strike," and that members of Congress had "asked for the rules of engagement governing these operations" and "that the legal documents justifying these operations be declassified and shared with the public." *Id*. at 4. He added:

> [T]he White House must declassify the Department of Justice's Office of Legal Counsel's opinion underpinning their legal argument for this operation. There is no reason for this document to remain hidden. The American people deserve to know why this administration believes it has a license to kill in their name and what parameters govern that authority. If the legal reasoning is sound, it should withstand public scrutiny. If it cannot, then these operations should not continue.

*Id*.

[3] The signatories included Senators Blumenthal, Kaine, Shaheen, Jack Reed, Kirsten Gillibrand, Mazie Hirono, Angus King Jr., Elizabeth Warren, Gary Peters, Tammy Duckworth, Jacky Rosen, Mark Kelly, and Elissa Slotkin. *See* Sen. Richard Blumenthal Letter (Nov. 24, 2025) at 1–2.

***Sen. Eric Schmitt***: On December 7, 2025, in an interview on ABC, Senator Schmitt referred to the OLC Memo in responding to reports that members of Congress had urged service members to disobey "unlawful" military orders. Stein Decl., Ex. K ("Sen. Eric Schmitt St'mt (Dec. 7, 2025)") at 4–5. He stated that the senators had not identified "what orders" they are "talking about." *Id*. at 5. He stated:

> [T]his President, the Secretary of War . . . [a]re going to carry out their mission. They executed another strike of a narcoterrorists just this past week. Those will continue, and they're completely authorized. I reviewed the 40-plus page memo by the Office of Legal Counsel. There's JAG officers in these rooms, George, every time there's a strike. So again, the narrative at the beginning of the week that these [strikes] were war crimes, that's clearly fallen away.

*Id*. at 6.

***Sen. Mark Kelly***: On or about December 18, 2025, Senator Kelly, in an interview, stated that the OLC Memo "asserts that alleged drug trafficking groups are a threat to the United States akin to a foreign nation attempting to invade." *Wash. Post* (Dec. 18, 2025) at 9.

**E. Plaintiffs' FOIA Request**

On October 15, 2025, plaintiffs submitted identical FOIA requests to DOJ, DOD, and the State Department. Dkt. 1-1 (the "FOIA request" or the "request"). The request sought three items, the first of which was the OLC Memo:

> 1. The OLC final opinion concerning the President's authority to order lethal strikes against drug cartels;
>
> 2. President Trump's July 2025 directive to the Department of Defense authorizing the use of military force against Latin American drug cartels deemed to be terrorist organizations; and,
>
> 3. Any unclassified summaries of the two above documents.

*Id*. at 4–5. Plaintiffs asked that the requests be processed on an expedited basis, because the records sought were "urgently" needed to inform the public about "actual or alleged Federal Government activity." *Id*. at 5 (quoting 5 U.S.C. § 552(a)(6)(E)(v)(II)).

### F. The Agencies' Responses

#### 1. State Department

On November 25, 2025, the State Department acknowledged receipt of the FOIA request. Compl. ¶ 35. By January 14, 2026, it notified plaintiffs that it had completed its initial search, which had not yielded responsive records. Dkt. 19 at 1. On February 4, 2026, after the other agencies had located responsive records, the parties agreed to dismiss the State Department. Dkt. 28 at 1. On February 27, 2026, the Court dismissed the State Department. Dkt. 34.

#### 2. DOD

On October 15, 2025, DOD acknowledged receipt of the FOIA request. Compl. ¶ 38. On February 4, 2026, DOD notified plaintiffs that it had located a record it believed responsive to the request for the July 2025 directive. Dkt. 28. On March 12, 2026, DOD notified plaintiffs it was withholding the directive in full, citing several FOIA exemptions. Dkt. 37 at 1. Plaintiffs do not challenge DOD's withholding of the July 2025 directive. *Id*.

#### 3. OLC

On November 25, 2025, DOJ acknowledged receipt of the FOIA request. Watzel Decl., Ex. B at 1. It denied plaintiffs' request for expedited processing. *Id*. at 1–2.

On March 12, 2026, after plaintiffs filed this action and the Court set a deadline for DOJ to complete its review, the agency reported that it had identified two responsive documents. Watzel Decl., Ex. C ("OLC FOIA Resp.") at 1. DOJ released one, an unclassified email chain within OLC, with "some material" redacted.[4] DOJ withheld the second document—the OLC Memo—in full. *Id*. at 52. It asserted that the Memo was exempt from disclosure under:

---

[4] The redactions were pursuant to FOIA Exemptions Five, on the grounds the material was protected by civil litigation privileges, and Six, on the ground that disclosure would unjustifiably invade personal privacy. *Id*. Plaintiffs do not challenge those redactions. Ps' MOL at 9–10.

> FOIA Exemption One, [5 U.S.C.] § 552(b)(1), because it is classified; FOIA Exemption Three, [5 U.S.C.] § 552(b)(3), because it is specifically exempted from disclosure under the National Security Act ["NSA"], 50 U.S.C. § 3024(i)(1); and FOIA Exemption Five, 5 U.S.C. § 552(b)(5), because it is protected by the presidential communication, deliberative process, and attorney-client privileges.

*Id*.

**G. Procedural History of This Action**

On December 9, 2025, plaintiffs filed the Complaint. Dkt. 1. On January 30, 2026, defendants answered, Dkt. 26, and the Court scheduled an initial conference, Dkt. 27.

On February 12, 2026, the Court, at that conference, ordered defendants to complete their review and processing of responsive records by March 12, 2026. Dkt. 31. After that review, the agencies reported that they were withholding in full the OLC Memo and the July 2025 directive. Dkt. 37. On March 17, 2026, the parties notified the Court that plaintiffs sought to challenge only the withholding of the Memo. Dkts. 37, 45.

On May 1, 2026, the parties cross-moved for summary judgment with respect to the withholding of the Memo. Dkts. 48–54. Each moved with respect to each exemption the agencies had invoked. On May 22, 2026, the parties opposed each other's motion. Dkts. 57–59. On May 29, 2026, the parties replied. Dkts. 60, 62. On June 24, 2026, the Court held argument. Dkt. 64.

## II. Legal Standards Governing Summary Judgment Motions under FOIA

**A. Summary Judgment in General**

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted). Rather, it generally must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**B. Summary Judgment under FOIA**

FOIA—5 U.S.C. § 552 *et seq.*—governs public access to information held by the federal government. FOIA's primary purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (internal quotation marks omitted). However, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (quoting *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 621 (1982) ("*Abramson*")). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the

public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (cleaned up).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (cleaned up). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (collecting cases). Courts review the adequacy of the agency's justifications *de novo*. *Id.* Even if portions of a responsive record are properly exempt, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii)(II); *see Abramson*, 456 U.S. at 626.

Summary judgment is the "typical method" by which a court resolves a challenge to a government agency's FOIA response. *See, e.g.*, *Johnson v. Cent. Intel. Agency*, No. 17 Civ. 1928, 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (internal quotation marks omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (cleaned up). But "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA

exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (internal quotation marks omitted).

Courts adopt a "deferential posture in FOIA cases regarding the uniquely executive purview of national security" and accord "substantial weight" to the agency's declarations predicting harm to national security. *Id*. at 73, 76 (cleaned up); *see also Halperin v. Cent. Intel. Agency*, 629 F.2d 144, 148 (D.C. Cir. 1980) (where agency affidavits appear sufficient, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency"). Courts defer "to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *ACLU v. Dep't of Just.*, 681 F.3d 61, 70 (2d Cir. 2012) ("*ACLU I*") (internal quotation marks omitted). Indeed, "[r]ecognizing the relative competencies of the executive and judiciary," it "is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies regarding whether disclosure of the [withheld information] would pose a threat to national security." *Id*. at 70–71 (internal quotation marks omitted).

**III. Discussion**

The threshold—and central—issue in these motions is whether the OLC Memo has been properly withheld in full. That issue turns on the agencies' claim, under FOIA Exemption Five, that the Memo is categorically subject to a claim of privilege. *See* Dkt. 54 ("Ds' MOL") at 14.

Plaintiffs do not seriously dispute that portions of the Memo are likely properly withheld under the other two claimed exemptions: as classified, under Exemption One, or as prohibited from disclosure by the National Security Act, under Exemption Three. Ps' MOL at 22–25. And DOJ's representation that an appendix to the Memo is factual in nature, *see* Watzel Decl. ¶ 18,

makes it likely, at a minimum, that that portion of the Memo contains material that is classified and/or is statutorily prohibited from disclosure.

At the same time, the agencies have acknowledged that portions of the Memo consist of legal analysis. As the agencies' counsel acknowledged at argument, although that legal analysis may embed facts or factual premises that implicate Exemptions One and Three and require redaction, the balance likely could not be withheld based on those exemptions.[5]

The Court accordingly focuses here on Exemption Five, because it is the one exemption whose applicability appears capable of resolution on a global basis and which would not require the agencies to propose redactions for the Court's *in camera* review.

**A. Exemption Five**

Exemption Five shields from disclosure documents subject to "the privileges available to Government agencies in civil litigation." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) ("*Sierra Club*"); *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) (same). It chiefly protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

To qualify, a document must satisfy two conditions: (1) its "source" must be a Government agency, and (2) it must "fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) ("*Klamath Water*"). These privileges include, for example, the deliberative process privilege, the attorney-client communications privilege, and the attorney work-product privilege. *See id.* at 8–9.

[5] The agencies reserved the right to argue that the Memo's legal analysis in its entirety is non-segregable.

It is undisputed that the Memo, issued by OLC, satisfies the first condition. *See* Ds' MOL at 2–3; Ps' MOL at 3–4. But the parties dispute whether the Memo is covered by a civil discovery privilege. The Government invokes three: (1) deliberative process privilege, (2) attorney-client privilege, and (3) presidential communications privilege. The Court addresses each in turn.

### 1. Deliberative Process Privilege

#### *a. The privilege in general*

The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Klamath Water*, 532 U.S. at 8–9. To protect agencies from having to operate in "a fishbowl," *Sierra Club*, 592 U.S. at 267, the privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) ("*Sears*") (cleaned up).

The Supreme Court has distinguished between "deliberative" materials and materials that embody the agency's law and policy. Only the former qualifies for the privilege. As the Court explained:

> Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.

*Id*. at 153 (cleaned up). Accordingly, the deliberative process privilege attaches when a document is both "(1) 'predecisional,' *i.e.*, 'prepared in order to assist an agency decisionmaker in arriving at [their] decision,' and (2) 'deliberative,' *i.e.*, 'actually . . . related to the process by which policies are formulated.'" *Brennan Ctr. for Just. v. Dep't of Just.*, 697 F.3d 184, 194 (2d

Cir. 2012) ("*Brennan I*") (quoting *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005) ("*La Raza*")).

A document is "deliberative" where it "form[s] an essential link in a specified consultative process," "reflects the personal opinions of the writer rather than the policy of the agency," and, "if released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citation omitted). A document is "post-decisional," and outside the privilege, where it "embod[ies] or explain[s]" an already-reached decision. *Sierra Club*, 592 U.S. at 263; *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 186 (1975) ("*Grumman*"); *see also generally* Note, *Freedom of Information Act and the Exemption for Intra-Agency Memoranda*, 86 HARV. L. REV. 1047 (1973).

Even where a document qualifies as deliberative, the privilege is subject to exceptions, *see La Raza*, 411 F.3d at 358; *Brennan I*, 697 F.3d at 194–95, and does not "operate indiscriminately to shield all decision-making by public officials," *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 514 (S.D.N.Y. 2007). Documents concerning "routine operating decision[s]" are outside the scope of the privilege. *Id*. And, salient here, a document originally within the privilege is subject to disclosure under FOIA, under the "working law" doctrine, where it has come to embody an agency's "effective law and policy." *Sears*, 421 U.S. at 153; *see also ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 593–99 (2d Cir. 2019) ("*ACLU v. NSA*").

*b. The "working law" doctrine*

The working law doctrine abrogates the deliberative process privilege as to a document that constitutes an agency's "working law." *Id*. at 601. The doctrine's rationale is that "an agency ought not be permitted to 'promulgate[] a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label.'" *N.Y. Times*

*Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 493 (2d Cir. 2019) ("*N.Y. Times III*") (quoting *Brennan I*, 697 F.3d at 200).

A document "embodies an agency's 'working law' when [it] binds agency officials or members of the public." *ACLU v. NSA*, 925 F.3d at 594. Such a document "announces what an agency's law *is*, not what the law *might be*." *Id*. (emphasis in original). It thus "has operative effect—*i.e.*, binding rather than persuasive power." *Id*.

For example, where the Government has "publicly assert[ed] that OLC advice 'establishes the legal boundaries within which we can operate,'" it "cannot invoke that relied-upon authority and then shield it from public view." *N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 116 (2d Cir. 2014) ("*N.Y. Times II*") (citation omitted).[6] Accordingly, where a memorandum that was "originally drafted as pre-decisional, attorney-client advice" has been "recycled and reissued as an agency's working law," it no longer is exempt under Exemption Five. *N.Y. Times III*, 939 F.3d at 491 (citation omitted).

For the advice or analysis within a document to become "working law," an agency generally must either expressly adopt or explicitly rely upon the conclusion *and* the reasoning of that document. *See La Raza*, 411 F.3d at 358 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). As the Second Circuit has

[6] Three seminal Exemption Five cases involved *The New York Times* as the plaintiff. *N.Y. Times I*, 752 F.3d 123 (2d Cir. 2014), and *N.Y. Times II*, *supra*, addressed a claim that the deliberative process privilege had been abrogated under the working law doctrine, with respect to an OLC-DOD memo regarding the targeted killing of Anwar al-Aulaqi. *N.Y. Times III*, *supra*, arose from a different FOIA action, involving a memo from a federal prosecutor to the attorney general, which advised against opening criminal investigations into alleged detainee mistreatment by the CIA. That decision addressed the interplay, under Exemption Five, between the attorney-client privilege and the working law doctrine.

explained: "'[W]orking law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional." *ACLU v. NSA*, 925 F.3d at 593.[7]

i. Express Adoption

Express adoption of a pre-decisional document into working law means that "a document first drafted as legal or policy advice has *become* an agency's 'effective law and policy.'" *ACLU v. NSA*, 925 F.3d at 595 (emphasis in original). The Circuit has given this illustration:

> For instance, an agency's director might receive a memorandum from counsel advising him or her how to conduct a program in accordance with law. The director might then distribute that document to subordinates with instructions to obey the advice rendered therein. After such distribution, the document is no longer privileged. The reason is straightforward: while the initial communication was deliberative and pre-decisional, the subsequent communication was a promulgation of "working law," and therefore post-decisional and no longer privileged.

*Id*.

Because the "adoption process is usually internal and hidden from public view," courts in this Circuit have generally "looked for external evidence that such adoption has occurred," including "whether the document is applied in the agency's dealings with the public." *Id*. Where an agency has "embraced" a document's reasoning as its own and relies on it as the sole legal authority for its claim that a policy has a basis in law, express adoption is readily found. *La Raza*, 411 F.3d at 359; *see also Brennan I*, 697 F.3d at 202–04 (finding that USAID expressly adopted OLC's advice and incorporated it into its decision whether the language of grants for HIV/AIDS and anti-trafficking work should require an "explicit and affirmative policy opposing

[7] Express adoption and incorporation are not freestanding "exceptions" to Exemption Five. They are a part of the inquiry whether "the previously-privileged intra-agency document has become binding 'working law.'" *N.Y. Times III*, 939 F.3d at 492 (rejecting argument that "a privileged document could lose Exemption 5 protection if the agency adopted or incorporated it into any non-privileged document, even if that document were not 'working law'" (emphasis omitted)).

prostitution"); *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 874–77 (D.C. Cir. 2010) (finding that White House Office of Management and Budget had informally adopted documents as working law where these embodied the agency's "formal or informal policy on how it carries out its responsibilities").

Courts, however, will not infer express adoption from the bare fact of a decision or a casual, unexplained reference to a privileged document. *See La Raza*, 411 F.3d at 359. An agency's action falls short of express adoption where, having reviewed a non-binding recommendation, it (1) makes a binary decision without giving any reasoning; (2) carries out the recommended decision without explaining its decision in writing; or (3) casually refers to a document in a fashion that does not imply agreement with its reasoning. *See, e.g.*, *Grumman*, 421 U.S. at 185–86 (finding reasoning in reports not adopted where agency simply ordered or denied a "clearance" without substantive reasoning or even a reference to the reports); *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1143 n.22 (D.C. Cir. 1983) ("If the agency merely carried out the recommended decision without explaining its decision in writing, we could not be sure that the memoranda accurately reflected the decisionmaker's thinking."); *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 81 (2d Cir. 2002) ("minor references" to document covered by deliberative process privilege insufficient to establish express adoption or incorporation).

ii. Incorporation by Reference

The doctrine of incorporation is a "close cousin" to that of adoption. *ACLU v. NSA*, 925 F.3d at 597. It is another means by which an agency may transform a pre-decisional advisory document into binding "working law." *Id*. at 597–98. Whereas in express-adoption cases courts look for external evidence that an agency treats the document as binding, "in cases of 'incorporation by reference,' [courts] identify the agency's *enactment* of that document as its law

or policy through explicit textual reference in a final decision." *Id*. at 597. As the Second Circuit explained:

> [I]ncorporation occurs only when the incorporating "opinion" is itself a document with functionally binding effect. This limitation is significant; a decisionmaker's mere statements expressing his or her reliance on the reasoning of a separate memorandum do not amount to "incorporation" of that memorandum. . . . Appropriately, such statements *cannot* "incorporate by reference" external memoranda because such statements do not themselves have binding effect, either within the agency or on the public.

*Id*. at 598. Thus, a document "is subject to disclosure under the doctrine of 'incorporation by reference' only when an agency's formal opinion or determination of law or policy expressly references and relies on that document and its reasoning as the basis for a decision." *Id*.

A court must examine "*all* the relevant facts and circumstances in determining" whether "incorporation by reference has occurred." *La Raza*, 411 F.3d at 357 n.5; *see also id*. at 357 (finding "repeated references" to OLC memorandum by attorney general and his top advisers, the substance of those comments, and those comments' being used to assure third parties of the legality of the actions they were asked to take, together, sufficient to establish that DOJ had incorporated memorandum into its new policy); *Brennan I*, 697 F.3d at 202–04 (finding USAID incorporated OLC's guidance by reference where agency's global AIDS coordinator stated during congressional hearing that, in implementing agency's policy, he was "simply following . . . [OLC's] advice").

*c. Application of these principles to the OLC Memo*

The threshold question is whether the Memo, as prepared, was pre-decisional and deliberative. Arguing not, plaintiffs term the Memo a purely "postdecisional memorand[um]," noting DOD deputy general counsel Young's testimony that the memorandum "derived" from an earlier decision reached by the inter-agency taskforce; the declaration by OLC's Watzel that the Memo "memorialized" that group's decision; and that the Memo is dated September 5, 2025,

well after President Trump's July directive and Secretary Hegseth's August execute order, and three days after the first boat strike. *See* Ps' MOL at 12–13.

On this point, the Court holds with the agencies. Although the Memo's finalization after the first boat strike favors the characterization of it as post-decisional—and although the Memo's post-creation treatment by DOD and the Administration compellingly support that it became the agency's "effective law and policy"—the evidence supports the conclusion that, at the time it issued, the Memo was "an essential link in a specified consultative process" of executive decision-making. *Grand Cent. P'ship, Inc.*, 166 F.3d at 482.

In particular, the declaration of OLC's Watzel, which attests to the circumstances surrounding the Memo's creation, supports this conclusion. Watzel recounts the Memo's solicitation and preparation in sufficient detail (two paragraphs) to support the presumption of good faith attached to agency affidavits. *See Wilner*, 592 F.3d at 73; *Carney*, 19 F.3d at 812. He attests that the Memo was solicited by and provided to legal advisers in the White House Counsel's Office who advise the National Security Adviser and the NSC staff, and that it "memorializes deliberative advice provided for use in advising the President and other senior Executive Branch officials regarding the legal availability of potential military action" and "the manner in which the Executive Branch should implement the advice in the event the President ordered such action." Watzel Decl. ¶ 17. He further attests that the advice in the Memo was initially discussed with attorneys from the White House Counsel's Office, the NSC, and three other Executive Branch agencies "at a meeting convened several weeks prior to the Memorandum being finalized." *Id.* ¶ 18. He attests that the Memo memorializes the advice in detail beyond that given at the meeting, and that it memorializes, in an appended statement of facts, the facts communicated to OLC in the course of seeking this advice. *Id.*

And the facts marshaled by plaintiffs, drawn principally from news reports, are broadly consistent with Watzel's account of a Memo that took shape over time, memorialized pre-decisional oral legal advice, and, in its final iteration, expanded on that advice. These support that the Executive Branch commissioned a "restricted interagency lawyers [working] group" to assess and evaluate the "legally available" options to target narcotrafficking, *Wash. Post* (Nov. 22, 2025) at 7–8; and that Administration officials told policy personnel during "the late summer and into the fall" of 2025—*i.e.*, before and after the first boat strikes—that an OLC memorandum was "being drafted" to address the legality of strikes on alleged narcotraffickers. *Wash. Post* (Dec. 18, 2025) at 8–9.

The Court therefore finds that, at its inception, the OLC Memo was protected by the deliberative process privilege, because it records pre-decisional legal advice given to the White House Counsel's Office, and thereafter to members of the Executive Branch, on whether and under what circumstances to authorize boat strikes.

The application of the working law doctrine, however, presents a different question. On that point, the assembled record compellingly supports the finding that DOD—the agency that asserts disclosure authority over the Memo—has treated the Memo as its effective law and policy governing the boat strikes. It reflects that other components of the Administration, including the White House, have held out the Memo in a similar manner. Under the standards set out by the Second Circuit, DOD has both expressly adopted the Memo and incorporated it by reference, so as to make it functionally binding and hence, "working law."

DOD's treatment of the Memo, in fact, tracks nearly every factor the Second Circuit has identified to gauge whether a document constitutes an agency's working law: (1) agency officials feel bound to follow the document's instructions; (2) an agency superior has distributed the

document to subordinates (rather than vice versa); (3) agency superiors have directed their subordinates to follow the document's instructions; and (4) the agency, in its dealings with the public, has relied upon the document. *See ACLU v. NSA*, 925 F.3d at 595. Indeed, in public statements regarding the legality of the boat strikes, DOD and Administration officials have relied exclusively on the OLC Memo as defining the parameters of their authority to undertake these strikes. They have not identified any other document (by OLC or otherwise) that does so, or that sets out the legal basis for the strikes. Nor, during this litigation, has either DOJ or DOD identified any alternative written guidance on this point.

First, the evidence overwhelmingly indicates that DOD officials view themselves as bound by the OLC Memo's guidance. General Caine, the chairman of the Joint Chiefs of Staff, referencing the Memo during congressional testimony, stated: "I know and trust that our commanders at Echelon are rigorously following *that legal opinion and those legal boundaries*." Gen. Caine Testimony (Apr. 30, 2026) at 4 (emphasis added). Likewise, in their testimony, DOD deputy general counsel Young and SOUTHCOM's General Donovan each cited the Memo as setting out the "manner" and the "legal basis," respectively, for the boat strikes. Charles Young Testimony (Oct. 7, 2025) at 77; Gen. Donovan Testimony (Mar. 19, 2026) at 3.[8]

Second, the evidence also readily shows that the guidance in the Memo was disseminated to subordinate DOD officers, with instructions to follow it. General Caine testified that the Memo shaped the "execution orders" regarding the boat strikes that were transmitted to the Unified Combatant Commands, or "COCOMs." Gen. Caine Testimony (Apr. 30, 2026) at 3–4.

[8] In what appears to have been an implicit reference to the Memo, Pentagon spokesman Sean Parnell likewise publicly stated that military officials are "aware we are on firm legal ground" because all boat strikes were "in complete compliance with the law of armed conflict." *Wash. Post* (Nov. 22, 2025) at 8.

These orders, he stated, included "a variety of criteria," such as "what constitutes a valid military and legally valid target in that theater." *Id*. at 4.[9] And the statements by Executive Branch officials explicitly or implicitly tying the Memo to "current" and "ongoing activity" make clear that the Memo has defined the "policy of the government on an ongoing basis," and was more than "simply a plan for a particular one-off operation." *ACLU v. Dep't of Def.*, 435 F. Supp. 3d 539, 570 (S.D.N.Y. 2020) (Engelmayer, J.) ("*ACLU v. Dep't of Def.*"). For example, Secretary Hegseth posted on X that the "current operations in the Caribbean are lawful," and had been approved by military and civilian lawyers "up and down the chain of command." *See* Hegseth Post (Nov. 28, 2025). And SOUTHCOM's General Donovan likewise testified, when questioned about the Memo, "I'm just *carrying out* the assigned tasks." Gen. Donovan Testimony (Mar. 19, 2026) at 3. Statements by officials outside of DOD have also underscored the Memo's ongoing role in setting parameters for boat strikes. Then-White House press secretary Leavitt cited the Memo in defending the "lethal targeting" of "presidentially designated narco terrorist groups" as "in accordance with the laws of war." Leavitt Briefing (Dec. 1, 2025) at 12. Most recently, Acting Attorney General Blanche, when questioned in testimony about the justification for the 66 then-reported boat strikes, cited the OLC Memo as "our legal basis." Dkt. 65 at 1 (quoting C-SPAN, Attorney General Nominee Todd Blanche Testifies at Confirmation Hearing at 2:18:36–19:41 (July 15, 2026, at 9:10 ET)).[10]

---

[9] The dissemination of the Memo to subordinate officers, directly or distilled to isolate its legal criteria, tracks the hypothetical presented in *ACLU v. NSA*, in which a document initially prepared to advise an agency director as to how a program can be conducted "in accordance with law" is stripped of its privilege when it is "distribut[ed] to subordinates with instructions to obey the advice rendered therein." 925 F.3d at 595.

[10] The accounts of members of Congress who had been briefed on the Memo are in accord. Senator Warner, in urging the Memo's public release, stated: "This appears to be a policy that is being carried out over weeks and potentially months." Sen. Mark Warner Br. (Oct. 30, 2025) at 13–14. And Representative Himes stated that the Memo had been cited in a classified briefing

Third, Executive Branch officials have repeatedly publicly invoked the OLC Memo as the basis for the lawfulness of the boat strikes. As chronicled above, these officials include the White House press secretary in a press briefing, the acting attorney general in congressional testimony, the defense secretary on social media, and military officials in multiple contexts. Most notably, press secretary Leavitt publicly touted the Memo as supporting that the boat strikes had been carried out "in accordance with the law of armed conflict," and noted that the Memo had been "made available" to all senators and representatives. Leavitt Briefing (Dec. 1, 2025) at 27. Secretary Hegseth posted on X that the boat strikes had been "approved by the best military and civilian lawyers, up and down the chain of command." *See* Hegseth Post (Nov. 28, 2025). Where, as here, an agency has used an OLC memorandum "in its dealings with the public" to supply "the sole legal authority for [its] claim that its new policy has a basis in the law," that supports the conclusion that the document has become working law. *See La Raza*, 411 F.3d at 359–60; *id*. at 359 (OLC advisory memorandum became working law where DOD had relied on it "not only to justify what [DOD] *would* do as a result of its deliberation, but also to justify what a third party—[*i.e.* law enforcement personnel]—*should* and *could* lawfully do" (emphasis in original)); *see also N.Y. Times III*, 939 F.3d at 493.

Finally, the number of official references to the OLC Memo, and the specificity of some of these, are significant. The assembled record reflects far more than *de minimis* citations or casual, unexplained references to the Memo. DOD and other Executive Branch officials have repeatedly described the Memo as setting out legal analysis to the effect that, where the United States is engaged in a non-international armed conflict with narcotraffickers, the use of lethal

---

for the House Armed Services Committee as the legal basis for the ongoing strikes. Rep. Jim Himes (Nov. 4, 2025) at 23; *see also* Sen. Tim Kaine Floor St'mt (Nov. 6, 2025) at 2; Sen. Jack Reed Floor St'mt (Dec. 3, 2025) at 4.

force against alleged drug boats would comport with international law. On November 28, 2025, Secretary Hegseth so stated on X; and three days later, press secretary Leavitt stated that the Memo demonstrated that the strikes were "in accordance with the laws of war"; and, as chronicled in statements by legislators, some refuting aspects of the Memo's legal analysis, the Administration has repeatedly cited it in briefings to Congress as supplying the legal basis for the boat strikes. *See* Rep. Jim Himes (Nov. 4, 2025) at 3–4; Sen. Tim Kaine Floor St'mt (Nov. 6, 2025) at 2; *Wash. Post* (Dec. 18, 2025) at 9 (citation omitted). The Executive Branch's repeated invocations of the Memo distinguish this case from cases where a limited citation or offhand reference to a document has been held insufficient to make the document working law. *See N.Y. Times III*, 939 F.3d at 491–92; *Wood v. Fed. Bureau of Investigation*, 432 F.3d 78, 84 (2d Cir. 2005) ("*Wood*").

Lest any doubt remain, the facts of this case comfortably accord with the three cases in which the Second Circuit has held the working law doctrine to defeat an agency's assertion of the deliberative process privilege over an OLC memo.

Most closely on point is *N.Y. Times II*. The Circuit there held that public statements by senior government officials attesting to the lawfulness of the targeted killings of al-Qaida affiliates defeated the invocation of the deliberative process privilege as to an initially classified and advisory memorandum from OLC. 756 F.3d at 114–17. The Circuit's holding relied, in part, on the Senate testimony of John O. Brennan—then-assistant to the President for homeland security and counterterrorism, and the incoming director of the CIA—that the "Office of Legal Counsel advice establishes the legal boundaries within which we can operate." *Id*. at 115. That testimony, the Circuit held, supported that OLC's memorandum was a source of working law. *Id*. The Senate testimony here of General Caine, in which he stated that "our commanders . . .

are rigorously following that legal opinion and those legal boundaries," is closely parallel. Gen. Caine Testimony (Apr. 30, 2026) at 4. The other statements that informed the Circuit's analysis in *N.Y. Times II* likewise have analogues here. Officials in *N.Y. Times II*—the State Department's legal adviser, DOD's general counsel, and the attorney general—had each asserted that the ongoing targeting of specific senior operational leaders of al-Qaida was lawful, as part of what the decision on review termed a "public relations" campaign—a characterization the Circuit echoed. *Id*. at 114 (citation omitted). Various statements reviewed above—including the social media posts of Secretary Hegseth, and the statements by White House press secretary Leavitt, DOD spokesman Parnell, and Acting Attorney General Blanche—may be similarly characterized.

Similarly, in *La Raza*, the Circuit held that DOJ had expressly adopted as its working law a 2002 OLC memorandum authorizing state governments to make arrests for civil violations of federal immigration law. 411 F.3d at 360. The Circuit noted that Attorney General John Ashcroft and his senior staff, including an acting assistant attorney general, had repeatedly cited that OLC memorandum not just to defend that policy, but as embodying it. *Id*. at 357–58. In particular, Ashcroft had stated at a press conference that "[OLC] has concluded that this narrow, limited mission . . . is within the inherent authority of the states," and had later described that conclusion as "*the policy of the Department on this issue*." *Id*. at 353 (emphasis in original). These and other statements, the Circuit held, "demonstrate[d] that [DOJ] regarded the Memorandum as the exclusive statement of . . . its new policy." *Id*. at 357. Here, the statements by senior DOD officials—including Secretary Hegseth, General Donovan, and spokesman Parnell—are much to the same effect, insofar as they cited the OLC Memo in support of the legality of DOD's execute orders, the decision to undertake strikes, the manner in which strikes

are conducted, and the ongoing military operations. Such use of the Memo by "Department personnel" is "powerful evidence that [the agency] explicitly adopted the OLC Memorandum as part of its policy." *La Raza*, 411 F.3d at 359–60.

Finally, in *Brennan I*, the Circuit relied on public statements by USAID as evidence that the agency had adopted an OLC memorandum as its working law. The Circuit pointed in particular to several USAID documents stating that OLC had "determined" that a statutory funding restriction "only may be applied to foreign non-governmental organizations and public international organizations." 697 F.3d at 204 (cleaned up). Other statements by USAID, including in congressional testimony and a draft memorandum, likewise attributed policy parameters to the OLC Memo. *Id*. So too here, in the statements reviewed above, officials invoked the OLC Memo as setting the legal parameters of the boat-strike program. These included statements by press secretary Leavitt and DOD deputy general counsel Young.

The agencies make two principal arguments against finding the Memo working law.

First, they note that OLC does not have decision-making responsibility with respect to ordering military action, and thus its Memo could not have constituted working law when it was created. Dkt. 59 ("Ds' Opp'n") at 8–9. Citing *Electronic Frontier Foundation v. U.S. Department of Justice*, 739 F.3d 1, 9–10 (D.C. Cir. 2014), the agencies contend that because OLC does not "speak with authority" on military matters, the Memo cannot constitute working law. Ds' Opp'n at 8.

That argument is faulty in two respects. For one, factually, the record refutes the premise that the OLC Memo reflected only OLC's guidance. It establishes that the OLC Memo memorialized the guidance developed by an inter-agency group of lawyers, including from the White House Counsel's Office and Executive Branch components with military responsibilities.

That is clear from the testimony of DOD deputy general counsel Young, to the effect that the "[OLC] opinion was derived through an interagency lawyer's working group with the CIA, the State Department, White House Counsel, Department of Justice, Department of Defense General Counsel, [and] Judge Advocates," Charles Young Testimony (Oct. 7, 2025) at 76; and the declaration of OLC attorney Watzel to the effect that the working group included attorneys from the NSC and "three other Executive Branch agencies," Watzel Decl. ¶ 17. In any event, even had the Memo consisted solely of legal guidance from OLC, under the case law above, such guidance can be adopted by an agency as its working law, including by express adoption and incorporation by reference. That has occurred here. *ACLU v. NSA*, which post-dated *Electronic Frontier Foundation* by some five years, set out "guiding principles" to help courts "determine" whether a document has become "functionally binding and hence, 'working law.'" *ACLU v. NSA*, 925 F.3d at 595. In finding express adoption and incorporation by reference, the Court has applied those principles.

Second, focusing specifically on express adoption, the agencies argue that the statements by DOD deputy general counsel Young and press secretary Leavitt did not expressly adopt the Memo. Ds' Opp'n at 11–16. But that argument is myopic. It does not take account of the full range of statements by Administration officials attributing to the Memo the legal parameters of the boat strike campaign—for instance, statements by the chairman of the Joint Chiefs, the general in command of SOUTHCOM, and the acting attorney general. And it ignores the Circuit's teaching that where an Administration, in its dealings with the public, repeatedly invokes a document as setting forth its policy parameters, that supports finding the document to constitute working law. *See La Raza*, 411 F.3d at 357–58; *ACLU v. NSA*, 925 F.3d at 595–99.

The Court thus finds the OLC Memo to qualify as working law. As public statements by officials across the Executive Branch demonstrate, DOD has adopted the OLC Memo. The Memo binds DOD and defines the parameters of its authority to undertake boat strikes. As to this area of DOD operations, it sets the boundaries within which the agency can operate. Accordingly, the Court rejects the agencies' defense of withholding under Exemption Five to the extent it is based on the deliberative process privilege.

**2. Attorney-Client Privilege**

*a. Governing principles*

The attorney-client privilege functions to "encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *ACLU v. NSA*, 925 F.3d at 589 (quoting *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)). It protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *see also Brennan I*, 697 F.3d at 207–08.

In the context of legal advice to government officials, "the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business." *ACLU v. NSA*, 925 F.3d at 589 (cleaned up). "The public interest in ensuring that government officials receive sound legal advice is at its apex when the programs about which advice is sought are secret and unlikely to be subject to litigation." *Id*. In such contexts, frank exchanges between government officials and their attorneys are crucial safeguards to ensure the legality of government action. *Id*.

As with communications with private counsel, the attorney-client privilege that attaches to communications with government counsel is nonetheless subject to waiver. In a FOIA action,

this privilege is overcome when a communication is voluntarily disclosed to outsiders beyond the traditional attorney-client relationship or adopted into an agency's "policy." *See, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) ("*Coastal States*"); *La Raza*, 411 F.3d at 360; *ACLU v. NSA*, 925 F.3d at 591–92.[11] A party that shares otherwise privileged communications with an outsider is generally disabled from claiming that the communications were intended to be confidential. *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015).

Accordingly, where an agency asserts the attorney-client privilege over communications, it must demonstrate "confidentiality both at the time of the communication and [that such has been] maintained since." *Coastal States*, 617 F.2d at 863. "The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure." *Id*. Under certain conditions, waiver may be found even when the dissemination was entirely within the agency. *See, e.g.*, *Ceglia v. Zuckerberg*, No. 10 Civ. 569, 2012 WL 1392965, at *2 (W.D.N.Y. Apr. 19, 2012), *aff'd*, 2012 WL 3527935 (W.D.N.Y. Aug. 15, 2012) ("Even the dissemination of confidential and privileged information to persons within an organization 'not shown to have a need to know such information' waives the attorney client privilege" (citation omitted)).

[11] A waiver may also be found where a party to litigation affirmatively places the subject matter of its own privileged communication at issue. No such "at issue" waiver is claimed here. *See In re County of Erie*, 546 F.3d at 229 (for doctrine to apply, "a party must *rely* on privileged advice from his counsel to make his claim or defense" (emphasis in original)); *Deutsche Bank Tr. Co. of Ams. v. Tri-Links Inv. Tr.*, 837 N.Y.S.2d 15, 23 (App. Div. 2007) (if mere relevance of privileged communications to the parties' dispute could trigger at-issue waiver, the "[attorney-client] privilege would have little effect").

An agency's assertion of the attorney-client privilege under Exemption Five can also be overcome by a showing that the document in question has been adopted as, or incorporated by reference into, the "agency's policy." *ACLU v. NSA*, 925 F.3d at 591 & n.62 (quoting *La Raza*, 411 F.3d at 360); *see also Brennan I*, 697 F.3d at 208. This principle is functionally similar to the working law doctrine, although it has a distinct basis. As the Second Circuit has explained:

> This rule—that an incorporated or adopted document is no longer protected by privilege—mirrors the general "fairness doctrine" that governs the implicit waiver of privilege during litigation. As we have previously explained, "courts have found waiver by implication when a client testifies concerning portions of the attorney-client communication . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense." And so we have consistently rejected parties' attempts to withhold attorney-client communications from a litigation adversary while relying on the same material to advance a claim in court. To put it simply, in court, a party may not wield a privileged communication as both a "shield and a sword."
>
> A similar principle applies when the Government "adopts" or "incorporates" a previously privileged document as its effective law and policy. Just as a litigating party may not offer a privileged communication to *invoke the law* while maintaining the privilege, so too the Government may not expressly *adopt* a privileged communication *as its effective law or policy* while maintaining the privilege.

*ACLU v. NSA*, 925 F.3d at 591 (emphases in original) (citations omitted).

*b. Application of these principles to the OLC Memo*

The threshold issue is whether the Memo, when issued, was protected by attorney-client privilege. It was. As OLC's declaration demonstrates, the Memo's purpose was to memorialize legal guidance to the NSC and its staff, which had been given to enable them to advise the President and senior Executive Branch officials about the "legal availability of potential military action." Watzel Decl. ¶ 17. The Memo was the product of deliberations among Executive Branch attorneys, including from OLC, and it "record[s] and explain[s]" that advice, including "the manner in which the Executive Branch should implement the advice in the event the President ordered such [military] action." *Id.* ¶¶ 17, 24. The facts memorialized in the Memo, in

turn, had been provided to OLC by NSC staff or "other entities within the Executive Branch" for the purpose of enabling it to develop this advice. *Id*. ¶ 24.

Like many other OLC memoranda that have been the subject of FOIA litigation, the Memo was thus unavoidably a communication from lawyers to a client that furnished confidential legal advice. As such, at its inception, it was covered by the privilege. *See, e.g.*, *ACLU v. NSA*, 925 F.3d at 585, 590–91 (OLC memorandum to attorney general, prepared for purpose of advising President regarding "highly classified and strictly compartmented program of electronic surveillance," constituted confidential client communication within scope of attorney-client privilege); *Brennan I*, 697 F.3d at 207 (OLC memorandum providing advice to agency officials regarding constitutionality of agency action fell within scope of attorney-client privilege); *N.Y. Times v. U.S. Dep't of Just.*, 101 F. Supp. 3d 310, 321 (S.D.N.Y. 2015) (email from litigation counsel in Bureau of Alcohol, Tobacco, Firearms and Explosives litigation division to agency's staff fell within attorney-client privilege); *cf. Nat'l Sec. Couns. v. Cent. Intel. Agency*, 960 F. Supp. 2d 101, 194 (D.D.C. 2013) (evidence regarding communications between CIA staff and members of CIA's Office of General Counsel regarding processing of FOIA requests insufficient to support attorney-client privilege claim).

However, for much the same reasons as the Court has found the deliberative process privilege overcome, the attorney-client privilege here has been overcome by the OLC Memo's adoption by DOD as its effective "law and policy" governing the boat strikes. As noted above in the discussion of working law, DOD and other parts of the Executive Branch, including the White House, have repeatedly adopted the Memo as setting out the law and policy governing the boat strikes, to the point that the chairman of the Joint Chiefs, in congressional testimony, has called out the Memo as establishing the "legal boundaries upon which we have been issued

[military] orders." Gen. Caine Testimony (Apr. 30, 2026) at 3–4. And courts in this Circuit and the D.C. Circuit have commonly held that where an agency's acts of adoption or incorporation establish that a document has become "working law" so as to defeat the deliberative-process claim, the same operates to abrogate the attorney-client privilege. *See, e.g.*, *Brennan I*, 697 F.3d at 208 ("The references to the February 2004 memorandum that served to remove the deliberative-process privilege thus also constitute waiver of the attorney-client privilege."); *La Raza*, 411 F.3d at 360–61 ("Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."); *N.Y. Times II*, 756 F.3d at 116–17 (holding that Government waived attorney-client and deliberative process privileges "by publicly asserting that OLC advice 'establishes the legal boundaries within which we can operate'"); *N.Y. Times Co. v. U.S. Dep't of the Treasury*, No. 15 Civ. 5740, 2016 WL 4147223, at *2 n.3 (S.D.N.Y. Aug. 2, 2016) ("Neither the attorney-client privilege nor the deliberative-process privilege can be invoked to justify withholding a document that contains an agency's working law." (cleaned up)); *cf. ACLU v. NSA*, 925 F.3d at 590–92, 599–600 (where OLC memorandum was neither created, adopted, nor incorporated as working law, it is protected by both the deliberative process and attorney-client privileges).

The agency defendants cannot claim surprise from this consequence of the Executive Branch's repeated public statements embracing the OLC Memo—and it only—as setting out the legal parameters for the boat strikes. The Second Circuit drove home these consequences in rejecting a similar Exemption Five argument more than a decade ago: "Agencies seeking OLC legal advice are surely sophisticated enough to know that in these circumstances attorney/client and deliberative process privileges can be waived and the advice publicly disclosed." *N.Y. Times*

*II*, 756 F.3d at 116; *see also Brennan I,* 697 F.3d at 207–08 (Government cannot rely on a privileged document "and then shield it from public view").

The agencies counter that finding a waiver here would require finding a waiver any time an entity adopts a policy based on legal advice. *See* Ds' Opp'n at 19–20. That is a considerable overstatement. As the Second Circuit's decisions on this area reflect, an agency is fully capable of seeking out and relying upon legal advice without adopting the privileged communication as its effective law and policy. The key distinction, as the Circuit has taught, is whether the agency has adopted or incorporated the otherwise privileged communication as its working law and policy. *La Raza*, 411 F.3d at 360; *Brennan I*, 697 F.3d at 208; *ACLU v. NSA,* 925 F.3d at 591. An agency is fully capable of relying on legal guidance without publicly embracing it as setting its effective law and policy. And the case law, including *ACLU v. NSA*, illustrates the ability of agencies to respect that line. *See* 925 F.3d at 599–600 (rejecting claim that working law defeated deliberative process or attorney-client privilege where OLC had analyzed a legal question, attorney general had reviewed and agreed with OLC's analysis in certifying a program, and no official had publicly held out OLC's memorandum as "binding authority" for policy); *Wood*, 432 F.3d at 84 (absence of public references to memorandum was "fatal" to asserted inference that DOJ had "adopted the reasoning of the [m]emo"); *N.Y. Times III*, 939 F.3d at 492 (recommendations to attorney general whether to formally investigate or criminally prosecute instances of alleged CIA wrongdoing were not binding—even if referenced by attorney general—and thus did not constitute DOJ's "working law").

The Court accordingly rejects DOJ's defense of withholding under Exemption Five to the extent it is based on the attorney-client privilege. *See, e.g.*, *La Raza*, 411 F.3d at 359–60 (where OLC memorandum was incorporated into DOJ's policy as working law, attorney-client privilege

could not be invoked to bar that memorandum's disclosure); *Brennan I*, 697 F.3d at 207–08 (rejecting argument that memorandum was exempt from disclosure based on attorney-client privilege where memorandum had been adopted as "agency law"); *Sears*, 421 U.S. at 151–54 (working law sufficient to abrogate attorney-client privilege where documents "supply the basis for an agency policy actually adopted"); *Falcone v. IRS*, 479 F. Supp. 985, 990 (E.D. Mich. 1979) (rejecting agency's claim to withhold documents based on attorney-client privilege where document reflected its working law); *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967, 974 (7th Cir. 1977) ("Where litigation is foreclosed as an option and the agency expressly chooses to make use of legal memoranda in its final decision, this choice eliminates any claim of attorney work product privilege . . . . Under these circumstances, such documents 'are not the ideas and theories which go into the making of the law, they are the law itself, and as such should be made available to the public.'" (citation omitted)).

### 3. Presidential Communications Privilege

#### *a. Governing principles*

The presidential communications privilege was first recognized by the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974) ("*Nixon*").[12] The privilege protects the confidentiality of the decision-making processes of the President and his senior advisers. It safeguards the President's ability to receive "candid, objective, and even blunt or harsh opinions" from advisers who might otherwise "be unwilling to express [those views] except privately." *Id.* at 708. And it covers communications that are "fundamental to the operation of Government," *id.*, to wit, ones "in performance of the President's responsibilities, . . . of his office, . . . and

[12] The privilege can be traced to *Marbury v. Madison*, in which Chief Justice Marshall recognized the Executive's ability to resist production of records on the grounds that a judicial inquiry "into the secrets of the cabinet" would give the appearance of "intermeddl[ing] with the prerogatives of the executive." 5 U.S. (1 Cranch) 137, 170 (1803).

made in the process of shaping policies and making decisions," *id*. at 708, 711; *see also Nixon v. Adm'r of Gen. Servs*., 433 U.S. 425, 449 (1977) ("*Nixon v. GSA*").

The privilege is distinct from the deliberative process and other privileges covered by FOIA Exemption Five in that it has constitutional, not common-law, origins. *See In re Sealed Case*, 121 F.3d 729, 743 (D.C. Cir. 1997). It "is 'inextricably rooted in the separation of powers under the Constitution' and 'flow[]s from the nature of enumerated powers of the President.'" *Id*. (quoting *Nixon*, 418 U.S. at 705 n.16, 708); *see also Trump v. United States*, 603 U.S. 593, 612–13 (2024); *Nixon v. Fitzgerald,* 457 U.S. 731, 753 (1982).

The D.C. Circuit's detailed decision in *In re Sealed Case* is widely recognized as the most comprehensive review of the privilege's purpose and scope. Several principles are germane here.

First, the privilege covers not only communications of the President but also those of his inner circle. *In re Sealed Case*, 121 F.3d at 751. These include the President's immediate White House advisers, and "members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *Id*. But the privilege does not "extend to staff outside the White House in executive branch agencies." *Id*. at 752. In determining whether the privilege attaches, the key question is the participants' "operational *proximity* to the President." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993) (emphasis in original). Communications authored—or solicited and received—by advisers "close enough to the President" to reveal "his deliberations or to pose a

risk to the candor of his advisers" are within the privilege's scope. *In re Sealed Case*, 121 F.3d at 752.[13]

Second, the privilege covers communications "intimately connected" to presidential decision-making and that "call ultimately for direct decisionmaking by the President." *In re Sealed Case*, 121 F.3d at 752–53. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. The privilege is thus implicated by communications in connection with the exercise of the President's enumerated and nondelegable powers. *In re Sealed Case,* 121 F.3d at 752–53.[14] But the privilege does not extend to decision-making within the Executive Branch generally. *Id*. at 745 (privilege applies to "communications made in the process of arriving at *presidential* decisions" (emphasis added)); *see also Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam) ("*Sirica*"); *see Nixon v. GSA*, 433 U.S. at 449.

---

[13] *See, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007) (privilege applied to emails from White House Counsel's Office "seeking Attorney General's comment on the President's December radio address"); *Amnesty Int'l USA v. Cent. Intel. Agency*, 728 F. Supp. 2d 479, 522–23 (S.D.N.Y. 2010) (privilege applied to communications "between senior presidential advisers and other United States government officials" about CIA program); *Samahon v. U.S. Dep't of Just.*, No. 13 Civ. 6462, 2015 WL 857358, at *13–14 (E.D. Pa. Feb. 27, 2015) (privilege applied to memoranda drafted by OLC regarding recess appointments sent to White House Counsel); *Am. Oversight v. Off. of Mgmt. & Budget*, 613 F. Supp. 3d 219, 230 (D.D.C. 2020) (privilege applied to requests to Office of Management and Budget by pPresident, Vice President, or President's immediate White House adviser).

[14] *See, e.g.*, *Amnesty Int'l USA*, 728 F. Supp. 2d at 523 (privilege covered communications concerning CIA terrorist detention and interrogation program); *Samahon*, 2015 WL 857358, at *13–14 (privilege covered OLC memorandum concerning presidential recess appointment power); *N.Y. Times v. U.S. Dep't of Def.*, 499 F. Supp. 2d at 516 (privilege covered documents related to NSA's domestic intelligence and wiretap program).

Third, the privilege is not limited to communications preceding a presidential decision. Unlike the deliberative process privilege, the presidential communications privilege applies to "final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745; *see also Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1113–14 (D.C. Cir. 2004). Post-decisional materials covered may include, for example, "follow-up reports" by presidential advisers after a presidential decision to pursue a "particular course of action." *In re Sealed Case*, 121 F.3d at 745–46.

Fourth, the presidential privilege is not absolute, and its invocation in connection with "materials that reflect presidential decision-making and deliberations" makes those materials only "presumptively privileged." *Id*. at 745 (cleaned up). The privilege can be overcome by "an adequate showing of need," such as in connection with a criminal prosecution, although, in light of the privilege's constitutional roots, a finding of "congressional or judicial negation" of the privilege "is subject to greater scrutiny than denial of the deliberative privilege." *Id*. The privilege may be overcome based on the "weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." *Sirica*, 487 F.2d at 717; *see also Nixon*, 418 U.S. at 706, 710 (rejecting claim of an "absolute, unqualified Presidential privilege" arising from the doctrine of separation of powers, and noting that privileges, "[w]hatever their origins," represent "exceptions to the demand for every man's evidence," and are "not lightly created nor expansively construed, for [they are] in derogation of the search for truth"); *Herbert v. Lando*, 441 U.S. 153, 175 (1979).

Importantly, the privilege is subject to waiver. In general, as to claims of privilege under Exemption Five, an agency may waive its right to withhold records through its treatment of the document at issue. For example, where an agency disseminates or voluntarily discloses a

document, that may preclude it from claiming the exemption. *See, e.g.*, *N.Y. Times II*, 756 F.3d at 114 (finding waiver of legal analysis, but not of classified information, in OLC-DOD memorandum). And where an agency has shared a document with outsiders, that may also preclude it from claiming the exemption because a "fundamental prerequisite" of a privilege is "confidentiality both at the time of the communication and maintained since." *Coastal States*, 617 F.2d at 863.[15]

The presidential communications privilege is likewise susceptible to waiver through disclosure, although such a waiver should not be "lightly inferred." *In re Sealed Case*, 121 F.3d at 741; *see also Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 827–28 (S.D.N.Y. 2021) ("*Knight*") ("[T]he President, or an agency invoking the privilege on his behalf, waives the privilege by the disclosure of the otherwise privileged information to third parties."); *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 24 (D.D.C. 2013); *ACLU v. Dep't of Just.*, No. 15 Civ. 1954, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016) ("*ACLU II*"). That is in part because the disclosure of privileged materials to persons beyond the limited circle of presidential advisers and staff is at odds with "the purposes that animate the privilege: the promotion of candor and effective presidential decision making" and the continued protection of "[t]he President's confidentiality interest." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 27–29.

---

[15] An agency can also waive privilege where a plaintiff identifies "specific information in the public domain that appears to duplicate that being withheld." *Assassination Archives & Rsch. Ctr. v. Cent. Intel. Agency*, 334 F.3d 55, 59 (D.C. Cir. 2003); *ACLU v. NSA*, 925 F.3d at 591; *N.Y. Times v. Cent. Intel. Agency*, 965 F.3d 109, 115–16 (2d Cir. 2020). "The 'logic of FOIA' postulates that an exemption can serve no purpose once information, including sensitive law enforcement intelligence, becomes public." *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999).

Maintaining the privilege thus requires "keeping the information in a 'circle [which] . . . has a narrow diameter.'" *Knight*, 560 F. Supp. 3d at 828; *see also ACLU v. Dep't of Def.*, 435 F. Supp. 3d at 559 (same); *ACLU II*, 2016 WL 889739, at *1–6. The "transmittal of a document to persons who are unlikely to be in a position to give advice to the President waives the privilege." *ACLU II*, 2016 WL 889739, at *4; *see also ACLU v. Dep't of Def.*, 435 F. Supp. 3d at 559 (same). On this basis, courts have held the privilege waived where a record was shared with persons not covered by the privilege. *See, e.g.*, *Knight*, 560 F. Supp. 3d at 829 (records shared for a "non-advisory purpose" with persons outside "narrow circle of the privilege"); *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 28 (records "distributed widely beyond the President's inner circle").[16]

*b. Application to the OLC Memo*

The threshold issue is whether the presidential communications privilege covers the OLC Memo. It does.

The agencies' argument on this issue rests largely on the attestations by OLC's declarant, Watzel. He represents that the Memo was "solicited by . . . legal advisers in the White House Counsel's Office," "memorializes deliberative advice provided for use in advising the President

[16] A waiver of the privilege may also occur where the President or others directly quote the withheld materials. *See Council on Am.-Islamic Rels. – Connecticut v. U.S. Citizenship & Immigr. Servs.*, 669 F. Supp. 3d 64, 82 (D. Conn. 2023) ("*CAIR Connecticut*"). But, to establish a waiver by this means, a party must make "stringent" showings: that (1) the record sought is as specific "as information previously released," (2) the record matches "the information previously disclosed," and (3) the information requested was already made public through an "official and documented disclosure." *Fitzgibbon v. Cent. Intel. Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990); *Jud. Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43, 57 (D.D.C. 2016) (rejecting waiver claim where plaintiff could not point to "specific items of information" that had reached the public domain), *aff'd on other grounds*, 876 F.3d 346 (D.C. Cir. 2017). Plaintiffs here do not pursue this theory. Nor could they viably. As reflected above, Administration officials have made many public statements about the OLC Memo, but—beyond reporting the Memo's bottom-line approval of the boat-strike program—these have not divulged its specific legal analysis.

and other senior executive branch officials regarding the legal availability of potential military action as part of a deliberative process in connection with the President's decision whether to take such action in his constitutional role as Commander in Chief," Watzel Decl. ¶ 17, and was "relied on by senior White House officials in the NSC and the Executive Office of the President as part of the President's decision-making process as to whether to take such action," *id.* ¶ 22.

Plaintiffs counter that the Watzel declaration is sparse on detail; that its representations tend towards the generic; that it does not represent that the President ever saw the Memo; and that it does not specify who saw it or the role they played in advising the President about the boat-strike program. They note, too, that the interagency working group whose advice the Memo distilled appears to have included agency lawyers who would ordinarily not qualify as "immediate" White House advisers. And they note that the Memo's creation date—after the President's July authorization directive and Secretary Hegseth's August execute order—suggests it was intended, at least in part, as a guide to later operational decisions. *See* Watzel Decl. ¶ 17 (describing Memo as containing "legal advice concerning the manner in which the *Executive Branch* should implement the advice *in the event* the President ordered such action" (emphases added)).

Plaintiffs' critiques are fair. A more specific declaration might have cinched the role the Memo played in the process by which the President was advised about the legal rules governing boat strikes, such as by identifying an author or recipient "close enough to the President to be revelatory of his deliberations," *In re Sealed Case*, 121 F.3d at 752, or with "operational proximity" to him. *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 910. In the end, however, the Court is persuaded that the privilege attaches to the Memo. An agency's good-faith justification for invoking a FOIA exemption need only "appear[] logical or plausible" to suffice.

*Wilner*, 592 F.3d at 73; *Carney*, 19 F.3d at 812. Here, OLC's affidavit attests, albeit at a high level, that the Memo informed the advice that senior advisers gave the President on the parameters of the boat-strike program. That is highly plausible, in that the Memo addressed a core and unique presidential power: whether and on what terms to authorize military action in his capacity as Commander in Chief. That the working group whose advice the Memo captured included at least one attorney from the White House Counsel's office makes it all the more plausible that the Memo informed presidential advice. Under the case law, the presence of agency attorneys in this advisory process would not defeat the privilege.[17]

That, however, does not end the inquiry. Plaintiffs argue that, even if the privilege initially applied, it was abrogated, in two ways. First, drawing on the working law doctrine discussed above, they argue that, where a document has become working law, the presidential

[17] *See, e.g.*, *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 173 (D.D.C. 2018) (privilege applied to legal memorandum prepared by interagency attorneys, including OLC, which had been "solicited by the Deputy Legal Adviser of the [NSC]"); *Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, No. 20 Civ. 172, 2021 WL 1167094, at *3 (D.D.C. Mar. 26, 2021) ("*Protect Democracy*") (same, where OLC memo was solicited by Deputy Counsel to the President).

Other cases in this line are distinguishable, in that they concern communications that either did not involve a senior presidential adviser or were not directed at advising the president, *see, e.g., Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 387–89 (D.D.C. 2018) (privilege does not "extend to staff outside the White House in executive branch agencies"); *Ctr. for Biological Diversity v. Off. of Mgmt. & Budget*, No. 7 Civ. 4997, 2008 WL 5129417, at *12 (N.D. Cal. Dec. 4, 2008) ("not all EOP [Executive Office of the President] officials qualify to claim the privilege"); *Jud. Watch, Inc.*, 365 F.3d at 1120–21 (memorandum exchanged within DOJ between pardon attorney and attorney general was outside privilege), or involved later distributions of a privileged document that were held to waive the privilege. *Knight*, 560 F. Supp. 3d at 827–28 (discussed *infra*).

communications privilege also cannot survive. Second, they argue that the privilege has been waived, by DOD and the White House. The first argument fails, but there is force to the second.

Plaintiffs' first argument, based on the working law doctrine, posits that because the presidential communications privilege is within Exemption Five, *see Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 886 (D.C. Cir. 2021), and because the working law doctrine defeats other Exemption Five privileges including the deliberative process privilege, *see N.Y. Times III*, 939 F.3d at 491 (collecting cases), it defeats the presidential communications privilege as well. The Court is unpersuaded. Neither the Second Circuit nor the D.C. Circuit has held that the working law doctrine overrides all Exemption Five privileges. On the contrary, the Second Circuit has expressly reserved its application to at least one such privilege (the attorney work-product privilege). *See id*. at 492 n.9. And plaintiffs have not identified any case applying the doctrine to the presidential communications privilege. To the contrary, district courts have consistently held that "the working law exception does not apply to the presidential communication[s] privilege." *ACLU v. Nat'l Sec. Agency*, No. 13 Civ. 9198, 2017 WL 1155910, at *12 (S.D.N.Y. Mar. 27, 2017), *aff'd*, 925 F.3d 576 (2d Cir. 2019); *see also Advocs. for the W. v. U.S. Dep't of Just.*, 331 F. Supp. 3d 1150, 1169 (D. Idaho 2018).[18]

[18] To be sure, the Supreme Court stated in *Sears* that "if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption *other than Exemption 5*." 421 U.S. at 161 (emphasis added). But that case did not involve the presidential communications privilege, and the Court later clarified that its statement was not meant as categorical, as it was made only "in the course of a discussion of the privilege for *predecisional* communications." *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 360 n.23 (1979) (emphasis added); *accord N.Y. Times III*, 939 F.3d at 491–92 & n.9 (quoting the statement from *Sears* but "reserv[ing]" the question whether the working law doctrine trumps the attorney work-product privilege).

There is good reason for that solid block of caselaw. The working law doctrine serves to prevent agencies from "promulgat[ing] a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label." *N.Y. Times III*, 939 F.3d at 493. The doctrine thus, as explained above, sensibly defeats common-law privileges grounded in preserving candor in the advisory process, such as the deliberative process and attorney-client privileges. *See Klamath Water*, 532 U.S. at 8–9 (deliberative process); *La Raza*, 411 F.3d at 360 (attorney-client). After all, "once an agency adopts or incorporates [a] document, frank communication will not be inhibited." *La Raza*, 411 F.3d at 360. But the presidential communications privilege, being "rooted in constitutional separation of powers principles," respects "the President's unique constitutional role" rather than simply fostering candid deliberation. *In re Sealed Case*, 121 F.3d at 745. It "affords greater protection against disclosure" than, for example, the deliberative process privilege, by "cover[ing] final and post-decisional materials as well as pre-deliberative ones." *Id*. at 745–46. Those separation-of-powers considerations do not disappear merely because the communication captures operative law.

Plaintiffs' second argument is that the privilege has been waived by the Memo's having been transmitted outside the presidential advisory circle for purposes other than to inform presidential decision-making, including within DOD and to military leaders, to guide operational decisions. Plaintiffs' legal premise is correct: the subsequent disclosure of a covered document can waive the presidential communications privilege. The privilege exists to give the "President and those who assist him [the freedom] to explore alternatives in the process of shaping policies and making decisions and to do so in a way that many would be unwilling to express except privately," *Nixon*, 418 U.S. at 708, and to facilitate discussions among the President and his inner

circle, free of the risk of disclosure that would "pose a risk to the candor of his advisers," *In re Sealed Case*, 121 F.3d at 752. As the assembled case law makes clear, the dissemination of covered documents within the Executive Branch, including for purposes of follow-on policymaking and implementation, is at odds with the purpose of the privilege and can waive it.

In *Center for Effective Government v. U.S. Department of State*, for example, Judge Huvelle considered a presidential communications privilege claim asserted over, as here, a single document, a Presidential Policy Directive on Global Development. 7 F. Supp. 3d at 25–29. That document had been transmitted to more than 30 persons in the Executive Branch, including "senior foreign policy advisors, cabinet officials, and agency heads concern[ed with] the global development policy of the United States." *Id*. at 20, 25. The purpose of disseminating it was to "guide decision-making" by "recipient agencies." *Id*. at 21. The transmittal memorandum accompanying the document had admonished recipients to "safeguard carefully" its contents and not to distribute it further without "advance approval." *Id*. at 20. Nonetheless, Judge Huvelle held, the privilege had been waived by the document's distribution "far beyond the President's close advisers." *Id*. at 25–29. As she put the point: "The purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount. If distribution is limited to advisory purposes, the privilege may apply, but if distribution is far broader, the purposes animating the privilege will not justify its application." *Id*. at 29.

Similarly, in *Knight*, Judge Torres considered a presidential communications privilege claim asserted over emails concerning policies and procedures governing communications during the COVID-19 pandemic. 560 F. Supp. 3d at 820–22. The case involved two emails authored by the White House chief of staff to senior government officials, and one from the director of the Centers for Disease Control to his principal deputy, chief of staff, and chief operating officer.

Like the Memo here, the emails had been generated by a mix of White House and outside officials. *Id*. at 827–28. Judge Torres held that the privilege had been waived by the dissemination of those emails "throughout the Executive Branch" and beyond. *Id*. at 829. The emails from the White House chief of staff, for example, had been sent to between 48 and 55 persons, including 12 outside the EOP, and did not prohibit further distribution. *Id*. The distribution of the documents "for a non-advisory purpose" to staff outside the privilege's scope, Judge Torres held, supported finding waiver. *Id*.

Other cases have likewise found colorable arguments that Executive Branch disclosures waived the presidential communications privilege, so as to require *in camera* review measuring the disclosures against the records sought. In *ACLU II*, Judge McMahon found a colorable claim of waiver with respect to an OLC memorandum setting out the Administration's procedures for approving military action against terrorist targets abroad. 2016 WL 889739, at *1–2. She ordered *in camera* review to test the relationship between the memorandum and the act said to have waived it: the dissemination to the public of a 2½-page "fact sheet" which comprehensively set out the Administration's procedures "when deciding whether to target for killing a terrorist suspect" abroad. *Id*. at *7. In *Brennan Center for Justice v. Department of State*, Judge Gardephe found a colorable claim of waiver with respect to a State Department report discussing the designation of certain countries as subject to travel restrictions. No. 17 Civ. 7520, 2019 WL 10984173, at *5–7 (S.D.N.Y. Mar. 29, 2019). He ordered *in camera* review to test whether the Department's cable transmission to "consular outposts" of the report, and disclosures by the Administration to the public and foreign governments, barred the State Department from invoking the privilege. *Id*. at *7. And in *CAIR Connecticut*, Judge Spector assessed whether the Department of Homeland Security had waived its right to withhold a report subject to the

privilege by distributing it within the Executive Branch and "publicly disclosing information contained in" it, including to persons outside "the narrow circle of the . . . privilege." 669 F. Supp. 3d at 78. Finding the waiver claim credible and not satisfactorily rebutted, he denied the agencies' motion for summary judgment and ordered a factual hearing to determine with whom and for what purposes the report had been shared, and the extent to which the recipients qualified as close presidential advisers. *Id*. at 80–81, 96.[19]

Plaintiffs here have marshaled evidence suggesting that the Memo has been accessed within the Executive Branch, including within DOD and the military, whose legal range of motion the Memo delineated.[20] Joint Chiefs General Caine, for example, attested to Congress that "our commanders at Echelon are rigorously following that legal opinion," Gen. Caine Testimony (Apr. 30, 2026) at 3–4; SOUTHCOM Commanding General Donovan stated that the Memo had been the "legal basis" for the strikes on his watch, Gen. Donovan Testimony (Mar. 19, 2026) at 3; and DOD deputy general counsel Young stated he had "seen" the Memo, Charles

---

[19] In a related line of FOIA cases, waivers of this privilege have been found based on public statements about a document. In a case involving an advisory report generated for the White House, for example, Judge Nichols rejected a privilege claim on waiver grounds, because the President had publicly held out portions of it, by "directly quoting from and summarizing portions of it" in a proclamation, so as to undercut the "need for confidentiality." *Cause of Action Inst. v. U.S. Dep't of Com.*, 513 F. Supp. 3d 116, at 124–26, 130–31 (D.D.C. Jan. 14, 2021). Judge Nichols found a waiver of the privilege with respect to the portions of the report that the President had quoted. *Id*. at 131.

[20] Plaintiffs do not argue that the dissemination of the Memo for *in camera* review by *Congress* worked a waiver, and for good reason. Where a document has been produced to Congress, the case law has not found a waiver. *See Murphy v. Dep't of the Army*, 613 F.2d 1151, 1156 (D.C. Cir. 1979) ("[T]o the extent that Congress has reserved to itself in Section 552(c) the right to receive information not available to the general public, and actually does receive such information pursuant to that section . . . , no waiver occurs of the privileges and exemptions which are available to the executive branch under the FOIA."); *Safeway Stores Inc. v. Fed. Trade Comm'n*, 428 F. Supp. 346, 347 (D.D.C. 1977) ("Disclosure to an authorized congressional committee does not waive the exemption.").

Young Testimony (Oct. 7, 2025) at 76–77. The exposure of the Memo to persons such as operational personnel—persons "unlikely to be in a position to give advice to the President," and outside the narrow circle of Presidential advisers—would be inconsistent with the privilege. *ACLU II*, 2016 WL 889739, at *4–5.

To be sure, these statements do not resolve the extent to which the Memo has been accessed beyond the President's inner circle. Using General Caine's locution, it would be possible for a commander to "rigorously follow" the guidance in the Memo without having seen it, if, for example, its essential conclusions had been communicated by other means.

DOD's declaration addressing downstream access to the Memo, however, raises more questions than it answers. The declaration, from DOD's general counsel, Matthews, was submitted along with the agencies' reply—after issues about access to the Memo within the Executive Branch arose in summary judgment briefing. Matthews states that his responsibilities include the "oversight of the handling of highly sensitive materials including other agency's equities." Dkt. 63 ("Matthews Supp. Decl.") ¶ 1. He further states that the Memo is "a highly classified document," with portions marked "Top Secret" (TS) or as "sensitive compartmentalized information" (SCI), such that these portions can be disclosed only to persons who have "a TS/SCI security clearance" and "have a specific need to know." *Id.* ¶ 4. DOD's sole copy of the Memo, according to Matthews, is held in a secure safe in his office, and access to it "must be specifically cleared with [Matthews] or [his] immediate staff," and it has been provided only to "appropriately cleared people with a need to know," which consist of "limited senior Department and military leadership officials, or their legal counsel." *Id.* ¶ 6.[21]

[21] In status reports to the Court about the defendant agencies' searches for documents responsive to the FOIA requests here, DOD did not disclose its possession of the OLC Memo. *See* Dkt. 28 (disclosing that OLC possessed the Memo, but reporting DOD's possession, among the records

Matthews' declaration reflects solicitude for the Memo's classified status. But it does not engage with the requirements of the presidential communications privilege. And it does not enable the Court to determine whether the departmental or military personnel within DOD who have been given access to the Memo are within the "narrow diameter," *ACLU II*, 2016 WL 889739, at *4, of presidential advisers "close enough to the President to be revelatory of his deliberations," *In re Sealed Case*, 121 F.3d at 751–52, to whose communications the privilege applies.

Military commanders whom Matthews and his staff have permitted to access the Memo, for example, may fall outside that circle. The fact that a military commander has a "need to know" the legal parameters of his authority does not make him a presidential adviser. And the case law rejects that there can be no waiver where downstream distribution of a privileged memorandum was on a "need to know" basis. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26; *see also CAIR Connecticut*, 669 F. Supp. 3d at 80 ("For the privilege to apply, the *reason* that a given recipient 'needs to know' must comport with the purpose of the privilege, which is to promote candor and effective presidential decision-making." (emphasis in original)).

And, to state the obvious, there are alternative ways to educate a military commander as to the scope of his authority to initiate or conduct a boat strike other than sharing a presidentially privileged memorandum. A separate memorandum addressed to that point would suffice. If DOD has chosen to use OLC's legal memorandum to the White House as its means to communicate the necessary operational concepts to personnel outside the privilege, that act—depending on its scale and circumstances—could be found a waiver. Matthews' declaration does

---

requested, only of the President's July 28, 2025 directive); *see also* Dkts. 32, 37. The record is not clear whether DOD's earlier search failed to uncover the Memo or, if it had, why DOD did not disclose its possession of a responsive record to plaintiffs' counsel or the Court.

not enable the Court to determine the extent to which DOD has provided access to the Memo to such persons.

The Matthews declaration is even more sparse as to access by persons outside DOD. Matthews states that he has acquired information about this subject from "across the Executive Branch." Matthews Supp. Decl. ¶ 5. He states that he understands that four hard copies of the Memo (including DOD's) presently exist and that they are handled as classified. *Id.* He states that, presently, the Memo exists in hard copy only and that access to it is "limited and strictly controlled." *Id.* ¶ 5. But that is all he says about access outside of DOD. He does not state which agency or agencies house the other three hard copies. He does not state who has been given access to these copies and for what purpose. The declaration thus does not contain information enabling the Court to determine whether the persons who have accessed the Memo are within, or outside, the privilege. Nor does it explain the basis on which Matthews drew these conclusions. And its use of the present tense leaves unaddressed issues regarding the past. For example: Were there ever other hard copies of the Memo? If so, who had access to these? Was the Memo, at any earlier point, accessible by other means (*e.g.*, electronically), and if so, who accessed it by those means?

Factual supplementation of the record—as in *ACLU II*, *Brennan Center*, and *CAIR Connecticut*—is therefore necessary to enable the Court to determine whether the privilege has been waived. Specifically, the Court seeks:

1. ***The identification of all persons who have been given access to the Memo***: The Court directs defendants, in a sworn declaration or declarations, to identify, by name and title, every person who, from its creation in September 2025 to date, has had or been given access to the OLC Memo in whole or in part, the date(s) of such access, the purposes for and context in

which this access was given, and the basis on which these factual determinations have been made. Insofar as the agencies have stated that there are finite copies of the Memo and that access to them has been tightly controlled, it is reasonable to seek this information.[22]

2. **In camera *review of the OLC Memo***: Insofar as the Memo—in content and form—may shed light on its intended or actual recipients, the Court directs defendants to make the Memo available to the Court for its *in camera* review.

The Court directs defendants to file the declaration(s), and to arrange for the Memo to be available for *in camera* review, within two weeks of this decision. *See ACLU II*, 2016 WL 889739, at *6 (ordering Government, within five days, to produce document at issue and "advise the court who has received [it] (including persons who received it from its original recipients) and for what purpose"); *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 172 (D.D.C. 2011) (directing agency to "provide further explanation regarding whether it shared with non-Executive Branch entities the responsive documents that it withheld from the plaintiff"). Defendants are authorized to make appropriate redactions in the declaration as publicly filed, while filing the unredacted declaration under seal. Upon review of these materials, the Court will determine whether to commission supplemental briefing.

---

[22] Although the Court does not require such, it would welcome a supplemental declaration from Matthews amplifying the factual basis for some of his representations. The agencies put forward Matthews as their declarant regarding Memo access. But his declaration does not state (1) within DOD, who Matthews had determined had accessed the Memo since its creation and how he made that determination; and (2) outside DOD, whether Matthews had determined who had accessed the Memo since its creation, and, if so, who had done so; and, if not, the basis for his representation that access had been "limited and strictly controlled." Matthews Supp. Decl. ¶ 5.

### B. FOIA Exemptions One and Three

The agencies separately invoke Exemptions One, covering classified documents, and Three, covering information prohibited from disclosure by statute.[23] Although the parties have briefed these exemptions, the Court is deferring consideration of them until it has fully resolved the applicability of Exemption Five.

That is because applying these exemptions could impose substantial burdens on the agencies—and potentially the Court—that would be unnecessary if the agencies prevail on Exemption Five.

Applying Exemptions One and Three would require the agencies to examine the Memo to identify portions covered by these exemptions. That process is apt to be painstaking and to occupy valuable time of government officials with national security responsibilities. *See Khatchadourian v. Def. Intel. Agency*, 597 F. Supp. 3d 96, 105 (D.D.C. 2022) (agency "initiated a 10-month renewed review" of information withheld under Exemptions One and Three after being ordered to "supplement the record regarding their segregability analysis"). Plaintiffs acknowledge that portions of the Memo are likely to fall within these two exemptions.[24] And it is likely that plaintiffs would challenge the agencies' application of these exemptions, which could warrant the Court's *in camera* review of the proposed redactions, alongside government

---

[23] Exemption One permits an agency to withhold records that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and are "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1); *see also* Exec. Order No. 13,526, § 1.1(a)(1)–(4), 75 Fed. Reg. 707 (Dec. 29, 2009) (standards for classification). Exemption Three permits an agency to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3); *see also Larson*, 565 F.3d at 864. The NSA, the statute the agencies invoke here, protects "intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

[24] The parties agree that these exemptions, as applied to the Memo, will likely prove coextensive. *See* Ps' MOL at 23–25; Ds' MOL at 12.

declarations explaining the bases for these. *See* 5 U.S.C. § 552(a)(4)(B); *Tigue*, 312 F.3d at 82 (2d Cir. 2002). The need for *in camera* review is a matter entrusted to the Court's discretion, *Int'l Bhd. of Elec. Workers v. Nat'l Lab. Rels. Bd.*, 845 F.2d 1177, 1180 (2d Cir. 1988), and turns on whether an agency's statements contain sufficiently specific detail "to demonstrate that the withheld information logically falls within the claimed exemption and evidence in the record does not suggest otherwise," *Wilner*, 592 F.3d at 76.

At the same time, it is all but certain that other portions of the Memo—in particular, its presumably thoroughgoing analysis of the law governing the boat-strike program—will fall outside the exemptions. Exemption One does not cover legal analysis—*e.g.*, constitutional and statutory interpretation, evaluations of precedent, and legal conclusions—from which classified information can be segregated. *See ACLU*, 2017 WL 1155910, at *16; *N.Y. Times II*, 756 F.3d at 119–20. Such analysis can be withheld only where it is "so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts." *ACLU v. NSA*, 925 F.3d at 601 (quoting *N.Y. Times II*, 756 F.3d at 119). Exemption Three likewise is subject to the FOIA provision that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

## CONCLUSION

For the reasons above, the Court, with respect to the parties' motions for summary judgment based on FOIA Exemption Five, (1) grants plaintiffs' motion and denies defendants' motion to the extent defendants invoke the deliberative process and attorney-client privileges; and (2) reserves judgment on the parties' motions to the extent defendants invoke the presidential communications privilege, pending its review of the materials that the Court has directed herein be produced.

Within 14 days of this decision, defendants are to (1) provide the Court with the factual declaration(s) addressing the questions specified above, and (2) make the OLC Memo available for the Court's *in camera* review.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: September 30, 2026
New York, New York