**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Civil Action No. 25-10189 (PAE) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION**

Jeffrey Stein
Brett Max Kaufman
Natalie Smith (admitted pro hac vice)
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org

## TABLE OF CONTENTS


INTRODUCTION ..................................................................................................... 1

STANADARD OF REVIEW..................................................................................... 2

ARGUMENT ......................................................................................................... 2

I. The Court correctly held that distribution beyond the President's close advisors for non-advisory purposes renders the presidential communications privilege inapplicable. .................................. 2

II. The Court's directive is proper and not burdensome. .................................................... 7

III. The record demonstrates that the presidential communications privilege does not shield the OLC memo from public release. .................................. 10

CONCLUSION..................................................................................................... 12

CERTIFICATE OF COMPLIANCE......................................................................... 13

# TABLE OF AUTHORITIES

## Cases

*ACLU v. DOJ*,
2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) .................................................................. 4, 10

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025)................................................................................ 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ......................................................................................................... 8, 9

*Ctr. for Effective Gov't v. Dep't of State* (*CEG*),
7 F. Supp. 3d 16 (D.D.C. 2013)........................................................................................... 5

*Drapkin v. Mafco Consol. Group, Inc.*,
818 F. Supp. 2d 678 (S.D.N.Y. 2011) ................................................................................. 2

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ...................................................................................... 3, 4, 12

*Jud. Watch, Inc. v. DOJ*,
365 F.3d 1108 (D.C. Cir. 2004) ....................................................................................... 4, 7

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*,
560 F. Supp. 3d 810 (S.D.N.Y. 2021)............................................................................... 5, 6

*Mikol v. Barnhart*,
554 F. Supp. 2d 498 (S.D.N.Y. 2008)................................................................................... 2

*New York v. Trump*,
778 F. Supp. 3d 578 (S.D.N.Y. 2025)................................................................................... 2

*Protect Democracy Project, Inc. v. DOJ*,
2021 WL 4935540 (D.D.C. May 17, 2021) .......................................................................... 7

*SBC 2010-1, LLC v. Morton*,
552 F. App'x 9 (2d Cir. 2013) ............................................................................................. 3

*Shrader v. CSX Transp., Inc.*,
70 F.3d 255 (2d Cir. 1995) ................................................................................................. 2

*U.S. DOGE Serv. v. U.S. Dist. Ct. for D.C.*,
2026 WL 3053469 (U.S. Oct. 13, 2026) ........ 9

*United States v. Nixon*,
418 U.S. 683 (1974) ........ 3, 4, 7, 10

**Other Authorities**

Michelle D. Christensen, *Security Clearance Process: Answers to Frequently Asked Questions*,
Cong. Rsch. Serv. R43216 (Oct. 5, 2023), ........ 7

Testimony of Gen. Francis L. Donovan Before the S. Comm. on Armed Servs., 119th Cong.
(2026) ........ 11

## INTRODUCTION

After concluding that the Office of Legal Counsel memorandum ("OLC memo") at issue in this Freedom of Information Act ("FOIA") lawsuit constitutes the "effective law and policy" of the Defense Department's ("DOD's") boat strikes campaign, and thus cannot be withheld under the deliberative process and attorney-client privileges, this Court ordered Defendants to produce, for *in camera* review, information intended to inform its further analysis as to whether Defendants may continue to conceal the OLC memo with the presidential communications privilege. Op. & Order 2, ECF No. 72 ("Order"). Defendants' motion to reconsider that directive fails, for three reasons.

First, Defendants' motion rests on recycled and unsupported arguments about "the law of the presidential communications privilege." Defs.' Br. 1, ECF No. 76. Even if these arguments were fair game for reconsideration (they are not), this Court correctly rejected Defendants' limitless view of the privilege.

Second, contrary to Defendants' protestations, the Court's directive is neither burdensome nor inappropriate. Defendants' past representations about access to the memo demonstrate that compliance with the Court's directive would be straightforward. And submitting the information this Court seeks for *in camera* review would not implicate, let alone impinge on, Defendants' constitutional prerogatives.

Finally, the existing record—in particular, SOUTHCOM Commander General Francis L. Donovan's March 19, 2026, Senate testimony—definitively shows that Defendants have circulated the OLC memo well beyond the narrow circle of presidential advisors for non-advisory purposes, thus eviscerating the privilege.

Accordingly, this Court should deny Defendants' motion to reconsider its Order or, alternatively, grant Plaintiffs' cross-motion for summary judgment based on the existing record.

## STANADARD OF REVIEW

Reconsideration "is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Drapkin v. Mafco Consol. Group, Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011). A motion for reconsideration "cannot . . . be used as a vehicle for relitigating issues already decided by the Court." *New York v. Trump*, 778 F. Supp. 3d 578, 586 (S.D.N.Y. 2025) (Engelmayer, J.) (citation omitted). Reconsideration may be appropriate where a court "overlooked" material facts in the record. *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008). However, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data . . . that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

## ARGUMENT

### I. The Court correctly held that distribution beyond the President's close advisors for non-advisory purposes renders the presidential communications privilege inapplicable.

Defendants contend that the government may, consistent with the privilege, circulate a document to a limitless number of "subordinate officials" who play no role whatsoever in the process of presidential decisionmaking, so long as those officials have some "need to know" the document's contents to implement executive branch policy. Defs.' Br. 3–4. Defendants are wrong.

As a threshold matter, Defendants' motion recycles arguments that this Court previously considered and rejected. *See* Defs.' Br. 3–8. Such argumentation is "impermissible" on a motion

for reconsideration and should be ignored. *SBC 2010-1, LLC v. Morton*, 552 F. App'x 9, 12 (2d Cir. 2013).

Regardless, the Court's Order correctly explained the privilege's "purpose and scope" and rightly rejected Defendants' unbounded position. *See* Order 47–52.

First, the Court accurately described the privilege's sole purpose: to ensure that "[a] President and those who assist him" are "free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." Order 49 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). Put another way, the privilege's purpose is to protect the President's interest in "confidentiality" while engaging in "Presidential decisionmaking." Order 47; *see Nixon*, 418 U.S. at 708.

Second, the Court correctly recognized that the privilege's scope extends only as far as is necessary to achieve its sole purpose. *See In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (holding that the "privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected"). In line with that purpose, this Court recognized that communications must have *both* of two characteristics to enjoy protection under the privilege: (1) direct connection to the President or his immediate advisory circle, *and* (2) a presidential advisory purpose. *See* Order 48–49, 52. One, because the president's confidentiality interest depends on an interlocutor's "operational proximity," *id*. at 48 (citation omitted), the privilege extends "only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate," *Sealed Case*, 121 F.3d at 752. And two, because it protects only the confidentiality of "Presidential decisionmaking" (and not executive

branch decisionmaking generally), *Nixon*, 418 U.S. at 708; Order 49, it "only applies to communications that these advisers and their staff author or solicit and receive in the course of performing their function of advising the President," *Sealed Case*, 121 F.3d at 752.[1]

Third, the Court accurately explained that the privilege "is not absolute" and "can be overcome by an adequate showing of need." Order 50 (quotation marks omitted). Recognizing the privilege's qualified nature, in the FOIA context, courts reject "interpretation[s] [that] would sweep within the reach of the presidential privilege much of the functions of the executive branch . . . for ours is a democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value." *Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108, 1122 (D.C. Cir. 2004); *Sealed Case*, 121 F.3d at 752.

Finally, the Court correctly explained that a presidential communication is not privileged when used for non-advisory purposes outside the narrow circle of presidential advisors. *See* Order 50–52. The government cannot cloak documents with the privilege when they are "voluntarily revealed to third parties outside the White House." *Sealed Case*, 121 F.3d at 741–42; *ACLU v. DOJ*, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016). This is because circulation beyond "the limited circle of presidential advisers and staff" to "persons who are unlikely to be in a position to give advice to the President" is incompatible with the privilege's lone purpose: confidentiality during presidential decisionmaking. Order 51–52 (citations omitted). Accordingly, every court that has considered the question has held that, when such dissemination occurs, the privilege does not protect the document at issue. *Id*. (collecting several cases).

---

[1] While Defendants are correct that the privilege applies to pre- and post-decisional communications, any protected communications must share *both* qualifying characteristics. *See Sealed Case*, 121 F.3d at 745 (explaining that "follow-up reports" from presidential advisors are the sort of post-decisional communications that fall within the privilege).

The government does not cite a *single case* holding that it may circulate presidential communications throughout the executive branch to "subordinate officials" for non-advisory use and nonetheless maintain the privilege. *See* Defs.' Br. 3–8. That is because there is no such case. Defendants' rehashed assertion instead rests on mischaracterizing (or omitting) authority this Court analyzed in its Order. What's more, if Defendants were correct, the repercussions would be radical: the government could conceal any document that *at any time* was treated confidentially for presidential advisory purposes, even if the document, in the hands of officials far from the White House, becomes the basis for agency action or (as here) agency law. There is no support, anywhere, for that kind of extreme view of the presidential communications privilege.

Start with *Center for Effective Government v. Department of State* (*CEG*), 7 F. Supp. 3d 16 (D.D.C. 2013). Defendants claim that *CEG* is nothing more than a case about "a document that was never genuinely confidential," Defs.' Br. 5, but that is no distinction at all. When it comes to the presidential communications privilege, the analysis is the same whether conducted at the birth of a document or at the time of its later use. Indeed, Defendants offer no explanation as to why a document should remain privileged once it bears precisely the same characteristics that rendered the presidential directive unprivileged from the start in *CEG*. There, as here, "the purposes of the privilege are not furthered by protecting from public disclosure" a communication that has been "distributed beyond the President's closest advisers for non-advisory purposes." *CEG*, 7 F. Supp. at 27. And there, as here, "invocation of an amorphous 'need to know'" does not "cure the problem where there is no claim of an advisory role between the document-recipient and the President." *Id*. Defendants' position thus cannot be squared with *CEG*.

Nor is it compatible with *Knight First Amendment Institute at Columbia University v. Centers for Disease Control & Prevention*, 560 F. Supp. 3d 810 (S.D.N.Y. 2021) (discussed at

Order 57–58), which Defendants' motion simply ignores. There, the court held the privilege inapplicable to two emails authored by presidential advisors but ultimately circulated to several executive branch officials well beyond the White House, including CDC staffers who were sent the documents "for information purposes only." *Id*. at 828–30. In these circumstances, "the documents were not treated as confidential for purposes of the privilege," meaning the government could no longer invoke its protection. *Id*. at 829.

Finding no support in the case law, Defendants protest that adherence to the privilege's strictures would somehow "undermine" executive branch governance. Defs.' Br. 6. Specifically, they insist that unless a president can freely disseminate a privileged document throughout the executive branch to "implement" a presidential "decision" "through his subordinates without waiving the privilege," the purpose of the privilege would be undermined. Defs.' Br. 4; *see id.* (complaining that the Court's view of the privilege will force executive branch officials to play a "game of telephone"). But that is not remotely true. "[T]o state the obvious," a President can easily compel implementation of his *decisions*—by, for example, creating a new document for that very purpose—without disclosing the *confidential advice he received* to people outside his close advisory circle. Order 61. Even if useful, such circulation is plainly inconsistent with the purpose of the privilege (i.e., to keep presidential advice closely held), and thus abrogates it.

Further, the only concrete example Defendants can muster—an OLC lawyer who "risk[s] waiver" by subsequently reviewing a presidential advice memorandum, Defs.' Br. 6–7—reveals their concern as empty. Critically, that document would continue to enjoy protection from public disclosure under, at the very least, the deliberative process and attorney-client privileges *unless* (as here) executive branch officials affirmatively abrogated them, such as through express adoption,

*see* Order 29–30, or official acknowledgment, *see Protect Democracy Project, Inc. v. DOJ*, 2021 WL 4935540, at *2 (D.D.C. May 17, 2021).

In truth, behind Defendants' smoke screen of an "undermined" executive is a boundless understanding of presidential privilege. On Defendants' view, the government may maintain privilege over a confidential presidential advice document even after it has been circulated to every executive branch employee who has some need to know its contents. That could be dozens, hundreds, or even thousands of individuals. *Compare* Matthews Suppl. Decl. ¶ 4, ECF No. 63 (stating that the memo can "be properly disclosed to individuals who have a TS/SCI security clearance, are properly read into the relevant compartment, and have a specific need to know"), *with* Michelle D. Christensen, *Security Clearance Process: Answers to Frequently Asked Questions*, Cong. Rsch. Serv. R43216 (Oct. 5, 2023), https://www.congress.gov/crs-product/R43216 (noting that 711,404 government employees had "Top Secret" clearance as of FY 2019). That theory of presidential privilege is not just contrary to the privilege's sole purpose. *See Nixon*, 418 U.S. at 708. It would also "considerably undermine the purposes of FOIA to foster openness and accountability in government." *Jud. Watch, Inc.*, 365 F.3d at 1118. And it is especially dangerous here, where the Court has already held that FOIA (and thus Congress) does not permit the withholding of a memo that has become "effective law and policy" and thus (the presidential communications privilege aside) must be disclosed. *See* Order 33–41. Accordingly, this Court was right to reject Defendants' limitless theory of executive branch secrecy.

## II. The Court's directive is proper and not burdensome.

Defendants also seek reconsideration of this Court's directive ordering them to produce, for *in camera* review, a list of individuals who have accessed the OLC memo, when they accessed

it, and why. *See* Order 62–63; ECF No. 77. Contrary to Defendants' objections, this directive is neither burdensome nor improper. Defs.' Br. 8–11.

To start, Defendants' claim that "[i]nvestigating and preparing" this list would "substantially . . . intrude on the functioning of the executive branch," Defs.' Br. 10, cannot be squared with their insistence that access to the memo has been "strictly controlled," *id*. at 8; Watzel Decl. ¶ 24, ECF No. 52, and "limited," Matthews Suppl. Decl. ¶ 5. DOD General Counsel Matthews has represented "that only four physical copies" of the memo "are maintained across the entire Executive Branch"; that it is "maintained in hard copy rather than stored on a classified network or distributed by secure email"; and that Mr. Matthews or his immediate staff "specifically cleared" the "limited senior [DOD] and military leadership officials, or their legal counsel" who have accessed DOD's single physical copy of the memo. Matthews Suppl. Decl. ¶¶ 5–7. If access to the memo has indeed been as stringently policed as Defendants claim, it is difficult to imagine how documenting the memo's usage would be burdensome in the slightest.

Defendants' separation-of-powers argument fares no better. They claim that this Court's directive runs afoul of the principles articulated in *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367 (2004), but that case is inapposite. As the Court has already explained, *see* ECF No. 77 at 2, its directive does not impose the sort of discovery obligations that might implicate *Cheney*'s "special considerations," 542 U.S. at 385. In complying with the Court's directive, Defendants will not "bear the burden of invoking executive privilege [or] filing objections . . . with detailed precision." *Id*. at 377 (citation modified); *see also id*. at 388 (explaining that the discovery order at issue in *Cheney* would have required the Vice President to "bear the onus of critiquing the unacceptable discovery requests line by line"). Rather, the Court has expressly provided that "Defendants may submit [their] declaration(s), in whole or in part, to the

Court alone for its *in camera* review." ECF No. 77 at 2. In such circumstances, *Cheney* is irrelevant.[2]

In any event, this Court's directive is nothing like the "unbounded" discovery order at issue in *Cheney*. That order greenlit requests from plaintiffs seeking "everything under the sky" about a task force chaired by the sitting Vice President, *id*. at 387–88, which yielded "24 boxes of [potentially responsive] materials" that would have taken months of attorney time to review, *id*. at 399 n.5 (Ginsburg, J., dissenting) (quoting the government's representations). By contrast, this Court's directive "precisely identifies" and "specifically enumerates" three narrow categories of information that are directly relevant to its privilege determination. *Id*. at 387 (citation modified). And given Defendants' numerous representations indicating that they have ready access to the information sought in the directive, there is no reason to believe compliance "might distract [the executive branch] from the energetic performance of its constitutional duties." *Id*. at 382.

To be sure, the Court could, out of an abundance of caution, narrow its directive even further. For instance, recognizing that the privilege's applicability in this case turns only on the OLC memo's circulation beyond core presidential advisors, *see* Order 52, the Court could expressly relieve Defendants of the obligation to include information about "the President and other senior White House officials" in its submissions. *See* Defs.' Br. 8–9 (identifying only these officials as implicating the separation-of-powers concerns articulated in *Cheney*). That clarification would neutralize the government's separation-of-powers objections, while allowing

[2] The Supreme Court recently granted certiorari in another distinguishable case involving party discovery and *Cheney*. *See U.S. DOGE Serv. v. U.S. Dist. Ct. for D.C.*, 2026 WL 3053469 (U.S. Oct. 13, 2026).

the Court to complete its inquiry.[3] Perhaps, too, the Court need not require Defendants to produce specific officials' names—which Defendants threaten, somewhat implausibly, might themselves "be privileged or classified," Defs.' Br. 10; *cf. Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 188 n.43 (D. Mass. 2025)—but only positions or ranks. And it may be that so many officials "beyond the circle of close presidential advisors" have seen the OLC memo that the specific (as opposed to general) purposes for their review may be irrelevant. *See ACLU*, 2016 WL 889739, at *5 (holding that such "widespread dissemination . . . eviscerate[s]" the privilege).

Whatever adjustments the Court might make to its Order, though, it should reject Defendants' attempt to entirely avoid compliance with its directive based solely on a "broad, undifferentiated" interest in confidential presidential advice, *Nixon*, 418 U.S. at 706, which is not remotely tailored to the Court's limited Order providing for *in camera* review.

## III. The record demonstrates that the presidential communications privilege does not shield the OLC memo from public release.

All of that said, Plaintiffs agree with Defendants that the Court can still "decide the remaining issues in the parties' summary judgment motions on the basis of the facts in the existing record." Defs.' Br. 1. Specifically, the Court should hold that the current record establishes that Defendants have eviscerated the presidential communications privilege through dissemination of the OLC memo, without the need for additional information from the government.

General Donovan's March 19, 2026, testimony before the Senate Armed Services Committee, *see* Order 12, 34–35, 38, 59 (citing this testimony), makes this dissemination plain.

[3] While Defendants may eventually contend that certain officials outside the White House count as presidential advisors for purposes of the privilege, submitting the information required by the Court's directive will not prejudice Defendants' ability to raise such arguments.

When asked by Senator Jack Reed about "what conclusions" he had "reached" about the boat strikes campaign, General Donovan responded:

> Well, Ranking Member, before assuming command on 5 February, I actually took a number of steps. . . . First one, is I read all the legal opinions tied to these operations. Next, I read every single execute order SOUTHCOM has been given since -- well, prior to Southern Spear -- to ensure that I could link those together so when I stepped into command, I could carry out those specific strikes, if required, and if they were part of the tactical solution.[4]

Minutes later, Senator Reed and General Donovan engaged in the following exchange:

> Senator Reed: Can you indicate the chain of command above you, who is immediately above you, then all the way up to the very top[?]
>
> General Donovan: The [S]ecretary of the [W]ar [*sic*] to the President of the United States.
>
> Senator Reed: And do you have contact with the White House directly through individuals in the [W]hite House?
>
> General Donovan: No, Ranking Member Reed.[5]

This testimony establishes two critical facts. First, it demonstrates that General Donovan personally reviewed the OLC memo which, as this Court held, is the only "legal opinion" Defendants have identified concerning the boat strikes campaign. *See* Order 34. And second, it shows that General Donovan reviewed the memo *solely* "to guide operational decisions" and not "to inform presidential decision-making." *Id*. at 56. Indeed, General Donovan did not even have *contact* with anyone in the White House. In these circumstances, where a previously covered presidential communication has been circulated to at least one individual "outside the White House" who is not a presidential advisor for purposes that are avowedly non-advisory, the privilege

---

[4] Testimony of Gen. Francis L. Donovan Before the S. Comm. on Armed Servs., 119th Cong., 22:18–23:1 (2026), https://www.armed-services.senate.gov/imo/media/doc/03-19-2026_full_transcript.pdf.

[5] *Id.* at 24:3–10.

does not apply. *Sealed Case*, 121 F.3d at 741–42 (finding the privilege inapplicable to a report that was shared with a single person beyond the White House); *see also* Order 50–52.[6]

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion for consideration or, alternatively, grant Plaintiffs' cross-motion for summary judgment based on the existing record.

Dated: October 16, 2026
New York, New York

Respectfully submitted,

*/s/ Jeffrey Stein*

Jeffrey Stein
Brett Max Kaufman
Natalie Smith (admitted pro hac vice)
Ashley Gorski
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Tel: (646) 905-8904
jstein@aclu.org
bkaufman@aclu.org

Perry Grossman
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3347
pgrossman@nyclu.org

Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org

[6] The memo's circulation throughout Congress, *see* Order 14–19, also indicates that it is not a closely held presidential communication, *see* Order 48 (explaining that the president's confidentiality interest turns on "operational proximity" to the president) (citation omitted). And while Congress's review of a deliberative executive branch document does not affect its privileged character, *see* Order 59 n.20 (citing deliberative process privilege cases), such review may have different implications for the presidential communications privilege, which has a distinct purpose and scope.

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey Stein, counsel of record for Plaintiffs, certify, per Local Civil Rules 7.1(c) and 6.3, that this brief was prepared using Microsoft Word and that this word-processing program has been applied to include all text other than what Local Civil Rule 7.1(c) allows to be excluded in preparing the following word count. I further certify that this brief contains 3,491 words, as compliant with the word-count limitations set forth in the above rules.

Dated: October 16, 2026
New York, New York

*/s/ Jeffrey Stein*
Jeffrey Stein
*Counsel for Plaintiffs*