UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *and* CENTER FOR CONSTITUTIONAL RIGHTS,

Plaintiffs,

-v-

U.S. DEPARTMENT OF JUSTICE *and* DEPARTMENT OF DEFENSE,

Defendants.

25 Civ. 10189 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, United States District Judge:

This decision resolves a partial motion for reconsideration in this case, which involves a request under the Freedom of Information Act ("FOIA") for a memorandum prepared by the Office of Legal Counsel ("OLC") of the United States Department of Justice ("DOJ") (the "OLC Memo" or the "Memo") regarding the legal parameters of the Government's use of lethal drone strikes on boats allegedly engaged in narcotics trafficking.

On September 30, 2026, the Court, on summary judgment, held that the OLC Memo may be protected in its entirety by the presidential communications privilege. *See ACLU v. U.S. Dep't of Just.*, No. 25 Civ. 10189 (PAE), 2026 WL 2935347, at *27 (S.D.N.Y. Sep. 30, 2026). But, because the privilege is subject to waiver, the Court ordered DOJ and the Department of Defense ("DOD") (collectively, "defendants") to submit information for *in camera* review, to enable the Court to assess defendants' representations that access to the Memo has been limited and that the Memo has not been meaningfully disseminated beyond the President's inner circle. *Id*. at *31–33.

The Court's order thus gave defendants—assuming their representations were true—a straightforward path to victory in this litigation: submit information that, by defendants' account, was readily available and stood to support their position. The defendants now, however, ask the Court to retract that order. They argue that the presidential communications privilege is incapable of being waived by the dissemination of the Memo within the Executive Branch. And, they argue, it would offend the separation of powers for them to submit, for *in camera* judicial review, information regarding their dissemination of the Memo.

Each argument is baseless. The Court accordingly denies defendants' partial motion for reconsideration.

## I. Background

### A. The OLC Memo

On July 25, 2025, President Trump issued a directive to DOD authorizing the use of military force against "foreign criminal groups" designated as terrorist organizations. *Id*. at *2. On August 5, 2025, Secretary of Defense Pete Hegseth, pursuant to the directive, issued an "execute order" authorizing DOD to conduct lethal strikes against suspected drug-trafficking vessels, reportedly without requiring the agency to "positive[ly] identif[y] any individual" before an attack. *Id*. Beginning on September 2, 2025, DOD conducted strikes under the order in the Caribbean Sea. *Id*. It later expanded these operations to the eastern Pacific Ocean. *Id*. at *3.

On September 5, 2025, three days after the first strikes, OLC issued the Memo, which addresses the Executive Branch's legal authority to conduct these operations. *Id*. at *4. The Memo has not been publicly released, but a wide range of Executive Branch officials have publicly referenced it. *Id*. at *5–8. The Memo has also been made available to members of Congress, some of whom have criticized its legal reasoning and called for its release. *Id*. at *8–11.

Against this backdrop, on October 15, 2025, plaintiffs—a coalition of nonprofit organizations—submitted a FOIA request to DOJ and DOD seeking disclosure of the OLC Memo. *Id*. at *11. DOJ withheld the Memo in its entirety, asserting that it was exempt from disclosure under three FOIA Exemptions:

> FOIA Exemption One, [5 U.S.C.] § 552(b)(1), because it is classified; FOIA Exemption Three, [5 U.S.C.] § 552(b)(3), because it is specifically exempted from disclosure under the National Security Act, 50 U.S.C. § 3024(i)(1); and FOIA Exemption Five, 5 U.S.C. § 552(b)(5), because it is protected by the presidential communication, deliberative process, and attorney-client privileges.

*Id*. at *12. Plaintiffs brought this action challenging that withholding. *Id*.

**B. The Court's September 30, 2026 Decision**

In its September 30, 2026 decision, the Court addressed the parties' cross-motions for summary judgment. *Id*. at *34. The decision focused on Exemption Five, because defendants' arguments under it, if meritorious, could justify withholding the Memo in its entirety. *Id*. at *14.

The Court held first that the Memo is not protected by the deliberative process or the attorney-client privilege. *Id*. at *34. The Government, the Court held, had adopted the OLC Memo as its "working law" by treating the Memo as its effective law and policy governing the boat strikes. *Id*. at *17–21, *23–24. Under the working law doctrine, an agency may not "promulgate[] a body of secret law" that it is "actually applying" but "attempting to protect behind a label," *N.Y. Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 493 (2d Cir. 2019), and doing so abrogates the deliberative process and attorney-client privileges. *See ACLU*, 2026 WL 2935347, at *17–21, *23–24.

The Court next held that, although the Memo, as prepared, was protected by the presidential communications privilege, the existing record is insufficient to determine whether the Memo remains privileged. *Id*. at *32. Citing a wide body of precedent, the Court explained that "the privilege is subject to waiver," and may be overcome where the privileged material has

been “disseminate[d] or voluntarily disclose[d]” “to persons beyond the limited circle of presidential advisers and staff” for purposes other than to inform presidential decision-making. *Id*. at *26–30 (citations omitted). Plaintiffs had marshaled evidence, including testimony from the chairman of the Joint Chiefs of Staff, that the Memo had been accessed within the Executive Branch, including within DOD and the military. *Id*. at *31. But that evidence, the Court concluded, did not “resolve the extent to which the Memo has been accessed beyond the President’s inner circle.” *Id*. Defendants, for their part, had responded with a declaration from DOD’s general counsel, Earl G. Matthews. *Id*. He attested that DOD’s copy of the Memo had been accessed only by “appropriately cleared people with a need to know,” consisting of “limited senior Department and military leadership officials, or their legal counsel.” *Id*. But, as the Court observed, Matthews’ declaration “raise[d] more questions than it answer[ed].” *Id*. It did not “enable the Court to determine whether the departmental or military personnel within DOD” with whom the Memo had been shared “are within the ‘narrow diameter’ of presidential advisers ‘close enough to the President to be revelatory of his deliberations’ to whose communications the privilege applies,” or whether the Government had circulated the Memo for other purposes, such as to communicate operational concepts to military personnel. *Id*. at *31–32 (quoting, *inter alia*, *In re Sealed Case*, 121 F.3d 729, 756 (D.C. Cir. 1997)). And Matthews’ declaration did not shed light on the extent to which other copies of the Memo had been accessed by persons outside the scope of the privilege. *Id*. at *32. Instead, as to persons “outside DOD,” Matthews had stated only, in general and conclusory terms, that such access has been “limited and strictly controlled.” *Id*.

Accordingly, the Court directed defendants, within 14 days, to submit a sworn declaration or declarations for the Court’s *in camera* review. The declaration(s) were to:

> [I]dentify, by name and title, every person who, from its creation in September 2025 to date, has had or been given access to the OLC Memo in whole or in part, the date(s) of such access, the purposes for and context in which this access was given, and the basis on which these factual determinations have been made.

*Id*. The Court also invited, but did not require, Matthews to submit a supplemental declaration amplifying on the factual basis for his representations. *Id*. at *32 n.22. The Court made clear that "[d]efendants are authorized to make appropriate redactions in the declaration as publicly filed, while filing the unredacted declaration under seal." *Id*. at *33. It also stated that it would, upon review of the requested information, "determine whether to commission supplemental briefing." *Id*.[1]

### C. Defendants' Partial Motion for Reconsideration

On October 8, 2026, defendants moved for partial reconsideration. Dkt. 76 ("Mot."). They asked the Court to reconsider its order directing submission of the sworn declaration(s), and to stay that order pending resolution of the motion and, if the motion is denied, for at least seven days thereafter. *Id*. at 11.

That day, the Court granted the motion for a stay, to "permit orderly consideration of the motion for reconsideration." Dkt. 77 at 2. It noted, however, that, in the memorandum of law defendants submitted in support of their motion, defendants "appear[ed]" to have erroneously "construe[d] the September 30, 2026 Order to require defendants to disclose the requested information to plaintiffs or the public." *Id*. "For the avoidance of doubt," the Court stated, "[d]efendants may submit the declaration(s), in whole or in part, to the Court alone for its *in camera* review." *Id*. The Court advised defendants to "be prepared, in the event that the Court

[1] The Court also ordered that defendants submit the Memo itself for *in camera* review. *Id*. at *32. Defendants have since done so. Dkt. 79.

denies the motion for reconsideration, to fully comply with" the Court's request "within 14 days of such a denial." *Id.*

On October 16, 2026, plaintiffs filed a response opposing defendants' motion. Dkt. 78. On October 21, 2026, defendants replied. Dkt. 80 ("Reply").

## II. Applicable Legal Standards

A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (cleaned up). Put differently, its purpose is not to "reargue those issues already considered when a party does not like the way the original motion was resolved." *SEC v. Neto*, 27 F. Supp. 3d 434, 439 (S.D.N.Y. 2014) (*quoting In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 387 (S.D.N.Y. 2011)).

Accordingly, the standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Reconsideration is appropriate "only when the [movant] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (cleaned up).

## III. Discussion

Defendants make two arguments in support of partial reconsideration. First, they argue that the information that the Court has ordered them to disclose cannot establish a waiver of the presidential communications privilege. Mot. at 3–8. Second, they argue that producing a sworn

declaration for the Court's *in camera* review would violate the separation of powers. *Id*. at 8–11. Neither argument has purchase.

### A. Defendants' Claim that Waiver Is Impossible

Defendants argue that it is legally impossible for a waiver of the presidential communications privilege to be found in this case. *Id*. at 3.

To the extent defendants suggest that a waiver by dissemination of materials covered by the privilege is unavailable as a matter of law, that is wrong. As the Court's decision reviewed, the case law uniformly holds that the privilege is subject to waiver, including where privileged materials have been disclosed to third parties outside the limited circle of presidential advisers and staff whose communications the privilege protects. *See ACLU*, 2026 WL 2935347, at *27; *see also In re Sealed Case*, 121 F.3d at 741–42; *Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 827–28 (S.D.N.Y. 2021) ("*Knight*"); *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 24 (D.D.C. 2013) ("*Ctr. for Effective Gov't*"); *ACLU v. Dep't of Just.*, No. 15 Civ. 1954, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016). That is because the disclosure of privileged presidential materials to persons outside that circle is at odds with "the purposes that animate the privilege: the promotion of candor and effective presidential decision-making" and the continued protection of "[t]he President's confidentiality interest." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26–29. There is no contrary authority. And defendants' reply brief concedes the point. *See* Reply at 3.[2]

[2] That understanding is also shared by OLC, which recently acknowledged that the presidential communications privilege "can be waived." Applicability of Executive Privilege to Presidential Communications with Private Advisers, 50 Op. O.L.C. (Aug. 10, 2026) (slip op. at 19–20) (collecting cases and OLC opinions), https://www.justice.gov/olc/media/1457271/dl [https://perma.cc/4LE9-YQ4U].

To the extent defendants argue that a waiver cannot have occurred with respect to the OLC Memo, that argument is both wrong and premature.

Defendants argue that the dissemination *within* the Executive Branch of a presidentially privileged memo is categorically incapable of working a waiver. Alternatively, they argue, the dissemination of a memo on a confidential basis within the Executive Branch cannot work a waiver. *See* Mot. at 6; Reply at 3. But defendants have not pointed to any case that comes close to supporting either proposition. And defendants' bid for a rule that would allow officials to circulate, waiver-free, a presidential communication within the Executive Branch is at odds with a uniform body of case law emphasizing the privilege's narrow contours. These include the D.C. Circuit's decision in *In re Sealed Case*, which comprehensively reviewed the privilege's purpose and scope. In agreeing that the privilege extended to discussions among presidential advisers that were not made directly to the President, the D.C. Circuit emphasized the need to tightly cabin this principle:

> We are aware that such an extension, unless carefully circumscribed to accomplish the purposes of the privilege, could pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President. In order to limit this risk, the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected. Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege. In particular, the privilege should not extend to staff outside the White House in executive branch agencies. Instead, the privilege should apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate. Only communications at that level are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers.

121 F.3d at 752 (citation omitted); *see also ACLU v. Dep't of Def.*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020); *ACLU*, 2016 WL 889739, at *4; *Knight*, 560 F. Supp. 3d at 829.

A bright-line rule that even wide downstream dissemination within the Executive Branch of a President's privileged presidential communications could not effect a waiver would be inconsistent with the privilege's narrow parameters. *See In re Sealed Case*, 121 F.3d at 741 (recognizing that voluntary disclosure of presidentially privileged communications "waives th[o]se privileges for the document or information specifically released" (collecting cases)). It would also be inconsistent with cases finding waivers of the presidential communications privilege by the dissemination of documents within the Executive Branch, *see, e.g.*, *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 20–29 (privilege waived by dissemination of presidentially privileged communication to more than 30 persons in Executive Branch, including "senior foreign policy advisors, cabinet officials, and agency heads"); *Knight*, 560 F. Supp. 3d at 828–30 (privilege waived by dissemination of presidentially privileged email to Executive Branch officials outside White House), and holding that imposing "need to know" restrictions on downstream Executive Branch recipients did not insulate against a waiver based on such dissemination, *see, e.g.*, *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26; *Council on Am.-Islamic Rels. – Connecticut v. U.S. Citizenship & Immigr. Servs.*, 669 F. Supp. 3d 64, 80 (D. Conn. 2023).

As for defendants' claim that it is "legally mistaken," Mot. at 3, that dissemination of the OLC Memo to personnel involved in the drone-strike program, no matter how many and how far afield these recipients were from presidential decision-making, could ever effect a waiver, it is unsupported by any case law. And defendants' suggestion that it was necessary for military personnel in the field to receive the OLC Memo to assure the "efficacy" of presidential decision-making, *id*. at 6, is not logically sound. As the Court put the point in its September 30, 2026 decision: "[T]here are alternative ways to educate a military commander as to the scope of his

authority to initiate or conduct a boat strike other than sharing a presidentially privileged memorandum. A separate memorandum directed to that point would suffice." *ACLU*, 2026 WL 2935347, at *32.

Defendants' argument is also premature. Mindful that waiver of this privilege "should not be lightly inferred," *In re Sealed Case*, 121 F.3d at 741, courts regularly commission *ex parte* proceedings to test the scale and nature of the dissemination before finding waiver. *See ACLU*, 2026 WL 2935347, at *30 (synopsizing cases). And, after *in camera* review of the information solicited from the Government, courts have not hesitated to reject claims of waiver. *See, e.g.*, *Brennan Ctr. for Just. v. U.S. Dep't of State*, No. 17 Civ. 7520, 2025 WL 753870, at *11–12 (S.D.N.Y. Mar. 10, 2025). Such may prove the case here. After its *in camera* review of defendants' declaration(s)—and such follow-on inquiries as these may occasion—the Court may or may not find a waiver. And, in the event defendants are dissatisfied with the Court's ruling, they will have an opportunity to seek reconsideration or appellate review.

The Court accordingly rejects defendants' argument that, no matter what the agencies' factual declaration(s) will reveal, it is impossible for them to reveal facts that would establish or support a waiver. That argument does not supply a viable basis for reconsideration. This ruling is without prejudice to defendants' right to submit, along with the declaration(s), a memorandum of law arguing that the assembled evidence including the declaration(s) does not make out a waiver.

### B. Defendants' Claim that the Court's Order Seeking Information Offends the Separation of Powers

Defendants separately argue that the Court's order requiring a declaration that identifies the persons who have been given access to the OLC Memo since its creation and the purpose for which each was given access would offend the separation of powers, because it would impose an

"inappropriate[] burden" on "the President, White House, and executive branch," including "the National Security Council and White House Counsel's Office staff." Mot. at 8, 10. Defendants do not claim that it would be impossible to comply with the order. *See* Reply at 4 (Executive Branch's ability to comply with the Court's order "is beside the point").

To the extent that defendants imply that the Court's order is out of the ordinary, they are wrong. Courts overseeing civil litigation, including in cases under FOIA, have long directed the Executive Branch to obtain and furnish information for their *in camera* review. *See, e.g.*, *Halperin v. Cent. Intel. Agency*, 446 F. Supp. 661, 664 (D.D.C. 1978) ("[T]he Court ordered defendants to explain fully the number of [human intelligence] sources involved and which information each had supplied[,] . . . [and] it would be permissible for defendants to file an appropriate explanatory affidavit under seal for in camera inspection."); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 150 (1989) ("The District Court ordered the Government to prepare a *Vaughn* Index and to answer the interrogatories. It ordered *sua sponte*, however, that this material be submitted to the court for examination *in camera* rather than be given directly to the [opposing party]."); *Pub. Educ. Ctr., Inc. v. Dep't of Def.*, 905 F. Supp. 19, 21 (D.D.C. 1995) ("[T]he Court ordered [DOD] to 'submit for *in camera* review a supplemental declaration from an individual with personal knowledge that sets forth explicitly, and in non-conclusory terms, the exact rationale for nondisclosure of each tape segment withheld.'"); *Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279, 295 (2d Cir. 1999) ("[T]he district court will have a number of options for eliciting further detail from the government. It may require supplemental *Vaughn* affidavits . . . for *in camera* review, particularly if the government holds fast to its view that revealing any greater specificity in open court could compromise national security."); *cf. United States v. Graf*, 784 F.3d 1, 4–5 (1st Cir. 2015) ("[T]he judge ordered the government to . . .

investigate this matter . . . [and] file an *in camera* report addressing whether [an unnamed informant] in [a] warrant application is an ascertainable individual with [certain] history and 'pedigree.'").

Such requests are familiar in the specific context of FOIA Exemption Five. To determine whether a privilege within the scope of that exemption applies, courts have long relied upon information they directed the Executive Branch to obtain and furnish. *See, e.g.*, *ACLU*, 2016 WL 889739, at *1, *6 (directing Government, within "five business days," to "advise the court of who has received" the withheld document—"a classified (at the TOP SECRET level), confidential communication from the President to certain Executive Branch Agency and department heads"—"including persons who received it from its original recipients," and "for what purpose"); *see also Elec. Frontier Found. v. Dep't of Just.*, 826 F. Supp. 2d 157, 172 (D.D.C. 2011) (directing Government to "provide further explanation regarding whether it shared with non-Executive Branch entities the responsive documents that it withheld from the plaintiff").

There is good reason for this line of cases. "Judicial control" over a case "cannot be abdicated to the caprice of executive officers." *United States v. Reynolds*, 345 U.S. 1, 9–10 (1953); *see also United States v. Nixon*, 418 U.S. 683, 688, 707 (1974) (affirming court order requiring *in camera* review of "certain tapes, memoranda, papers, transcripts or other writings relating to certain precisely identified meetings between the President and others," in service of the "legitimate needs of the judicial process"). Absent factual information only the Executive Branch can uncover, judicial review is sometimes "not possible," and, in the context of FOIA litigation, "the adversary process envisioned" by Congress "cannot function." *Halpern*, 181 F.3d at 295. Far from offending the separation of powers principle, a court-imposed information-

gathering obligation on the Executive Branch is familiar as a means to test the viability of a FOIA exemption invoked by the Executive Branch. And where the exemption the Executive Branch invokes is Exemption Five and rests on the presidential communications privilege, some pertinent information may come from the White House.

Defendants contend that the Court's order contravenes *Cheney v. United States District Court*, 542 U.S. 367 (2004), in that it imposes "inappropriate discovery obligations" which "could 'distract [the executive branch] from the energetic performance of its constitutional duties.'" Mot. at 9. *Cheney* is inapposite. It involved a broad-ranging civil litigation discovery demand, comprising many document requests, which effectively obliged the Vice President and other senior officials to "bear the onus of critiquing the unacceptable discovery requests line by line." 542 U.S. at 388. The case thus involved "special considerations" which, the Supreme Court held, would justify a court, even without the invocation of executive privilege, to modify overly broad discovery requests. *Id*. at 385, 389–90.

*Cheney* does not bear any resemblance to this case. The Court's order here involves a single document: the OLC Memo. And it seeks merely the identification of persons who—after the Memo issued on September 5, 2025—accessed it and the purpose for and date of that access. *See ACLU*, 2026 WL 2935347, at *33. The order is thus tightly tailored to the legal inquiry necessitated by *defendants'* invocation of the presidential communications privilege: To what extent and for what purposes has the Memo been accessed by persons outside the narrow scope of the privilege? And that inquiry, in turn, is necessitated by public statements by Executive Branch officials, chronicled in the Court's September 30, 2026 decision, indicating that the Memo has been shared with persons who appear to be outside that privilege. *See id*. at *31.

Defendants have not supplied any factual basis on which to conclude that assembling this finite data set would meaningfully occupy the time of any senior official, whether of the White House, the National Security Council, or either defendant agency. Conclusory assertions aside, defendants have not offered any reason to believe that the limited fact-gathering occasioned by the Court's order would approach—in scale, time, rigor, or factual or legal complexity—the exercises routinely occasioned in FOIA cases, in which the Executive Branch is called upon to collect, analyze, sort, log, redact, and produce formidable volumes of official records. *See, e.g.*, *Armstrong v. Exec. Off. of President*, 830 F. Supp. 19, 21–24 (D.D.C. 1993) (ordering Executive Office of the President to prepare a *Vaughn* index for "457 notelogs and 1,046 other documents" within 35 days); *Ctr. for Biological Diversity v. Off. of Mgmt. & Budget*, 625 F. Supp. 2d 885, 888, 894 (N.D. Cal. 2009) (ordering Office of Management and Budget within Executive Office of the President to prepare a "more particularized *Vaughn* Index" and supplemental declarations concerning withholdings in "[a]pproximately 822 documents"); *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 559 F. Supp. 2d 9, 13 (D.D.C. 2008) (ordering general counsel of Office of Administration within Executive Office of the President to submit a declaration "respond[ing] to factual questions the Court posed during a . . . telephone conference"), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009).

Indeed, in a declaration defendants took the initiative to submit, they have represented that they have already undertaken *much of this very inquiry*. In his supplemental declaration in support of defendants' motion for summary judgment, DOD general counsel Matthews attested under penalty of perjury that he has determined there are only four copies of the OLC Memo, that DOD's copy has been "provided only" to "limited senior Department and military leadership officials," and that access to the other three copies of the Memorandum is likewise "limited and

strictly controlled." Dkt. 63 ¶¶ 5–7. To be sure, as the Court has noted, Matthews' declaration is problematic for a number of reasons: It is vague and conclusory; it does not set out the basis for his knowledge, it is written largely in the present tense in a manner that obscures whether there were ever earlier additional copies of the Memo that no longer exist; it does not enable the Court to quantify access to the Memo by persons inside or outside of DOD; and it does not enable the Court to assess whether the persons who have accessed the Memo fall within or outside the privilege and, if not, for what purpose they were given access. *See ACLU*, 2026 WL 2935347, at *31–32. But taking Matthews at his word, the exercise occasioned by the Court's order was one that he undertook or commenced to undertake. Tellingly, despite having furnished the Matthews supplemental declaration on their own initiative, defendants have not supplied the Court with any factual substantiation of their claim that the declaration the Court has ordered be produced would impose a meaningful burden on any senior official. *Contrast Cheney*, 542 U.S. at 387–88 (describing discovery order as requiring production of "everything under the sky" about the Vice President's task force).

The Court accordingly rejects defendants' alternative argument for reconsideration: that compliance with the Court's order would substantially burden senior Government officials.

The Court does, however, narrow the order in its September 30, 2026 decision, in a manner that will streamline the information sought. It is not necessary for the defendants' declaration(s) to list, among the persons given access to the OLC Memo, (1) the President, (2) the Vice President, (3) the National Security Advisor and his staff, (4) any lawyer at the White House Counsel's Office, or (5) any lawyer at OLC. Based on the declaration of OLC special counsel Ryan Watzel, the Court agrees that such persons are within the circle of presidential

advisers whose communications are covered by the presidential communications privilege. *See* Dkt. 52 ¶¶ 17, 18, 22.

## CONCLUSION

For the reasons above, the Court denies defendants' partial motion for reconsideration, Dkt. 75. The Court lifts the administrative stay it entered on October 8, 2026, Dkt. 77, pending resolution of that motion.

Defendants shall file, for the Court's *in camera* review, a declaration or declarations in compliance with the Court's September 30, 2026 decision, as narrowed herein, within 14 days of the issuance of this order. *See ACLU*, 2026 WL 2935347, at *32; *see also* Dkt. 77 at 2.[3] For the avoidance of doubt, the filing of a notice of appeal will not stay this order, which will remain in effect unless and until stayed by this or a higher court.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: October 27, 2026
New York, New York

---

[3] As explained *supra* Part III.A, defendants are authorized to file, contemporaneous with the declaration(s), a separate memorandum of law setting out their views as to the applicability of the privilege in light of the information in the declaration(s). Defendants are authorized to publicly file this memorandum in redacted form. Any response from plaintiffs is due one week later.

The Court also invites defendants, by separate *ex parte* letter, to alert the Court to any sensitivities of which it ought to be aware with respect to potential citations to the declaration(s).